**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REVEREND PATRICK J. MAHONEY,

       *Plaintiff*,

  v.

THE UNITED STATES CAPITOL POLICE
BOARD, in its Official Capacity; KAREN H.
GIBSON, in her Official Capacity as U.S.
Senate Sergeant at Arms and Doorkeeper and
Chair, Capitol Police Board; WILLIAM J.
WALKER, in his Official Capacity as U.S.
House of Representatives Sergeant at Arms and
Member, Capitol Police Board; J. BRETT
BLANTON, in his Official Capacity as
Architect of the Capitol and Member, Capitol
Police Board; J. THOMAS MANGER, in his
Official Capacity as Chief of Police, Capitol
Police, and Ex-Officio Member, Capitol Police
Board, and JOHN DOEs 1-5, in their Official
and Individual Capacities,

       *Defendants*.

Case No. _____

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

1

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

    I.    REGULATIONS THAT GOVERN DEMONSTRATION ACTIVITY AT THE UNITED STATES CAPITOL ....................................................................................................... 2

    II.    THE AFTERMATH OF JANUARY 6, 2021 ...................................................... 7

    III.    THE BOARD FAILS TO GRANT REV. MAHONEY'S A PERMIT TO CONDUCT A PRAYER VIGIL ......................................................................................................... 8

ARGUMENT ................................................................................................................ 11

    I.    REV. MAHONEY IS LIKELY TO SUCCEED ON THE MERITS ................................. 11

        A.    The Government has violated Rev. Mahoney's rights to freedom of speech, association, and assembly. ........................................................................................ 11

        B.    The Government has violated Rev. Mahoney's rights to religious exercise ............. 19

        1.    The Government has violated Rev. Mahoney's rights of equal protection ............... 22

    II.    REV. MAHONEY WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A TRO ............................................................................................................................ 23

    III.    THE BALANCE OF HARMS TIPS IN REV. MAHONEY'S FAVOR ...................... 23

    IV.    THE TRO IS IN THE PUBLIC INTEREST ................................................. 24

CONCLUSION............................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Bantam Books, Inc. v. Sullivan*,

   372 U.S. 58 (1963)................................................................................................... 12

*Boos v. Berry*,

   485 U.S. 312 (1988)................................................................................................. 16

*Burwell v. Hobby Lobby Stores, Inc.*,

   573 U.S. 682 (2014)................................................................................................. 20

*Carey v. Brown*,

   447 U.S. 455 (1980)................................................................................................. 22

*Chaplaincy of Full Gospel Churches v. England*,

   454 F.3d 290 (D.C. Cir. 2006).................................................................................. 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,

   508 U.S. 520 (1993)......................................................................................... 20, 21, 23

*City of Lakewood v. Plain Dealer Publishing Co.*,

   486 U.S. 750 (1988)........................................................................................... 12, 15

*Cmty. for Creative Non-Violence v. Kerrigan*,

   865 F.2d 382 (D.C. Cir. 1989)................................................................................... 3

*Cmty. for Creative Non-Violence v. Turner*,

   893 F.2d 1387 (D.C. Cir. 1990)............................................................................. 3, 12

*Doe v. Mattis*,

   928 F.3d 1 (D.C. Cir. 2019)...................................................................................... 11

*Flippin v. U.S. Dep't of Interior*,

No. CV 19-1221 (BAH), 2019 WL 7372669, at *1 (D.D.C. Dec. 31, 2019). ............................ 7

*\*Freedman v. Maryland*,

380 U.S. 51 (1965)................................................................................................ 12

*Grayned v. City of Rockford*,

408 U.S. 104 (1972) .............................................................................................. 15

*\*Jeannette Rankin Brigade v. Chief of Capitol Police*,

342 F. Supp. 575 (D.D.C. 1972) ...................................................................... 16, 17

*\*Lederman v. United States*,

291 F.3d 36, 39 (D.C. Cir. 2002) ......................................................... 2, 16, 17, 18

*Mahoney v. Pelosi, et al.*,

No. 1:21-cv-00859 (D.D.C. Mar. 30, 2021) ......................................................... 5, 7

*Morgan Stanley DW Inc. v. Rothe*,

150 F. Supp 2d 67 (D.D.C. 2001) ........................................................................... 11

*NAACP v. Alabama*,

357 US. 449 (1958)................................................................................................ 11

*\*Niemotko v. State of Maryland*,

340 U.S. 268 (1951)..................................................................................... 13, 14, 22

*\*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

460 U.S. 37 (1983)................................................................................................ 16

*Police Dep't of Chicago v. Mosley*,

408 U.S. 92 (1972)................................................................................................ 13

*Reno v. American Civil Liberties Union*,

    521 U.S. 844 (1997) ................................................................................ 15

*Roman Cath. Diocese of Brooklyn v. Cuomo*,

    ___ U.S. ___, 141 S. Ct. 63 (2020) ........................................................ 21

*\*Saia v. People of State of New York,*

    334 U.S. 558 (1948) ................................................................................ 15

*\*Shuttlesworth v. Birmingham,*

    394 U.S. 147 (1969) ................................................................................ 13

*Southeastern Promotions, Ltd. v. Conrad*,

    420 U.S. 546 (1975) ................................................................................ 12

*Tandon v. Newsom,*

    , ___ U. S. ___, 141 S.Ct. 1294 (2021) .................................................. 21

*Thomas v. Chicago Park Dist.*,

    534 U.S. 316 (2002) ................................................................................ 15

*Thomas v. Review Bd. of Indiana Employment Security Div.*,

    450 U.S. 707 (1981) ................................................................................ 21

*\*U.S. v. Grace*,

    461 U.S. 171 (1983) .......................................................................... 16, 17

*Whitney v. California*,

    274 U.S. 357 (1927) ................................................................................ 11

*Wisconsin v. Yoder*,

    406 U.S. 205 (1972) ................................................................................ 20

**Statutes**

2 U.S.C. § 1967(a)(4).............................................................................................. 6

2 U.S.C. § 1969(a) .................................................................................................. 3

40 U.S.C. § 193f(b)(4)-(5) ..................................................................................... 18

40 U.S.C. § 212b(a). ............................................................................................... 3

40 U.S.C. § 5104(e)(2)(D) ..................................................................................... 18

42 U.S.C. § 2000bb *et seq.*................................................................................... 19

42 U.S.C. § 2000bb-1 ............................................................................................. 22

42 U.S.C. § 2000bb-2(2)......................................................................................... 22

D.C. Code § 22-1307 ............................................................................................... 6

D.C. Code § 22-1307(a)(1)(D), (2)......................................................................... 6

D.C. Code § 22-1307(b)(1) ..................................................................................... 6

D.C. Code § 22-3571.01 ......................................................................................... 6

D.C. Code § 22-1307 ............................................................................................... 6

**Other Authorities**

TRAFFIC REGULATIONS FOR THE UNITED STATES CAPITOL GROUNDS

CTR § 12............................................................................................................... 3

CTR § 12.1.10........................................................................................................ 3

CTR § 12.2.20.................................................................................................... 4, 6

CTR § 12.3.10........................................................................................................ 5

CTR § 12.4.10........................................................................................................ 5

CTR § 12.4.20........................................................................................................ 5

Religious Freedom Restoration Act ("RFRA") .................................................. 19

**Constitutional Provisions**

U.S. Const. amend. I .................................................................................................... passim

U.S. Const. amend. X ................................................................................................. 15, 22

U.S. Const. amend. XIV .................................................................................................. 22

# INTRODUCTION

The Government's refusal to issue a permit to Plaintiff Reverend Patrick J. Mahoney ("Rev. Mahoney") to hold a prayer vigil on the United States Capitol Grounds is unlawful and must end immediately.  Rev. Mahoney, an ordained Presbyterian Minister, duly applied for the permit under the applicable regulations, seeking to hold the vigil on the Western Front Lawn of the Capitol Grounds on September 11, 2021—the twentieth anniversary of the September 11, 2001 terrorists attacks in New York, Washington, DC, and Pennsylvania.  Consistent with his religious views, the purpose of the vigil was to "ask[] God to protect and watch over America and bring healing to our world and build bridges to our Muslim neighbors."

While the Government has permitted other events on the Capitol Grounds over the past several weeks—including at least one event on the Western Front Lawn—it failed to grant Rev. Mahoney's permit application to hold his proposed prayer vigil without meaningful explanation, other than to say the Western Front Lawn was "closed."  This justification, however, is simply not true.  Although the Western Front Lawn was "closed" after the events of January 6, 2021, the fence closing the Western Front Lawn was removed in July 2021.  In any event, the Government's permitting regime, which clearly acts as a prior restraint on speech, is impermissible because the Government has not demonstrated that it applied "narrow, objective, and definite" criteria to guide its decision not to issue Rev. Mahoney a permit.  Moreover, even taking the Government at its word that the Western Front Lawn is "closed," the Government has impermissibly created a no-speech zone around the perimeter of the Capitol, an outcome that is not narrowly tailored to any significant governmental interest.  Thus, the Government has violated Rev. Mahoney's rights to free speech, assembly, and association under the First Amendment.

In addition to violating Rev. Mahoney's free speech rights, the Government has also violated his rights to religious freedom and equal protection of the laws. Refusing to grant Rev. Mahoney a permit to hold a prayer vigil on the Western Front Lawn while permitting other, non-religious activities at the *exact same location* mere weeks ago is discriminatory against Rev. Mahoney and is without any legitimate justification.

Rev. Mahoney respectfully requests that this Court issue a temporary restraining order precluding the Government from failing to grant him a permit to hold his prayer vigil on September 11, 2021, on the Western Front Lawn of the Capitol. Further, to allow Rev. Mahoney sufficient time to plan and execute the vigil, he respectfully requests that the Court resolve his application for a temporary restraining order by September 9, 2021.

## FACTUAL BACKGROUND

A discussion of the background regulations applicable on the United States Capitol Grounds, followed by a discussion of the Government's response to the events of January 6, 2021, will be helpful to providing context to the Government's failure to grant Rev. Mahoney's permit to conduct a prayer vigil on September 11, 2021.

## I.    REGULATIONS THAT GOVERN DEMONSTRATION ACTIVITY AT THE UNITED STATES CAPITOL

"The United States Capitol Grounds extend from Union Station in the North to Virginia Avenue in the South, and from Second Street Northeast to Third Streets North- and Southwest." *Lederman v. United States*, 291 F.3d 36, 39 (D.C. Cir. 2002). The Capitol Grounds "encompass the Capitol itself as well as House and Senate office buildings, [other buildings], and public open space." *Id.*

The United States Capitol Police Board (the "Board") is charged with regulating "movement of all vehicular and other traffic . . . within the . . . Capitol Grounds." 2 U.S.C. § 1969(a) (formerly 40 U.S.C. § 212b(a)). The Board's statutory authority "is limited to the regulation of traffic." *Cmty. for Creative Non-Violence v. Kerrigan*, 865 F.2d 382, 385 (D.C. Cir. 1989). Accordingly, a "regulation is not within the Board's authority unless it is reasonably related to traffic-related interests." *Id.* Pursuant to its statutory authority, the Board promulgated the TRAFFIC REGULATIONS FOR THE UNITED STATES CAPITOL GROUNDS, as amended February 17, 2019. (Declaration of Patrick J. Mahoney ¶ 11, attached hereto as Exhibit A; CTR, attached hereto as Exhibit B.[1])

Among other things, the CTR regulates "Demonstrations and Special Events." (CTR § 12.) Pursuant to the CTR, "[d]emonstration activity[2] is allowed [only] in designated areas as indicated on the 'United States Capitol Grounds Demonstration Area Map'" (the "Demonstration Area Map"). (*Id.* § 12.2.10 and Appx. G.) The CTR and the Demonstration Area Map designate certain areas of the Capitol Grounds as "No Demonstration Permitted" areas—*i.e.*, areas in which all demonstration activity is prohibited, no matter how large or small the group that wishes to perform demonstration activity. (*Id.* § 12.2.10 and Appx. G.) These areas include, but are not limited to, an approximately 50-yard buffer zone on all sides of the Capitol building itself. (*Id.* § 12.2.10 and Appx. G.) The CTR and Demonstration Area Map designate other areas of the Capitol

---

[1] The CTR is available on the webpage of the United States Capitol Police, at https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/US%20Capitol%20Grounds%20Traffic%20Regulations_Amended%20February%202019_0.pdf, last visited on August 30, 2021.

[2] "Demonstration activity" is defined as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." CTR § 12.1.10.

grounds as "Demonstration Permit Area[s]"—*i.e.*, areas in which demonstration activity is allowed, subject to the permitting requirements set forth in more detail below.

As relevant here, the Western Front Lawn, which is delineated on the Demonstration Area Map as "Area 1," is a "Demonstration Permit Area." (*Id.* Appx. G.) Thus, according to the CTR and Demonstration Area Map, demonstration activity may occur in the Western Front Lawn. For the Court's convenience, a screen shot of the Demonstration Area Map follows:



(*See also id.* Appx. G.)

The CTR also provides that "[n]o person or group of any size may engage in demonstration activity on the steps of the United States Capitol, on the steps of any building on Capitol Grounds or in any area otherwise closed or restricted for official use." (*Id.* § 12.2.20.) The areas that may be "closed" or "restricted for official use" are broader than the areas designated "No Demonstration Permitted" on the Demonstration Area Map. In other words, the areas designated "No

4

Demonstration Permitted" on the Demonstration Area Map are permanently closed (or, at least, have been closed since December 5, 2012, the effective date of the Demonstration Area Map), while additional areas may be "closed" or "restricted for official use" on a temporary basis. (*Id.*)

The Board determined which areas on the Demonstration Area Map were designated "No Demonstration Permitted" and which were designated "Demonstration Permit Area[s]." (*See* Declaration of Scott Grossi, attached hereto as Exhibit C.[3]) Further, the Board determines which areas of the Capitol Grounds should be "closed" or "restricted for official use" on a temporary basis. (*Id.*) The CTR does not set forth any standards from which the Board was to make these determinations in the past or is to make these determinations going forward.

The CTR requires certain groups of people visiting the Capitol Grounds to obtain a permit. Specifically, groups of twenty (20) people or more who wish to engage in "demonstration activity" are required to obtain a permit to do so. (*Id.* § 12.4.10.) Permit applications must be submitted in writing to the Board at least ten (10) business days prior to the proposed demonstration activity and must set forth information about the proposed demonstration activity (such as the requested area; the date, time, and duration of the demonstration activity; and the estimated number of participants, *etc.*). (*Id.* § 12.4.20.) Groups of less than twenty (20) people are not required to obtain a permit to engage in demonstration activity. (*Id.* § 12.3.10.)

Under the CTR, there is no requirement that the Board issue a permit on the same terms— or at the same location—as sought in the permit application. (*Id.*) Indeed, if a permit were to seek authorization to conduct demonstration activity in an area designated as "No Demonstration Permitted" on the Demonstration Area Map, under a strict application of the CTR, no permit would

---

[3] This Declaration was filed by the Government in a prior lawsuit brought by Rev. Mahoney. *See Mahoney v. Pelosi, et al.*, No. 1:21-cv-00859 (D.D.C. Mar. 30, 2021) (ECF 10-1).

issue authorizing demonstration in that area. (*Id.*) Further, as noted, pursuant to the CTR, areas designated as "Demonstration Permit Area[s]" on the Demonstration Area Map may nevertheless be temporarily "closed" or "restricted for official use." (*Id.* § 12.2.20.) As with areas designated "No Demonstration Permitted," pursuant to the CTR, no permit would issue for areas that are "closed" or "restricted for official use." (*Id.*)

The CTR itself does not set forth any criminal punishment attendant to a violation of its provisions. By statute, however, Capitol Police, are authorized to enforce federal law and the law of the District of Columbia on the Capitol Grounds. *See* 2 U.S.C. § 1967(a)(4). District of Columbia Code § 22-1307 provides, among other things, that "[i]t is unlawful for a person, alone or in concert with others . . . [t]o crowd, obstruct, or incommode . . . [t]he passage through or within any park [] and [t]o continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding." D.C. Code § 22-1307(a)(1)(D), (2). That statute also provides that "[i]t is unlawful for a person, alone or in concert with others, to engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration." D.C. Code § 22-1307(b)(1). For purposes of this latter provision, demonstration means "marching, congregating, standing, sitting, lying down, parading, demonstrating, or patrolling by one or more persons, with or without signs, for the purpose of persuading one or more individuals, or the public, or to protest some action, attitude, or belief." *Id.*

Violation of D.C. Code § 22-1307 is a misdemeanor, subject to a fine of $500 and / or up to 90 days' imprisonment. *Id.*; *see also* D.C. Code § 22-3571.01

## II.    THE AFTERMATH OF JANUARY 6, 2021

In response to the events of January 6, 2021, the National Guard was mobilized and fences were erected around numerous federal properties, including the Capitol Grounds and Building itself.  Two fences surrounded the Capitol Grounds—an outer fence and an inner fence.  (Mahoney Decl. ¶ 10.)   In March 2021, the outer fence was removed, and Areas 3, 5, 6, 12, and 15 were opened.  (*Id.*; Capitol Police Board Order 21.08, attached hereto as Exhibit D.[4])  In July 2021, the inner fence was removed from around the Capitol Grounds, opening Areas 1, 8, 9,10 and, 11, which includes the Western Front Lawn (Area 1).  (Mahoney Decl. ¶ 10.)

Since the removal of the interior fencing, demonstration activities have resumed in areas that were previously temporarily closed.  (Mahoney Decl. ¶ 12.)  For example, the Board issued a permit allowing the American Conservative Union ("ACU") to hold a rally, which was projected to attract 300 participants, on the Western Front Lawn on July 27, 2021, for the purpose of seeking action by the Biden Administration against the oppressive communist dictatorship in Cuba.  (Mahoney Decl. ¶ 12; *see also* ACU Permit at 1, attached hereto as Exhibit E.)  The rally was permitted for 8.5 hours and involved a stage, a podium, a sound system, and a generator.  (ACU Permit at 1.)  That event went forward as permitted.  (Mahoney Decl. ¶ 13; *see also* Photographs from ACU event, attached hereto as Exhibit F.[5])

---

[4] Board Orders are not publicly available on the Capitol Police website, nor is Board subject to the Freedom of Information Act.  *See Flippin v. U.S. Dep't of Interior*, No. CV 19-1221 (BAH), 2019 WL 7372669, at *1 (D.D.C. Dec. 31, 2019).  Rev. Mahoney has access to Board Order 21.08 only because the Government filed it as an exhibit to a brief it filed in the lawsuit referenced in footnote 3.  *See Mahoney v. Pelosi, et al.*, No. 1:21-cv-00859 (D.D.C. Mar. 30, 2021) (ECF 10-1 Ex. 3).

[5] Rev. Mahoney attended that demonstration.  (Mahoney Decl. ¶ 13.)

In addition to the ACU event, after Congress adjourned for its August 2021 recess, Representative Cori Bush, joined by scores of people, was allowed to hold a demonstration on the Eastern steps in front of the House of Representatives from approximately July 30 - August 3, 2021. (Mahoney Decl. ¶¶ 14-15; *see also* Photographs from Representative Bush's demonstration, attached hereto as Exhibit G.)  The purpose of the demonstration was to convince the Biden administration to issue an executive order renewing the residential eviction moratorium first implemented in the wake of COVID-19.  (Mahoney Decl. ¶ 14.)  The Eastern steps in front of the House of Representatives is closer to the Capitol Building than the Western Front Lawn, and the demonstration was attended by scores of people during both day and night.  (*Id.*)  Despite the fact the area where Representative Bush and others protested is an area designated "No Demonstration Permitted" on the Demonstration Area Map, the demonstration was allowed to continue for several days.  (*Id.*)

### III.    THE BOARD FAILS TO GRANT REV. MAHONEY'S A PERMIT TO CONDUCT A PRAYER VIGIL

On July 9, 2021, Rev. Mahoney applied for a permit seeking to hold a prayer vigil on the Western Front Lawn on September 11, 2021.  (Mahoney Decl. ¶ 16; July 9 Permit Application, attached hereto as Exhibit H.[6]).  The permit application states that the purpose of the vigil is to "ask[] God to protect and watch over America and bring healing to our world and build bridges to our Muslim neighbors."  (July 9 Permit Application.)  The permit application further states that

---

[6] Although the permit application states that Rev. Mahoney seeks a permit to use the "Lower Western Terrace," Rev. Mahoney clarified in a later conversation with Officer Kibala (discussed in the text) that he was, in fact, seeking a permit for the Western Front Lawn.  (Mahoney Decl. ¶ 17.)

the vigil will last three (3) hours, have 25-100 participants, and require only the use of a podium. (*Id.*)

On August 19, 2021, Officer Kibala of the Capitol Police contacted Rev. Mahoney by telephone regarding the permit application. (Mahoney Decl. ¶ 18.) Officer Kibala informed Rev. Mahoney that the permit application "could not be processed" because all grounds within the area of where the perimeter of the inner fence that had been installed after January 6, 2021—including but not limited to the Western Front Lawn—were "closed." (*Id.*[7]) Further, Officer Kibala cryptically informed Rev. Mahoney that the Western Front Lawn was undergoing "maintenance." (*Id.* ¶ 19.) Officer Kibala then instructed Rev. Mahoney that he could submit another permit application for another area of the Capitol Grounds. (*Id.*)

Later on August 19, Officer Kibala sent Rev. Mahoney an email confirming their conversation and providing him a blank permit application in the event he wished to seek to hold another prayer vigil on another location on the Capitol Grounds. (*Id.* ¶ 21; August 19, 2021 email from Officer Kibala to Rev. Mahoney, attached hereto as Exhibit I.[8])

Also later on August 19, Rev. Mahoney sent Lieutenant Grossi of the Capitol Police an email regarding the proposed September 11 prayer vigil wherein he expressed his "frustrat[ion] and confus[ion]" regarding the Board's policies in light of the Board's issuance of a permit to the ACU and the fact Representative Bush's demonstration went forward. (Mahoney Decl. ¶ 22; August 19-20, 2021 email exchange between Rev. Mahoney and Lieutenant Grossi, attached

---

[7] Re. Mahoney understood Officer Kibala's statement to mean that Areas 1, 8, 9, 10, and 11 were closed.

[8] That email also references another permit application that Rev. Mahoney had submitted for a proposed demonstration to take place on August 24, 2021. The Board refused to process that application too. (Mahoney Decl. ¶ 21.) Regardless, that demonstration is not at issue in this lawsuit.

hereto as Exhibit J.) The next day, Lieutenant Grossi responded, writing "[c]urrently, Area 1[—*i.e.*, the Western Front Lawn]—and the East Front Areas are not authorized for permitted demonstrations."  (August 19-20, 2021 email exchange between Rev. Mahoney and Lieutenant Grossi.)

Rev. Mahoney continues to desire to hold the aforementioned prayer vigil on the Lower Western Terrance on September 11, 2021.  (Mahoney Decl. ¶ 23.)  In light of the Board's refusal to process his application for that vigil, however, on August 23, 2021, he submitted another permit application to hold a separate vigil on September 11, 2021.  (Mahoney Decl. ¶ 24; *see also* August 23 Permit Application, attached hereto as Exhibit K.)  This second prayer vigil differed from the first.  For one thing, the application sought a permit for a "[p]rayer vigil and remembrance for all those who perished on 9/11 and to pray for God's protection over America [and] to pray for Christian women and children living in Afghanistan who are facing violence and brutality." (August 23 Permit Application.) Further, this second proposed vigil would last 2 hours and was estimated to draw 20-40 participants.  (*Id.*)  Finally, the proposed location of this second proposed vigil was "Area 10—Eastern grassy side in front of the House side."  (*Id.*)

Despite the fact that Area 10, like Area 1, is designated as a "Demonstration Activity Permitted" area on the Demonstration Area Map, (*see* CTR Appx. G), Rev. Mahoney was not granted a permit for this second vigil either, (Mahoney Decl. ¶ 26).  The email informing Rev. Mahoney of this fact, which came from Officer Kibala, stated that "the areas on the East Front of Capitol Grounds, to include Area #10, are currently closed."  (*Id.*; August 25, 2021 email from Officer Kibala to Rev. Mahoney, attached hereto as Exhibit L.)  Officer Kibala's email did not explain why Area 10 was allegedly "closed."  (August 25, 2021 email from Officer Kibala to Rev. Mahoney.)

## ARGUMENT

The Court should issue a temporary restraining order enjoining the Government from failing to grant a permit Rev. Mahoney to hold his prayer vigil on the Western Front Lawn of the Capitol Grounds on September 11, 2021.   A temporary restraining order, like a preliminary injunction, should issue based on the consideration of four factors: "(i) whether the party seeking the injunction is likely to succeed on the merits of the action, (ii) whether the party is likely to suffer irreparable harm without an injunction, (iii) whether the balance of equities tips in the party's favor, and (iv) whether an injunction would serve the public interest."  *Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction.").   Rev. Mahoney satisfies all of these requirements in this application.

## I.     REV. MAHONEY IS LIKELY TO SUCCEED ON THE MERITS

Rev. Mahoney is likely to succeed on the merits of his claims that the Government's failure to grant his permit application violates his rights to freedom of speech, assembly, association, religion, and equal protection of law.

### A. The Government has violated Rev. Mahoney's rights to freedom of speech, association, and assembly.

"The right of free speech . . . and the right of assembly are, of course, fundamental rights" protected by the First Amendment to the United States Constitution. *Whitney v. California*, 274 U.S. 357, 373 (1927).   The same is true of the right to association.  *See NAACP v. Alabama*, 357 US. 449 460 (1958) (observing that the "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the . . . freedom of speech").   The Government's refusal to grant Rev. Mahoney a permit to hold a peaceful prayer vigil on the Capitol Grounds, and

specifically, on the Western Front Lawn at the Capitol, on September 11, 2021, violates these fundamental rights.

> 1. <u>The permitting regime is an impermissible prior restraint on speech, both facially and as applied.</u>

It is beyond dispute that the Government's permitting scheme for demonstration activity on the Capitol Grounds constitutes a prior restraint on free expression. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975) (holding that regulatory scheme in which government board was "empowered to determine whether the applicant should be granted permission—in effect, a license or permit" constituted a prior restraint); *see also Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1389 (D.C. Cir. 1990) (striking down permit requirement at Washington Metro Area Transit Authority ("WMATA") as impermissible prior restraint). Here, persons who want to participate in demonstration activity in groups of twenty (20) people or more on the Capital Grounds must first obtain a permit from the Capitol Police to do so. This permitting scheme plainly constitutes a prior restraint on speech. *Conrad*, 420 U.S. at 554; *Turner*, 893 F.3d at 1389-90.

Prior restraints—particularly, as here, those regulating speech in a traditional public forum (more on that below)—present at least two threats to the exercise of protected expression. For one, systems of prior restraint that place "unbridled discretion in the hands of a government official . . . may result in censorship." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988). For another, prior restraints create a "chilling effect" on constitutionally protected speech. *Freedman v. Maryland*, 380 U.S. 51, 60 (1965). Because of these threats, a system of prior restraint "comes to [court] bearing a heavy burden against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). In particular, to meet its burden of justifying a system of prior restraints, the Government must "provide 'narrow, objective, and definite standards to guide the licensing authority' and ensure a content-neutral determination." *Turner*, 893 F.3d at

1390 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)); *see also Niemotko v. State of Maryland*, 340 U.S. 268, 272 (1951) ("[I]n the absence of narrowly drawn, reasonable and definite standards for the officials to follow, [the permitting regime] must be invalid.").

Applying the foregoing principles here, the Government's permitting regime violates the First Amendment:

*First*, the Government's refusal to permit Rev. Mahoney to hold his prayer vigil was not content-neutral.  In fact, the Government has permitted other speakers—with messages different from Rev. Mahoney's—to speak on the Capital Grounds over the past several weeks.  This fact demonstrates that the Government's failure to permit Rev. Mahoney to hold his prayer vigil is the product of content-based discrimination.  Discrimination against speech on the basis of its content is flatly prohibited by the First Amendment.  *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95-96 (1972) ("[A]bove all else, the First Amendment means that government has no power to retrain free expression because of its message, its ideas, its subject matter or its content.").

In particular, on July 27, 2021, the ACU was permitted to hold a large rally on the Western Front Lawn to express its political views.  That is the precise area where Mahoney applied for a permit to demonstrate on September 11, 2021.  Moreover, Representative Bush was allowed to hold a demonstration on the Eastern steps of the House, which are just in front of the House of Representatives, for several days in late July / early August 2021, to express her political views regarding the eviction moratorium.  Yet Reverend Mahoney was not permitted to hold a "prayer vigil and remembrance" on the Western Front Lawn "asking God to protect and watch over America and bring healing to our world and build bridges to our Muslim neighbors."  The fact that other rallies/demonstrations with different purposes were permitted to go forward on the Capitol Grounds—one of which was in the same location where Reverend Mahoney wanted to hold his

prayer vigil—establishes that the Government's actions were not content-neutral. *See Niemotko*, 340 U.S. at 272 (refusal to issue park permits to members of the Jehovah's Witnesses for Bible talks when other religious and political groups had been allowed to use park for similar purposes violates Constitution).

**Second**, the Government did not apply "narrow, objective, and definite standards" here. Although the Government will likely claim that the Western Front Lawn was "closed," the Government removed the inner fence closing off the Western Front Lawn in July of this year. Thus, that area is no longer "closed." Indeed, as discussed, ACU held a demonstration in the Western Front Lawn approximately one month ago.

The Government may not arbitrarily close a traditional public forum based on vague assertions that closure is required due to "maintenance." In *Shuttlesworth*, for example, the Supreme Court struck down an ordinance that conferred upon the city commission the power to prohibit demonstrations that contravened "public welfare, peace, safety, health, decency, good order, morals or convenience." 394 U.S. at 149. The Supreme Court observed that "an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Id.* at 151. Under *Shuttlesworth*, the Government cannot satisfy its heavy burden of justifying a prior restraint simply by trotting out the word "maintenance," waiving it around like a talisman insulated from constitutional review, and calling it a day.

Allowing the Government to avoid constitutional review based on such vague assertions would contravene the Supreme Court's teaching that even prior restraints based on "time, place,

and manner" restrictions must still be "subject to effective judicial review." *See City of Lakewood,* 486 U.S. 757-58 (licensing scheme that gives the government unlimited discretion is facially unconstitutional)*; Saia v. People of State of New York,* 334 U.S. 558, 559-60 (1948) (city ordinance prohibiting use of sound amplification devices, except with permission obtained from chief of police, is invalid as infringing right of free speech, in absence of any standards prescribed for exercise by chief of police of his discretion)*; Niemotko*, 340 U.S. at 272 ("[I]f a municipality conditions holding street meetings on the granting of a permit by the police, the basis which guides licensing officials in granting or denying a permit must not give them a free hand . . . when the actualities of police administration are taken into account."); *cf. Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002) (upholding permit denial where official chose among thirteen (13) delineated grounds for denying the permit and was required to "clearly explain its reasons for any denial"). Rather, in order to justify its on-again/off-again prior restraint on Rev. Mahoney's free-speech rights, the Government has the obligation of demonstrating that it applied "narrow, objective, and definite" criteria that guided its discretion. *Shuttlesworth*, 394 U.S. at 151. The Government has failed to do so here.[9]

2. The permitting regime infringes on rights of expression in a traditional public forum, both facially and as applied.

The concerns that animate the safeguards set forth in the Supreme Court case law regarding prior restraints take on a heightened importance here because the Capitol Grounds—including the

_____

[9] For similar reasons, the permitting regime is unconstitutionally vague in violation of the Fifth Amendment. Due process requires that the Government give people of ordinary intelligence fair notice of what is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The lack of such notice in a law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–872 (1997). Here, the Government has not announced criteria by which it approves or fail to approve a permit application.

Western Front Lawn—are indisputably a traditional public forum. In *Lederman*, the District of Columbia Circuit Court held that "the entire Capitol Grounds are a public forum." 291 F.3d 35, 42 (D.C. Cir. 2002); *see also Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F. Supp. 575, 583–84 (D.D.C. 1972) (three-judge panel) (concluding that the Capitol Grounds are "an area to which access cannot be denied broadly or absolutely"), *aff'd* 409 U.S. 972 (1972). While interior spaces within the Capitol buildings themselves, such as "the Senate and House floors, committee rooms, *etc.*" are not a public forum, *Lederman*, 291 F.3d at 42, the Capitol Grounds themselves—including the Western Front Lawn—clearly are.

Because the Western Front Lawn is a public forum, the Government's power to restrict expressive activity there is "very limited," *id.* at 44 (quoting *U.S. v. Grace*, 461 U.S. 171, 182 (1983)), and is subjected to the most searching review, *Boos v. Berry*, 485 U.S. 312 (1988). Specifically, restrictions on speech in a traditional public forum will only satisfy constitutional scrutiny if they are "[1] content-neutral, . . . [2] narrowly tailored to serve a significant government interest, and [3] leave open ample alternative channels for communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Lederman*, 291 F.3d at 44. Importantly, if the restrictions fail just one of these requirements, they are invalid. *Lederman*, 291 F.3d at 44.

Applying these principles, the Government's refusal to grant a permit to Rev. Mahoney violates his right to free expression in a traditional public forum:

***First***, as discussed, the Government's decision to fail to grant Rev. Mahoney a permit for his September 11th prayer vigil was not content-neutral in light of the fact that a permit was granted to the ACU and Representative Bush was allowed to hold her demonstration in an allegedly

"restricted" area.  This fact alone violates renders the Government's failure to issue a permit constitutionally deficient under *Perry* and similar cases.

*Second*, even if the Government's actions here were content-neutral (and they were not), they still would be impermissible because they were not "narrowly tailored to serve a significant government interest."  As an initial matter, to date, the Government has not articulated a reason for failing to grant Reverend Mahoney a permit, other than to say that the Western Front Lawn is "closed." As noted, however, even that justification is questionable considering that other events/demonstrations have been allowed to proceed.

In any event, to the extent the Government should be taken at its word that the Western Front Lawn is now suddenly "closed," the Court must recall that "per se bans on expressive conduct are inherently suspect."  *Lederman*, 291 F.3d at 44 (citing *Grace*, 461 U.S. at 182 (questioning the need for a "total ban" on carrying flags and banners)).  This is so, according to the District of Columbia Circuit Court in *Lederman*, because, regardless of the Government's justification for the ban, prohibiting *all* expressive activity in a public forum does not legitimately serve any governmental interest. *Id.*  Put simply, "the Constitution does not tolerate regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." *Id.* (internal quotation marks omitted); *Jeannette Rankin Brigade,* 342 F. Supp. at 585 (striking statute barring all expressive activity on Capitol Grounds because its terms "flatly prohibit all assemblages, whether or not they threaten [any legitimate governmental] interests").

Indeed, in *Turner*, the District of Columbia Circuit Court affirmed the lower court order striking down the WMATA's permit requirement, which the WMATA defended on the ground of "safety," because it "fail[ed] the 'narrow tailoring' inquiry.  893 F.3d at 1392.  The court noted

that "[a]lthough WMATA's stated interests [in safety] are achieved more effectively with the regulation than without it, the permit requirement also restricts many incidents of free expression that pose little or no threat to WMATA's ability to providing safe and efficient transportation and an equitably available forum for public expression." *Id.* In short, the District of Columbia Circuit Court concluded, "[w]hile the [permit system] arguably eliminates the sources of evil that allegedly threaten WMATA's ability to provide a safe and efficient transportation system, it does so at too high a cost." *Id.*

The same is true here. The Government has made no showing that the entire Western Front Lawn should be "closed" due to considerations related to traffic, and vague allegations of "maintenance" are insufficient to meet the Government's burden. *Turner*, 893 F.3d at 1392*; see also Lederman*, 291 F.3d at 44 (concluding that courts must "closely scrutinize" challenged speech restrictions "to determine if they indeed promote the Government's purposes in more than a speculative way").

What is more, regardless of the putative justification, the Government has "substantially less restrictive" alternatives to a complete ban of demonstration activity in certain areas of the Capitol Grounds. *Lederman*, 291 F.3d at 44. For example, if crowd control were at issue, the Government "could rely on existing laws that bar visitors to the Capitol Grounds from 'utter[ing] loud, threatening, or abusive language, . . . engag[ing] in any disorderly or disruptive conduct,' or 'obstruct[ing] . . . or . . . imped [ing] passage through or within' the Grounds." *Id.* (quoting 40 U.S.C. § 193f(b)(4)-(5) (now codified at 40 U.S.C. § 5104(e)(2)(D)). The Government could rely on increased patrols, stepped-up surveillance, or any number of other measures that do not squelch speech. The Government has not demonstrated why these less-restrictive alternative means of are inadequate to serve whatever justification it is asserting as the basis for the closure here.

18

*Third*, the Government has not left open adequate alternative channels of communication. Similar to the situation in *Turner*, where the entire above-ground area of the WMATA was subject to a permit requirement, 893 F.3d at 1393, here, the entire Capitol Grounds between 1st Street NW/1st Street SW, Independence Avenue, 1st Street SE/1st Street NE, and Constitution Avenue, are "closed."  Indeed, after being informed that the Government would not issue him a permit to hold the prayer vigil on the Western Front Lawn, Rev. Mahoney applied for a permit to hold a separate vigil in Area 10 of the Area Demonstration Map, which is located on the on the eastern side of the Capitol building in front of the House of Representatives.  Despite the fact that Area 10, like the Western Front Lawn (Area 1), is designated as a "Demonstration Activity Permitted" area on the Demonstration Area Map, the Government refused to process this request for a permit too.  To be sure, there are areas outside of the main Capitol Grounds that are open for demonstration activity, but the Court should not countenance the Government's efforts to force protected speech to the outermost corners of the Capitol Grounds based on nothing more than vague allegations of "maintenance."

For these reasons, Rev. Mahoney has made a strong showing that the Government's refusal to grant him a permit for his proposed September 11th vigil violates his rights to free speech, assembly, and association.

**B.  The Government has violated Rev. Mahoney's rights to religious exercise.**

The Government's refusal to permit Rev. Mahoney to hold his proposed prayer vigil also violates his rights under the Free Exercise Clause and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*

1. <u>The Government has violated the Free Exercise Clause.</u>

The Free Exercise Clause forbids the Government from "prohibiting the free exercise [of religion]." U. S. Const. amend. I. Under the Free Exercise Clause, "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

Here, the Government's policies and actions impose a substantial burden on Rev. Mahoney's religious exercise. Rev. Mahoney feels called by God to hold the September 11th prayer vigil on the Western Front Lawn, in the shadow of the Capitol Building. (Mahoney Decl. ¶¶ 2-8.) When addressing claims involving a party's religious exercise, "it is not for [the courts] to say that their religious beliefs are mistaken or insubstantial." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014). Instead, a court's "narrow function" is to determine whether the party's religious activity is motivated by the party's "honest conviction." *Id.* Here, there is no question but that Rev. Mahoney's "honest conviction" is the motivation behind his desire to hold the September 11th prayer vigil. (Mahoney Decl. ¶¶ 2-8.)

Despite this fact, if Rev. Mahoney were to go forward with the September 11 vigil without a permit, he would potentially be subject to arrest and criminal. The threat of criminal penalties plainly imposes a substantial burden on religious exercise. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 234–36 (1972) (recognizing that criminal penalties under compulsory school attendance laws for Amish parents substantially burden religious exercise under the First Amendment); *see also Hobby Lobby* 573 U.S. at 726 (concluding that large civil fine substantially burdens religious exercise under RFRA). Accordingly, the Government's refusal to issue Rev. Mahoney a permit constitutes a substantial burden on his exercise of religion.

Further, the Government's policies and actions are neither neutral nor of general applicability. Again, the Government has prohibited Rev. Mahony's religious gathering, while allowing non-religious demonstration activity. This constitutes classic discrimination on the basis of religion. *Roman Cath. Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 67 (2020) (noting that regulations that treat houses of worship differently from retail businesses triggered strict scrutiny); *Tandon v. Newsom*, ___ U. S. ___, 141 S.Ct. 1294, 1297 (2021) (per curiam) ("The State cannot assume the worst when people go to worship but assume the best when people go to work." (internal quotation marks omitted)).

In addition, the Government's mandates are not "the least restrictive means of achieving [a] compelling state interest." *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 718 (1981). The Supreme Court has cautioned that a governmental "interest . . . is not compelling" if the government restricts only protected conduct while "fail[ing] to enact feasible measures to restrict other conduct producing . . . alleged harm of the same sort." *Church of the Lukumi*, 508 at 546-47. As discussed, the Government has allowed at least two non-religious demonstrations on the Capitol Grounds in just the past several weeks, including one that was larger and occurred on the exact location as Rev. Mahoney seeks access to here (the ACU event) and another that lasted for a longer period of time and was even closer to the Capital Building than Rev. Mahoney's proposed vigil (Representative Bush's event). Moreover, during these events, the Government necessarily relied on less restrictive means than prohibiting the events, such as stricter enforcement of other laws, increased patrols, stepped-up surveillance, *etc.*, all of which are measures that would impact religious expression less than the prohibition imposed here. Thus, the Government cannot establish that its actions here were narrowly tailored to further any compelling interest.

2.    The Government has violated RFRA.

As the Supreme Court recently reiterated, RFRA provides "broad protection[s] for religious liberty." *Hobby Lobby*, 573 U.S. at 693-94. Under RFRA, the Government may not "substantially burden a person's exercise of religion" unless it can satisfy strict scrutiny by "demonstrat[ing] that application of the burden to the person" is "the least restrictive means of furthering" a "compelling governmental interest." *Id.* (quoting 42 U.S.C. § 2000bb-1 and § 2000bb-2(2)).

For the same reasons as discussed regarding the Free Exercise Clause, the Government has violated RFRA. As noted, the Government's policies and actions have substantially burdened Rev. Mahoney's religious exercise. Moreover, as discussed the Government cannot justify its actions under strict scrutiny. Accordingly, just as the Government has violated Rev. Mahoney's rights under the Free Exercise Clause, it has also violated his rights under RFRA.

**C.    The Government has violated Rev. Mahoney's rights of equal protection.**

Finally, the Government's refusal to grant Rev. Mahony a permit—while granting the ACU a permit and allowing Representative Bush to hold a multi-day demonstration on the Eastern steps of the House—constitutes a violation of Rev. Mahoney's equal protection rights under the Fifth and Fourteenth Amendments. "When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Carey v. Brown*, 447 U.S. 455, 461–62 (1980); *see also Niemotko*, 340 U.S. at 272 ("The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body.").

Here, the Government has not attempted to justify its differential treatment of Rev. Mahoney vis-à-vis either the ACU or Representative Bush. Nor, on the record here, could it. Accordingly, Rev. Mahoney is likely to succeed on his equal protection claim.

## II.    REV. MAHONEY WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A TRO

Because Rev. Mahoney has established a likelihood of success on the merits of his First Amendment claims, and because he will be forced to forgo holding his September 11 prayer vigil before the Court can fully resolve his claims (Mahoney Decl. ¶ 27), he has established irreparable harm. When, as here, the movant's "First Amendment interests are either threatened or [are] in fact being impaired at the time relief is sought," irreparable injury is established. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). In the absence of an injunction, Rev. Mahoney's exercise of his First Amendment rights will not only be chilled, they will be frozen solid. On these facts, Rev. Mahoney has established irreparable harm.

## III.    THE BALANCE OF HARMS TIPS IN REV. MAHONEY'S FAVOR

Granting Rev. Mahoney the right to hold his prayer vigil on September 11th will not cause a substantial injury to the Government and, in any event, the balance of harm tips in Rev. Mahoney's favor.

The Government has no legitimate governmental interest in selectively applying an unconstitutional and discriminatory policy that chills the exercise of First Amendment rights. Further, vague and conclusory assertions of "maintenance" cannot trump Rev. Mahoney's rights, particularly considering the Government has ostensibly opened the Western Front Lawn and other areas of the Capitol Grounds to events and demonstrations by others in recent weeks. In light of these facts, the Government should not be permitted to hide behind flip-flop decisions and vague assertions to justify its actions. Instead, the balance of harms tips in Rev. Mahoney's favor.

**IV.    THE TRO IS IN THE PUBLIC INTEREST**

Finally, the public interest is best served by the issuance of a temporary restraining order here.   Informed public discourse, political debate, freedom of religious exercise, and equal protection of the laws are at the foundation of American democracy.   Granting a temporary restraining order will ensure that Rev. Mahoney remains free to communicate his message and practice his religion peacefully absent the chill and threat of enforcement of the Government's oppressive policies and practices, which rise to the level of an unconstitutional prior restraint. Further, the public interest is served by re-opening the Capitol Grounds—a traditional public forum—and establishing it again, not only as the seat of government, but as the epicenter of the citizenry's exercise of their constitutional rights.   Thus, the public interest factor tips solidly in favor of Rev. Mahoney.

## CONCLUSION

For the foregoing reasons, Rev. Mahoney respectfully requests this Court grant his Application for a Temporary Restraining Order, and issue an order to show cause why a preliminary injunction should not be issued as follows:

1.    The Government shall issue a permit to Rev. Mahoney so that his proposed prayer vigil on the Western Front Lawn may go forward on September 11, 2021;

2.    The Government, as well as their agents, employees, and successors in office, shall be restrained and enjoined from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any unreasonable prohibition on Plaintiff's engagement in First Amendment protected activities at said prayer vigil;

3.    The Government shall show cause, at a time and place to be directed by the Court, why a preliminary injunction should not issue requiring the Government to act as described above; and

4.    The temporary restraining order shall remain in effect until such time as the Court has ruled on whether a preliminary injunction should issue, all such relief being necessary to prevent the Government from further violating Rev. Mahoney's constitutional rights, pending trial on the merits of his claims.

Dated: August 31, 2021                              Respectfully submitted,


By: /s Harmeet K. Dhillon
Harmeet K. Dhillon
Mark P. Meuser
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

Brian R. Chavez-Ochoa
CHAVEZ-OCHOA LAW OFFICES, INC.
4 Jean Street, Suite 4
Valley Springs, California 95252

Joshua Wallace Dixon (*pro hac vice* pending)
CENTER FOR AMERICAN LIBERTY
5100 Buckeystown Pike, Suite 250
Frederick, MD 21704
(703) 687-6200

Counsel for Plaintiff Patrick J. Mahoney