UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATRICK J. MAHONEY,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 21-2314 (JEB)** |
| **UNITED STATES CAPITOL POLICE BOARD,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Given security concerns in the wake of the January 6, 2021, attack on the United States Capitol, the Government thereafter temporarily closed most of the Capitol Grounds to demonstrations.  In the ensuing months, Defendant U.S. Capitol Police Board gradually eased the closures, though some restrictions remain in place, particularly for groups of 20 or more people.  Enter Plaintiff Patrick J. Mahoney, a clergyman who sought to hold a prayer vigil on the West Front Lawn of the Capitol on September 11, 2021, to commemorate the twentieth anniversary of another significant attack on our country.  The Government denied his permit application because the area was still closed to demonstrations, but it later clarified that Plaintiff could go forward so long as his vigil attracted fewer than 20 people.  Mahoney alleges that, notwithstanding this justification, Defendants permitted several other large demonstrations on the West Front Lawn around that same time.  After this Court denied Plaintiff's Motion for Temporary Restraining Order, he went forward with the vigil on the West Front Lawn on September 11 with only his wife.

Plaintiff now returns with an Amended Complaint, which challenges the Board's denial of his permit application and adds that he wants to hold large vigils on the West Front Lawn in the near future, which he still cannot lawfully do.  Mahoney contends that Defendants' conduct contravenes various provisions of the First Amendment, the Fifth Amendment, the Fourteenth Amendment, and the Religious Freedom Restoration Act.  Defendants (the Board and certain individuals associated with the Board) now move to dismiss.  Agreeing with the Government as to most but not all of its contentions, the Court will grant the Motion in part and deny it in part.

I.    **Background**

The Court begins with a brief overview of the applicable regulations governing demonstrations on the United States Capitol Grounds, then turns to the facts giving rise to this suit, and concludes with the case's procedural history.

A.  Applicable Regulations

"The United States Capitol Grounds extend from Union Station in the North to Virginia Avenue in the South, and from Second Street Northeast to Third Streets North- and Southwest, encompassing the Capitol itself as well as House and Senate office buildings, a power plant, press areas, and public open space."  Lederman v. United States, 291 F.3d 36, 39 (D.C. Cir. 2002); see ECF No. 14 (Exh. A to Amended Complaint) (Traffic Regulations for the U.S. Capitol Grounds), Appx. G.  Federal law charges the Board, "consisting of the Sergeant at Arms of the United States Senate, the Sergeant at Arms of the House of Representatives, and the Architect of the Capitol," Lederman, 291 F.3d at 39, with regulating the "movement of all vehicular and other traffic . . . within the . . . Capitol Grounds."  2 U.S.C. § 1969(a).  Pursuant to this statutory authority, the Board promulgated the Traffic Regulations for the U.S. Capitol

Grounds, which govern, among other things, all "Demonstrations" and "Special Events" on the Capitol Grounds.  See Traffic Regulations, § 12.

The regulations define "demonstration activity" as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution."  Id. § 12.1.10.  They further provide that demonstration activity is generally allowed in designated areas as indicated on the United States Capitol Grounds Demonstration Areas Map, which is replicated below.  Id. § 12.2.10.  Within the designated areas, "[n]o person or group of less than twenty (20) persons shall be required to obtain a permit" to demonstrate.  Id. § 12.3.10.  Groups of 20 or more people, however, must apply for and obtain a permit in order to demonstrate there.  Id. § 12.4.10.  No demonstration — regardless of size — is permitted in areas that the Board designates as closed to public use.  Id. § 12.2.20.  Similarly, because the Board has the authority to temporarily deem an area "closed or restricted for official use," an area that is not marked as closed to demonstration on the map may nonetheless be closed to large groups, small groups, or both at a particular time based on present security risks.  Id.  Such closures occurred after January 6, 2021.  See ECF No. 13 (Am. Compl.), ¶ 35.

In the Demonstration Map attached to the Traffic Regulations and Plaintiff's Complaint and replicated below, the unnumbered dark-shaded zones mark areas in which no demonstration activity is ever permitted, while the numbered lightly shaded zones denote areas in which groups of fewer than 20 people may demonstrate without a permit, and groups of 20 or more may do so after obtaining a permit under ordinary circumstances.



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

Id. Appx. G.

The Capitol Police are authorized by statute to enforce federal and District of Columbia

law on the Capitol Grounds.  See 2 U.S.C. § 1967(a)(4).  District of Columbia Code § 22-

1307(b)(1) provides, as relevant here, "It is unlawful for a person, alone or in concert with

others, to engage in a demonstration in an area where it is otherwise unlawful to demonstrate and

to continue or resume engaging in a demonstration after being instructed by a law enforcement

officer to cease engaging in a demonstration."  Violation of this law is a misdemeanor that is

subject to up to 90 days' imprisonment and a fine of $500.  See D.C. Code §§ 22-1307(b)(1), 22-

3571.01.

    B.    Factual Background

    Taking the facts alleged in Mahoney's Amended Complaint as true, "[i]n response to the

events of January 6, 2021," the Government erected fences around "most, if not all, of the

4

Capitol Grounds."  Am. Compl., ¶ 35.  "The Capitol Grounds were surrounded by two fences —

an outer fence and an inner fence — and, on information and belief, the areas surrounded by the

fences were closed to pedestrian traffic and all expressive activity."  Id.

In March 2021, the Board authorized the removal of the outer fence, and Areas 3, 5, 6,

12, 15–18, and 23 on the Demonstration Area Map were opened to pedestrian traffic,

unpermitted demonstrations by groups of 19 or fewer, and permitted demonstrations by groups

of greater than 19 but fewer than 50 people.  Id., ¶ 36.  In July 2021, the Board removed the inner

fence.  Id., ¶ 37.  Area 1, which abuts the Capitol building to the west and includes the West

Front Lawn, remained closed to demonstrations of any size at that time.  Id., ¶¶ 36, 47.

That was the state of affairs when Plaintiff applied for a demonstration permit in July

2021.  According to Mahoney, he "felt called by God to hold a prayer vigil for the United States

on September 11, 2021 — the twentieth anniversary of September 11, 2001 — on the Western

Front Lawn, in the shadow of the Capitol Building, where he has held similar prayer vigils in

years past."  Id., ¶ 45.  He applied for a permit to hold such a vigil, which he believed would

attract at least 20 people.  Id., ¶¶ 45–46.  In August, however, Plaintiff was informed that his

application was not accepted because the West Front Lawn remained closed.  Id., ¶ 47.  Mahoney

further alleges that the Government "has permitted other events on the Capitol Grounds in the

recent past — including at least two (2) recent events on the Western Front Lawn."  Id., ¶ 3.  He

thus filed this lawsuit on August 31, initially seeking, among other things, a temporary injunction

requiring the Government to issue him a permit to hold his prayer vigil on September 11, 2021.

See ECF No. 1 (Complaint).

On September 2, 2021 — still over a week before his proposed vigil — the Board opened

Areas 1 and 8–11, including the West Front Lawn, to demonstration activity for groups of 19 or

fewer.  See Am. Compl., ¶ 50.  The Areas remained closed, however, to larger groups.  Id., ¶ 51.
The Board also opened a number of other Areas to demonstrations involving groups of 20 or
more, subject to obtaining a permit.  Id., ¶ 50.

    C.  Procedural History

    On the same day that Plaintiff filed this suit, he moved for a temporary restraining order
and preliminary injunction directing Defendants to allow him to hold the prayer vigil (with more
than 19 people) on the West Front Lawn on September 11.  See ECF No. 4 (Amended Motion
for TRO) at 1.  After a telephonic hearing, the Court denied Mahoney's Motion on September 9,
2021.  See Minute Order of Sept. 9, 2021.  On September 11, Mahoney went forward with a
prayer vigil on the West Front Lawn with just his wife, as he was allowed to do.  See ECF No.
18 (Pl. Opp.) at 11.

    He then filed a six-count Amended Complaint in November 2021, contending that
Defendants violated his First Amendment rights to freedom of speech, freedom of association
and assembly, and free exercise of religion; his Fifth Amendment right to due process; his Fifth
and Fourteenth Amendment rights to equal protection, and the Religious Freedom Restoration
Act.  See Am. Compl., ¶¶ 63–122.  The Amended Complaint states that Mahoney "desires to
hold additional prayer vigils on the Capitol Grounds in the near future, including but not limited
to vigils involving twenty (20) or more people on the Western Front Lawn, which he will be
unable to hold under the Government's permitting regime."  Id., ¶ 9.  He seeks declaratory and
injunctive relief, as well as monetary damages and attorney fees.  Id. at 26–28.  The Government
now moves to dismiss.  See ECF No. 16-1 (Motion to Dismiss).

    After briefing was finished on the Motion to Dismiss, Plaintiff moved for another
preliminary injunction and to incorporate several case citations into his Opposition to the Motion

to Dismiss.  See ECF Nos. 20 (Motion for Preliminary Injunction), 21 (Motion to Incorporate

Case Citations).  While the Court will not address the renewed Motion for Preliminary Injunction

here, it will, at Mahoney's request, "take account of the four additional cases cited and discussed

in the PI Memo . . . in considering Defendants' Motion to Dismiss."  Motion to Incorporate Case

Citations at 5.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a suit when the

complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a motion to

dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff

the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air

Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation marks

omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court need not accept as true,

however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by

the facts set forth in the complaint.  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006)

(quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations"

are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S.

544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to

state a claim to relief that is plausible on its face," Iqbal, 556 U.S. at 678 (internal quotation

omitted).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and

unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above

the speculative level." Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

## III.   Analysis

Mahoney contends that Defendants' conduct offends numerous constitutional provisions, as well as RFRA.  The Court first addresses his free-speech challenge — which consists of both facial and as-applied components — before separately examining his Equal Protection claim, his various religious-exercise challenges, and his Due Process count.  Last, because the parties dispute the available relief, the Court concludes with a brief discussion of the remedies that Plaintiff may pursue going forward.

### A.   Freedom of Speech

Within Mahoney's free-speech challenge, he raises several different theories of liability. First, he maintains that the Traffic Regulations are facially unconstitutional because they both fail intermediate scrutiny and constitute an impermissible prior restraint on speech.  Second, he argues that the Board's application of the Traffic Regulations in his case violate the First Amendment.  The Court looks at each of those theories in turn.

#### 1.  *Facial Challenge*

##### a.  Time, Place, and Manner Restriction

In resolving Plaintiff's facial challenge to the Traffic Regulations, the Court is guided by several recent First Amendment decisions of the D.C. Circuit.  Among those is Mahoney v. Doe, 642 F.3d 1112 (D.C. Cir. 2011), another First Amendment suit brought by Mahoney himself. There, in determining whether "the First Amendment protects his right to chalk the street in front of the White House," the D.C. Circuit explained that its analysis would "proceed in three steps: first, determining whether the First Amendment protects the speech at issue, then identifying the

nature of the forum, and finally assessing whether the District's justifications for restricting

Mahoney's speech 'satisfy the requisite standard.'" Id. at 1116 (quoting Cornelius v. NAACP

Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985)); see Lederman, 291 F.3d at 41, 44

(applying same framework to facial challenge).

      Here, "Defendants do not dispute that the First Amendment applies to the prayer vigil

that Plaintiff proposed for September 11, 2021, and that the West Front Lawn has been found to

be a traditional public forum."  Motion to Dismiss at 10.  The key question is thus whether the

Traffic Regulations constitute a lawful "time, place, and manner regulation[]."  Mahoney, 642

F.3d at 1117.  That is because laws that "restrict expressive conduct in a traditional public

forum" withstand intermediate scrutiny only if "the restrictions 'are content-neutral, are narrowly

tailored to serve a significant government interest, and leave open ample alternative channels of

communication.'"  Id. (quoting United States v. Grace, 461 U.S. 171, 177 (1983)); see also, e.g.,

Lederman, 291 F.3d at 44; Edwards v. D.C., 755 F.3d 996, 1001–02 (D.C. Cir. 2014) (describing

intermediate-scrutiny standard in free-speech context).  Although "this test is more easily recited

than applied," Frederick Douglass Found., Inc. v. D.C., 531 F. Supp. 3d 316, 330 (D.D.C. 2021),

the Court believes that its application here makes clear that the Traffic Regulations are lawful on

their face.

      First, the regulations are plainly content neutral.  In making such a determination, courts

"consider whether a regulation of speech 'on its face' draws distinctions based on the message a

speaker conveys."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015) (quoting Sorrell v. IMS

Health, Inc., 564 U.S. 552, 566 (2011)).  Here, the regulations expressly provide that the

provisions concerning demonstration activity "shall apply equally to all demonstrators,

regardless of viewpoint."  Traffic Regulations § 12.1.20.  Additionally, they do not prohibit

particular types of speech and are thus content neutral.  Indeed, despite vigorously challenging the next two prongs of the intermediate-scrutiny analysis, Mahoney tacitly admits that the regulations are content neutral by remaining silent on the issue.  See Pl. Opp. at 13–21.

Second, while the issue demands considerably more analysis than the content-neutrality inquiry, the Traffic Regulations are also "narrowly tailored to serve a significant government interest."  Mahoney, 642 F.3d at 1117 (quoting Grace, 461 U.S. at 177).  It is well established that "ensuring public safety and order" is a significant government interest.  United States v. Mahoney, 247 F.3d 279, 286 (D.C. Cir. 2001) (quoting Schenck v. Pro-Choice Network of Western New York, 519 U.S. 357, 376 (1997)).  That interest is amplified near the Capitol or similar major Government sites, where prominent public officials are present and conducting official government business.  See, e.g., Grace, 461 U.S. at 182 ("We do not denigrate the necessity to protect persons and property or to maintain proper order and decorum within the Supreme Court grounds."); Lederman, 291 F.3d at 44–45 (acknowledging Government's interest in promoting security around Capitol); Mahoney v. U.S. Marshals Serv., 454 F. Supp. 2d 21, 33 (D.D.C. 2006) ("The governmental interest in protecting those in attendance at the Red Mass is quite significant and, indeed, it is compelling.").  It is thus clear that the Traffic Regulations, which were promulgated "in the interest of securing public safety and for protection against personal injury or damage to property," Traffic Regulations at 3, advance a significant government interest.  In fact, Plaintiff "does not dispute that the Government's asserted interests in security are substantial in the abstract."  Pl. Opp. at 19.

Rather, relying on Lederman, Mahoney contends that Defendants have not demonstrated that the Traffic Regulations are narrowly tailored to serve that interest in a nonspeculative manner.  See Pl. Opp. at 17–20.  In Lederman, the D.C. Circuit declared facially unconstitutional

a "regulation banning leafleting and other 'demonstration activit[ies]' on the sidewalk at the foot

of the House and Senate steps on the East Front of the United States Capitol."  291 F.3d at 39

(alterations in original).  In finding that the law at issue in Lederman failed the narrow-tailoring

analysis, the Court of Appeals cautioned that "the Constitution does not tolerate 'regulations that,

while serving their purported aims, prohibit a wide range of activities that do not interfere with

the Government's objectives.'"  Id. at 44 (quoting Cmty. for Creative Non-Violence v. Kerrigan

(CCNV), 865 F.2d 382, 390 (D.C. Cir. 1989)).  Applying that principle, the panel concluded that

the "ban's absolute nature" rendered the regulation not narrowly tailored, as "[s]ome banned

activities" "cannot possibly" interfere "with the stated objectives of traffic control and safety."

Id. at 45.

        To describe Lederman in any detail, however, is to distinguish it from this case.

Preliminarily, it is beyond dispute that the Government's interest in promoting security around

the Capitol is far more acute than when Lederman was filed in 1999.  Well before January of last

year, the events of September 11, 2001 — the very event that Mahoney sought to commemorate

in his vigil — dramatically changed the security landscape on the Capitol Grounds.  See, e.g.,

Architect of the Capitol, Capitol Visitor Center, https://bit.ly/3ujvMOo.  Indeed, those attacks

"necessitated additional design changes" to the Capitol Visitor Center and "prompted Congress

to provide the necessary funding to move the project into construction," which was not

completed until 2008.  Id.  It is similarly unchallenged that the Capitol Grounds closures at issue

in this case were implemented in response to the unprecedented violence on January 6, 2021.

See Am. Compl., ¶¶ 35–36.  Given the very different security posture from that in Lederman, it

is eminently reasonable for the Government to submit that greater restrictions and security

measures are now warranted to serve the admittedly significant interests at stake.  Further, by

gradually reopening portions of the Capitol Grounds as more time passed after January 6 without further major incidents, the Board demonstrated that it was tailoring its approach to evolving security needs, rather than continuing to opt for the cleaver over the scalpel.

What is more, the nature of the regulations here stands in sharp contradistinction to the ban at issue in <u>Lederman</u>.  There, it was critical that the regulation "impose[d] precisely the sort of 'total' restriction on certain types of speech that the Supreme Court" has questioned.  <u>See</u> 291 F.3d at 45 (citing <u>Grace</u>, 461 U.S. at 182).  Here, by contrast, the relevant Traffic Regulations are far from an absolute ban on speech; they provide that groups of 19 people or fewer can demonstrate in almost all areas of the Capitol Grounds without a permit, and they set out a clear permitting process for large groups.  <u>See</u> Traffic Regulations §§ 12.2.10–12.3.10.  Indeed, Mahoney was himself able to pray with his wife without a permit on September 11, the day for which he initially sought a permit.  <u>See</u> Pl. Opp. at 11.

If anything, <u>Lederman</u> confirms that the Traffic Regulations are narrowly tailored to serve the Government's interest.  There, the Court of Appeals was particularly troubled by the Board's "virtually *per se* ban on expressive activity on the East Front sidewalk" because of the "ready availability of 'substantially less restrictive' alternatives that would 'equally effective[ly]' promote safety and orderly traffic flow."  291 F.3d at 45 (quoting <u>CCNV</u>, 865 F.2d at 390).  The majority explained, "[T]he Board could require permits for demonstrations on the sidewalk, limit the duration of such demonstrations, <u>restrict the number of individuals who may demonstrate simultaneously</u>, require that demonstrators present bags and other personal possessions to police officers for screening, or prohibit activities likely to attract large crowds."  <u>Id.</u> at 45–46 (emphasis added).  Here, the Board heeded the D.C. Circuit's reprimand: it responded to an extraordinary threat to security — which itself grew out of a large assembly — by "restrict[ing]

the number of individuals who may demonstrate simultaneously." Id. at 46.  To be sure, Lederman went on to caution that it was "uncertain that every identified alternative would survive constitutional scrutiny, though some surely would." Id.  Especially in light of the unprecedented security concerns surrounding the Capitol in 2021, however, as well as the Board's responsiveness in adapting the restrictions to meet the present threat without going further than necessary, the Court concludes that the Traffic Regulations were narrowly tailored in that they "achieve [the Government's] intended objectives while also permitting some demonstrations on the [West Front Lawn]." Id.

Third and last, the Traffic Regulations also leave open ample alternative channels of communication.  Mahoney contends that "[b]y closing all of Capitol Square to demonstration activity, the Government has failed this requirement."  Pl. Opp. at 20.  That argument ignores the fact that Plaintiff remained free to demonstrate with fewer than 20 people in his desired location, and with 20 or more in most of the numbered areas on the Capitol Grounds.  In fact, some of those areas are across the street from Capitol Square and, like the West Front Lawn, also have prominent views of the Capitol, and Plaintiff offers no substantive reason why they are not of essentially equivalent utility.  See Am. Compl., ¶ 36; Traffic Regulations, Appx. G.  In short, "[b]ecause Plaintiff[] remain[s] 'free to engage in a rich variety of expressive activities' and retain[s] 'a multitude of possibilities for meaningful protest,' it matters not that the [Government] curbed but a single form of such potential expression."  Frederick Douglass Found., Inc., 531 F. Supp. 3d at 338 (quoting White House Vigil for ERA Comm. v. Clark, 746 F.2d 1518, 1528 (D.C. Cir. 1984)).

The Traffic Regulations thus implement facially constitutional time, place, and manner restrictions on speech.

13

b.   Prior Restraint

Undaunted, Mahoney asserts that the regulations are facially unconstitutional for yet another reason: they allegedly impose a standardless prior restraint on speech.  The Court can dispose of this challenge more swiftly.

A law acts as a prior restraint when it mandates that a speaker seek government permission before engaging in protected expression.  See, e.g., City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 757 (1988); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969).  Prior restraints implicate First Amendment concerns because they can involve "the danger of censorship and abridgment of . . . First Amendment freedoms" of speech and expression.  Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975).  As Plaintiff recognizes, however, prior restraints on speech are not *per se* unconstitutional; instead, regulations imposing permitting schemes on speech are unlawful only when they confer "virtually unbridled" discretion on the permitting authority.  Shuttlesworth, 394 U.S. at 151; see Pl. Opp. at 21.

To the extent that the Traffic Regulations require Government permission, the Court concludes that they impose exactly the type of "narrow, objective, and definite standards" necessary to withstand constitutional scrutiny.  Shuttlesworth, 394 U.S. at 151.  Indeed, the regulations are crystal clear about the standards for determining permit eligibility for demonstration activity: if a group of 19 or fewer people wishes to demonstrate, it may do so in any area on the Capitol Grounds classified as open to demonstration activity.  See Traffic Regulations §§ 12.2.10, 12.3.10.  A larger group, conversely, must submit a permit application.  Id. § 12.4.  Such requests will be approved as a matter of course unless the Board temporarily has ordered the particular area closed for large groups given present security concerns.  There is thus no reason to think that the Board exercises any meaningful discretion in making permitting

14

decisions.  In fact, beyond checking the current status of the demonstration area in question and ascertaining the size of the group, it is not clear what (if any) independent deliberation goes into permitting decisions.

Resisting this conclusion, Mahoney argues that the Board has provided no standards regarding how it determines which areas of the Capitol Grounds will be open or closed to large groups at a given time.  See Pl. Opp. at 22–23.  While Plaintiff is correct insofar as the Board does not make public a precise formula that guides its decision, that is largely beside the point here.  There can be little doubt that the Board makes such decisions based on its determinations about the present security risks posed at various areas on the Capitol Grounds.  To the extent that Mahoney demands that certain sensitive materials informing particular closure decisions be made public, the Board is expressly prohibited by statute from doing so.  Indeed, 2 U.S.C. § 1979(b) states that the Board may not release "any security information" to the public unless it "determines in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police."

In any event, the Board has explained that, consistent with the Traffic Regulations, a large group interested in demonstrating on the Capitol Grounds "need only ask which areas are available for the proposed demonstration" to understand whether its demonstration will be permitted.  See Reply at 15 (citing Traffic Regulations § 12.4.20 n.37).  It is thus plain that Defendants base their individual permitting decisions on "narrow, objective, and definite standards" — i.e., whether the area at issue is open or closed to large demonstrations. Shuttlesworth, 394 U.S. at 151.

     2.  *As-Applied Challenge*

Mahoney next contends that even if the Traffic Regulations are not unconstitutional on their face, Defendants' enforcement of them violate the First Amendment.  This is known as an "as-applied" challenge.  See, e.g., Mahoney, 642 F.3d at 1120.

     Before delving into the merits, the Court must determine the proper legal framework for analyzing the issue.  The crux of Mahoney's as-applied challenge is that the Board did not enforce the Traffic Regulations uniformly, as evidenced by the fact that it "allow[ed] other [demonstration] events requiring a permit to proceed while not affording Rev. Mahoney the same opportunity."  Am. Compl., ¶ 4; see Pl. Opp. at 25.  The Government contends that the challenge should therefore be viewed as a selective-enforcement claim, which is "properly analyzed under the Equal Protection Clause, not the First Amendment."  Motion to Dismiss at 11 n.5.  Guided by its holdings in a recent similar case, the Court agrees.

     In its first Opinion in Frederick Douglass Foundation, this Court noted that "the D.C. Circuit does not appear to have conclusively weighed in on which doctrinal framework governs claims of" this sort.  See 531 F. Supp. 3d at 328.  In its second Opinion, however, the Court observed that "[t]he Circuit's limited pronouncements . . . suggest that Plaintiffs' claim is better considered within the selective-enforcement framework of the Fifth Amendment than within that for as-applied First Amendment viewpoint-discrimination challenges."  Frederick Douglass Found., Inc. v. D.C., No. 20-3346, 2021 WL 3912119, at *4 (D.D.C. Sept. 1, 2021).  While the Court acknowledged that "[a]ny difference between these two approaches is, at least in this case, semantic rather than substantive," id. at *6 (quoting Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011)), it ultimately analyzed the challenge under the selective-enforcement framework. Id. at *6–10.  As Mahoney has not supplied any compelling reason to disavow the Court's

extensive prior reasoning — and at any rate admits that "whether the Court analyzes Government's actions here under the rubric of free speech or equal protection, the outcome is the same," Pl. Opp. at 24 n.7 — the Court will follow the same approach here.

  B. <u>Equal Protection</u>

 The gravamen of Mahoney's claim is that the Board selectively enforced the Traffic Regulations by denying his permit to host a large vigil on September 11, 2021, while allowing other groups to hold large demonstrations around that time. <u>See</u> Pl. Opp. at 24–27. He further alleges that the Board's selective enforcement "was based on the <u>content</u> of [his] speech." <u>Id.</u> at 25 (emphasis added); <u>see</u> Am. Compl., ¶ 4. Although the Amended Complaint briefly alludes to additional discriminatory enforcement based on his religion and identity, <u>see</u> Am. Compl., ¶ 4, Mahoney's Opposition focuses exclusively on the content of his proposed speech, and the Court will thus do the same.

 "When determining whether the [Equal Protection] Clause has been violated because of selective enforcement or prosecution, plaintiffs must establish two factors: 'that (1) [they were] singled out for prosecution from among others similarly situated and (2) that [the] prosecution was improperly motivated, <i>i.e.</i>, based on race, religion or another arbitrary classification.'" <u>Frederick Douglass Found., Inc.</u>, 2021 WL 3912119, at *7 (quoting <u>Branch Ministries v. Rossotti</u>, 211 F.3d 137, 144 (D.C. Cir. 2000)); <u>see also</u> <u>Wandering Dago, Inc. v. Destito</u>, 879 F.3d 20, 40 (2d Cir. 2018) (applying similar test in selective-enforcement claim based on viewpoint discrimination). The Court addresses the two requirements in order.

 Parties are "'similarly situated' for purposes of a selective enforcement claim 'when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.'" <u>United States v. AT&T Inc.</u>,

290 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting Branch Ministries, 211 F.3d at 145); see Frederick

Douglass Found., Inc., 2021 WL 3912119, at *7.  To satisfy this requirement, Plaintiff alleges

that the Board allowed at least three large demonstrations to go forward on the West Front Lawn

or Capitol Square during summer 2021 while not permitting him to hold a similar demonstration.

See Am. Compl., ¶¶ 38–48.  More specifically, the Amended Complaint alleges that "the Board

issued a permit allowing the American Conservative Union ('ACU') to hold a rally, which was

projected to attract 300 participants, on the Western Front Lawn on July 27, 2021, for the

purpose of seeking action by the Biden Administration against the oppressive communist

dictatorship in Cuba," and that the event "went forward" with "scores of people" in attendance.

Id., ¶ 39.  In addition to a second event on the West Front Lawn that same day, the Amended

Complaint also alleges that the Board allowed a third demonstration to proceed around that time.

Id., ¶¶ 40–41.  Mahoney alleges that, for the third event, the Board consented to a demonstration

"on the Eastern steps in front of the House of Representatives from approximately June 30 –

August 3, 2021, in an effort to convince the Biden administration to issue an executive order

continuing the residential eviction moratorium first implemented in the wake of COVID-19."

Id., ¶ 41.  The Amended Complaint further alleges that the Eastern steps were closed to

demonstration activity at the time, and that, with the Board's permission, the "demonstration was

attended by scores of people during both day and night."  Id.

    While the issue is no slam dunk for Plaintiff, the Court concludes that he has plausibly

alleged that the Board enforced the Traffic Regulations against him differently than against

others similarly situated.  Taking the Amended Complaint as true — which the Court must at this

stage — Mahoney plainly alleges that the Board allowed three large demonstrations to go

forward in late summer 2021 on or around the West Front Lawn, while it denied Mahoney's

application to do the same.  It is not apparent on the face of the Amended Complaint, moreover, that the permitted demonstrations involved "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." AT&T Inc., 290 F. Supp. 3d at 4 (quoting Branch Ministries, 211 F.3d at 145).

Not so fast, respond Defendants.  They note that "Plaintiff is not situated similarly to the applicants for the other events": "Those demonstrations were not subject to the Traffic Regulations because they were sponsored or requested by Members of Congress."  Motion to Dismiss at 20.  While the Court relied on this important point in denying the prior TRO, we are now at a different procedural stage.  In other words, the problem with this argument is that it is premised on facts not alleged in the Amended Complaint.  Rather, Defendants support their position by relying on a Declaration by Lieutenant Scott J. Grossi, which was submitted in connection with their previously filed Opposition to Mahoney's Motion for Temporary Restraining Order.  See ECF No. 10-1 (Grossi Decl.), ¶¶ 19–23.  While the Court could previously consider such information, at the motion-to-dismiss stage it may weigh only "the facts alleged in the complaint," "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Emp't Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).  Although the Government halfheartedly suggests that it may be appropriate to take judicial notice of the fact that the three other demonstrations at issue were sponsored or requested by Members of Congress, see Reply at 10, the Court agrees with Mahoney that taking judicial notice of such disputed facts is not warranted.  After all, "[a] federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it either 'is generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose

accuracy cannot reasonably be questioned.'" Hurd v. D.C., 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)). Defendants provide no source other than Grossi's disputed declaration to support their contention about the identity of the sponsors of the comparator demonstrations, and it would thus be improper to take judicial notice of such information. See Reply at 10.

The Court accordingly concludes that Mahoney has sufficiently alleged that the Board enforced the Traffic Regulations against him differently from how it enforced the rules against others similarly situated. To be sure, the Government may well prevail at summary judgment if it can show Congressional sponsorship of the other events. It also may ultimately prove significant that, as the Amended Complaint concedes, Mahoney's demonstration application was not the only one that was denied during summer 2021. See Am. Compl., ¶ 42. At this stage, however, when the Amended Complaint says nothing about the specifics of those other applications, and the Court is to "grant [P]laintiff the benefit of all inferences that can be derived from the facts alleged," Sparrow, 216 F.3d at 1113 (internal quotation marks and citation omitted), Plaintiff has satisfied the first prong of the selective-enforcement framework. In short, he has identified several large demonstrations that were allowed to go forward on or around the West Front Lawn while his was not, without any apparent and legitimate prosecutorial factors justifying such decisions.

That conclusion alone, however, is not enough for Mahoney to advance. Recall, plaintiffs "must clear an additional hurdle if their selective-enforcement claim is to survive: pleading sufficient facts to suggest that the [defendant] plausibly acted with an improper motive in enforcing the [regulations] against them." Frederick Douglass Found., Inc., 2021 WL 3912119, at *10 (citing Branch Ministries, 211 F.3d at 144). Acting with such motive "involves

a decisionmaker's undertaking a course of action 'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'" Iqbal, 556 U.S. at 676–77 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)); see also Frederick Douglass Found., Inc., 2021 WL 3912119, at *7 (quoting Branch Ministries, 211 F.3d at 144) (plaintiff must show "that [the] prosecution was improperly motivated, i.e., based on race, religion or another arbitrary classification").

Although the parties all but ignore this requirement, the Court again sides with Mahoney. In addition to the factual allegations referenced above, the Amended Complaint specifically alleges that "[t]he Government prohibited Rev. Mahoney's religious gathering while allowing non-religious public gatherings." Am. Compl., ¶ 87. Taking the Amended Complaint as true and refraining from looking to extra-record materials, Plaintiff has therefore alleged that the Board declined to enforce the Traffic Regulations against several large demonstrations that did not involve religious speech, while it enforced them against him because of the religious content of his speech. It is thus at least plausible that Defendants' decision was based on the content of Mahoney's speech, even if that is not the only plausible explanation. See Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("A complaint survives a motion to dismiss even [i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.") (internal quotation marks and citation omitted). Whether Mahoney will be able to prove the claim is a different question — one that the Court need not address today.

The Court's holding requires resolution of a related issue. Specifically, Mahoney also alleges that Defendants violated his constitutional right to assembly. See Am. Compl., ¶¶ 74–81. The precise contours of the claim are not terribly clear, as both parties treat it as a corollary of

21

the claim previously discussed and address the issue only in a footnote.  See Motion to Dismiss at 15 n.8; Pl. Opp. at 30 n.10.  What is clear at this stage is that all agree, in reliance on the same authority, Christian Legal Society Chapter of the University of California v. Martinez, 561 U.S. 661 (2010), that the free-assembly claim should rise and fall with Mahoney's as-applied free-speech challenge.  See Motion to Dismiss at 15 n.8; Pl. Opp. at 30 n.10.  In Martinez, the Supreme Court explained that "speech and expressive-association rights are closely linked," and that "[w]hen these intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review . . . only to be invalidated as an impermissible infringement of expressive association."  561 U.S. at 680–81 (internal citation omitted).  In light of the parties' agreement on this issue, the Government's lack of a showing that the claim should be dismissed, and the Supreme Court's language in Martinez, the Court will permit Plaintiff's freedom-of-assembly claim to advance to discovery.

     C.  Religious Exercise

Finished with the parties' various speech-related arguments, the Court now takes up their dispute about another bedrock yet fraught First Amendment question: religion.  Plaintiff alleges that Defendants violated both the Free Exercise Clause and RFRA by prohibiting him from carrying out a large prayer vigil on the West Front Lawn in remembrance of the events of September 11, 2001.  Because neither side distinguishes between the constitutional and statutory arguments, the Court will address both counts together.  See MTD at 15–17; Pl. Opp. at 30–33; see also, e.g., Branch Ministries, 211 F.3d at 142–44 (discussing Free Exercise and RFRA claims together).

RFRA provides, as relevant here, that the "Government shall not substantially burden a person's exercise of religion" unless "it demonstrates that application of the burden . . . (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)–(b); see also id. § 2000bb-2(2) (clarifying that RFRA applies to District of Columbia).  A challenger under RFRA has the initial burden of showing that the Government's conduct "substantially burdens his religious exercise."  Holt v. Hobbs, 574 U.S. 352, 361 (2015) (discussing burden under analogous Religious Land Use and Institutionalized Persons Act).  Plaintiffs carry the same initial burden when bringing a challenge under the Free Exercise Clause; as with RFRA, that Clause is implicated only "when a law or regulation imposes a substantial, as opposed to inconsequential, burden on the litigant's religious practice."  Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002); see also Branch Ministries, 211 F.3d at 142 ("To sustain its claim under either the [Free Exercise Clause] or [RFRA], [a plaintiff] must first establish that its free exercise right has been substantially burdened."); but see Brandon v. Kinter, 938 F.3d 21, 32 & n.7 (2d Cir. 2019) (applying substantial-burden requirement but questioning whether it survives Employment Division, Department of Human Resources v. Smith, 494 U.S. 872 (1990)).  Unlike in the RFRA context, however, if a plaintiff bringing a free-exercise challenge successfully demonstrates a substantial burden on religious exercise, courts will not inquire into whether the law imposes the least restrictive means of furthering a compelling governmental interest "so long as [it is] neutral and generally applicable."  Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1876 (2021) (citing Smith, 494 U.S. at 878–82).

In determining whether Plaintiff has carried his initial burden under both RFRA and the Free Exercise Clause — viz., that the Traffic Regulations impose a substantial burden on his exercise of religion — the Court is once again guided by Mahoney and other recent decisions of the D.C. Circuit.  In Mahoney, even though the plaintiffs insisted (and the court accepted) that

their abortion-related chalking efforts were "religiously motivated," the Court of Appeals concluded that the District's enforcement of an ordinance preventing them from doing so did not substantially burden their religious exercise.  See 642 F.3d at 1120–21.  As the panel explained, enforcing the ordinance neither "force[d plaintiffs] to engage in conduct that their religion forbids" nor "prevent[ed] them from engaging in conduct their religion requires."  Id. at 1121 (quoting Henderson v. Kennedy, 253 F.3d 12, 16 (D.C. Cir. 2001)).  That was true because the law "prohibit[ed] only 'one of a multitude of means' of conveying" plaintiffs' chosen religious message.  Id.

The Circuit recently reaffirmed that reasoning in a case in which a public-transit authority refused to accept an advertisement involving religion for display in its advertising space.  See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 897 F.3d 314, 320 (D.C. Cir. 2018).  There, the plaintiff organization's assertion that the advertising offered a "unique and powerful format" for its religiously motivated faith-spreading campaign was not enough.  Id. at 333.  The Court of Appeals explained that, notwithstanding that assertion, the plaintiff never "alleged that its religion requires displaying advertisements on" WMATA property, and that it "has many other ways to pursue its evangelization efforts."  Id.  "Sincere religious beliefs," the Circuit concluded, "are not impermissibly burdened by restrictions on evangelizing . . . where a 'multitude of means' remains for the same evangelization."  Id. (pointing to newspapers, social media, and city bus shelters as possible alternative means); see also Henderson, 253 F.3d at 16–17 (similar).

The principles outlined in these binding decisions foreclose Mahoney's claim that the Traffic Regulations impose a substantial burden on his exercise of religion.  The closest the Amended Complaint comes to alleging facts supporting such a claim is pleading that Plaintiff

"felt called by God to hold the September 11th prayer vigil on the Western Front Lawn," and that "[t]his was Rev. Mahoney's honest conviction."  Am. Compl., ¶ 115.  The Court does not question the sincerity of that belief.  Its mere "existence," however, and "even the sincere desire to act in accordance with it," is "not enough to sustain a claim."  Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 281 F. Supp. 3d 88, 114 (D.D.C. 2017), aff'd, 897 F.3d at 335; see also Mahoney, 642 F.3d at 1120–21 (accepting that pro-life advocacy is "religiously motivated" is insufficient to establish substantial burden on religious exercise).  Here, Mahoney has not alleged that his sincerely held religious belief required him to conduct his September 11 vigil with more than 19 people.  See Archdiocese of Wash., 897 F.3d at 333.  And remember that the West Front Lawn was available to him and 18 others.  Notwithstanding Defendants' enforcement of the Traffic Regulations, Plaintiff thus retained a "multitude of means" — including holding the vigil with his wife that he in fact went forward with — to carry out his religious exercise.  Id.

To be sure, Mahoney alleges that he "believed his proposed vigil would have attracted twenty (20) or more people."  Am. Compl., ¶ 45.  But nowhere does he allege that having a large group present was essential to carrying out his sincerely held religious belief.  Indeed, while Plaintiff contends that it is "farcical" to compare his and his wife's prayer on the West Front Lawn on September 11 with a "vigil," Pl. Opp. at 11 n.1, he does not allege in the Amended Complaint that the size of the vigil had any relationship to his exercise of religion.  Common definitions, moreover, belie his characterization.  The ordinary meaning of the term "vigil" — which the Amended Complaint uses repeatedly — has no connotation as to the number of people involved.  See Vigil, Merriam-Webster Dictionary, https://bit.ly/3GxVj8J (defining vigil as "an event or a period of time when a person or group stays in a place and quietly waits, prays, etc. . . .") (emphasis added).  Plaintiff has therefore not alleged that the Traffic Regulations

"force[d] [him] to engage in conduct that [his] religion forbids or . . . prevents [him] from engaging in conduct [his] religion requires." Mahoney, 642 F.3d at 1121 (quoting Henderson, 253 F.3d at 16).

Further, while the Court has no occasion to reach the issue, it seems entirely plausible based on the Amended Complaint that holding a larger vigil adjacent to Area 1 — still on the Capitol Grounds and "in the shadow of the Capitol Building," Am. Compl., ¶ 45 — would have allowed Mahoney to exercise his religious beliefs. See Archdiocese of Wash., 897 F.3d at 333; Mahoney, 642 F.3d at 1121 (although plaintiffs could not chalk, they could still spread religious message through picketing); Henderson, 253 F.3d at 16–17 (similar). Because there are ample other reasons for holding that Plaintiff has not demonstrated a substantial burden on his religious exercise, however, the Court will not definitively weigh in on whether such options provide yet another basis for dismissing his religious-exercise claims.

Mahoney does not even attempt to grapple with these decisions from the Court of Appeals. See Pl. Opp. at 30–33. Nor does he acknowledge the binding principles for which they stand. Rather, he simply maintains that it is "'not for the [Government] to say that [an adherent's] religious beliefs are mistaken or insubstantial,' nor may the Government inquire into the 'centrality' of the practice to the practitioner's religious life." Id. at 32 (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 725 (2014); then Kaemmerling v. Lappin, 553 F.3d 669, 678–79 (D.C. Cir. 2008)). Although Mahoney correctly states the law, it is of no help to him here. That is because, as the Court has already demonstrated, even accepting his allegations about his religious beliefs, the Traffic Regulations do not prevent him from engaging in conduct his religion requires.

In any event, even if Mahoney had established that the Government substantially burdened his religious exercise, the Court would nonetheless likely conclude that the Traffic Regulations impose the least restrictive means of furthering a compelling governmental interest. As a threshold matter, Plaintiff never opposes Defendants' alternate argument on this issue, see Pl. Opp. at 30–33, and the Court could thus consider the argument conceded.  See, e.g., Nat'l Sec. Couns. v. CIA, 898 F. Supp. 2d 233, 268 (D.D.C. 2012), aff'd, 969 F.3d 406 (D.C. Cir. 2020) ("[T]he Court may treat the plaintiff's failure to oppose the defendant's 12(b)(6) arguments as a decision to concede those arguments."); Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), aff'd, 98 Fed. Appx. 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  At any rate, however, Defendants appear to have the better argument on the merits, albeit without the benefit of any briefing by Plaintiff on the subject.

As discussed at length in the context of Mahoney's free-speech challenge under intermediate scrutiny, the relevant sections of the Traffic Regulations are narrowly tailored to advance the Government's significant interest in promoting security around the Capitol.  Rather than rehashing a similar analysis of the Government's interests, it suffices to state that such interests are compelling in a free-exercise analysis.  So, too, is it probable that the Traffic Regulations impose the least restrictive means of furthering that compelling interest.  Although courts apply a more exacting review when evaluating whether a compelling governmental interest justifies a burden on religious exercise than when analyzing a facial free-speech challenge to a content-neutral law, compare Fulton, 141 S. Ct. at 1881, with Lederman, 291 F.3d

27

at 44, Plaintiff supplies no compelling reason to think that distinction should dictate a different outcome in this case.  For substantially similar reasons that the Court concluded that the Traffic Regulations were narrowly tailored to advance the Government's security interest, it similarly would likely hold that they are the least restrictive means of advancing that interest.  For instance, the Traffic Regulations permit smaller groups to demonstrate without a permit in almost all areas on the Capitol Grounds, and they restrict the size of demonstrations only in the areas closest to the Capitol, where the greatest security risk is posed.  The restrictions, moreover, have been relaxed as more time has elapsed after January 6, 2021, demonstrating that the Board trims the scope of Traffic Regulations in response to updated threats.  In short, for many of the same reasons as discussed at length above, the Traffic Regulations likely "advance[] 'interests of the highest order'" via the least restrictive means available.  See Fulton, 141 S. Ct. at 1881 (quoting Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 546 (1993)).

Before moving on, the Court notes one last issue that it need not reach to decide this free-exercise claim.  Because it concludes that (1) the Government has not substantially burdened Plaintiff's religious exercise, and (2) even if it had, the Traffic Regulations represent the least restrictive means of furthering a compelling interest, it has no occasion to separately address whether the regulations are "neutral and generally applicable."  Id. at 1876.

D.  Due Process

That brings the Court to Mahoney's final challenge, brought under the Due Process Clause.  Here, he alleges that the Traffic Regulations are overbroad, allow the Government "unfettered discretion" over permitting decisions, and are unconstitutionally vague.  See Am. Compl., ¶¶ 97–100.  In his Opposition, Plaintiff clarifies that "[a]spects of [his] due process claim overlap with his free speech claim."  Pl. Opp. at 35.  In fact, with regard to his contentions

that the Traffic Regulations are facially overbroad and afford the Government unfettered discretion, he readily admits that "[t]he same conclusion applies under the Due Process Clause" as under the Free Speech Clause.  Id.  The Court agrees with this last point: because it has already rejected Mahoney's arguments about overbreadth and unfettered discretion in the First Amendment context, the same outcome obtains.

This means that just one due-process question remains: are the Traffic Regulations unconstitutionally vague?  The answer is no.  Even if Mahoney has a liberty interest in speaking on the West Front Lawn — which he never addresses, id. at 35–37 — there is no vagueness problem.

"The Due Process Clause 'requires the invalidation of laws [or regulations] that are impermissibly vague.'"  U.S. Telecom Ass'n v. FCC, 825 F.3d 674, 734 (D.C. Cir. 2016) (quoting FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012)).  That requirement stems from the "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  Fox Television Stations, Inc., 567 U.S. at 253.  "[A] regulation is not impermissibly vague," however, "because it is 'marked by flexibility and reasonable breadth, rather than meticulous specificity.'"  U.S. Telecom Ass'n, 825 F.3d at 737 (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).  "Instead, regulations withstand a vagueness challenge as long as a 'reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require.'"  Bellion Spirits, LLC v. United States, 7 F.4th 1201, 1214 (D.C. Cir. 2021) (quoting Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Review Comm'n, 108 F.3d 358, 362 (D.C. Cir. 1997)).  "Moreover, vagueness concerns are mitigated when regulated entities 'have

the ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process.'"  Id. (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)).

Applying those principles, the Court concludes that the Traffic Regulations are not unconstitutionally vague.  As discussed in the context of Plaintiff's facial free-speech challenge, the regulations' requirements for demonstrators are clear.  If a group of fewer than 20 people wants to demonstrate, it may do so in any area on the Capitol Grounds classified as open to demonstration activity.  See Traffic Regulations §§ 12.2.10, 12.3.10.  A group of 20 or more, however, requires a permit application.  Id. § 12.4.  Such requests will be approved as a matter of course unless the Board temporarily has ordered a particular area closed for large groups given security concerns.  Indeed, Mahoney himself admits that "the Traffic Regulations themselves, in conjunction with the Demonstration Map, are sufficiently definite to ward off a vagueness challenge."  Pl. Opp. at 36.  In his view, the "problem" instead is that "the Board opens and closes areas of the Capitol Grounds through secret Board Orders, which are not published in such a way that the general public is aware of them."  Id.  Once again, the Court is not persuaded by his effort to relabel an already debunked argument.

While Plaintiff appears to be correct that the Board does not make publicly available the reasons for its decision to open or close certain parts of the Capitol Grounds to large demonstrations, that nondisclosure is largely irrelevant.  Recall, Congress has explicitly precluded the Board from releasing "any security information" unless it "determines in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose

protection and safety is under the jurisdiction of the Capitol Police." 2 U.S.C. § 1979(b).  At any rate, Mahoney offers no compelling reason to conclude that the Board's not disclosing why certain parts of the Capitol Grounds are open or closed at a given time renders the Traffic Regulations constitutionally infirm.  What is relevant is whether a "reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." Bellion Spirits, LLC, 7 F.4th at 1214 (internal quotations marks and citation omitted). Consistent with the Traffic Regulations, an applicant "need only ask which areas are available for the proposed demonstration" to understand whether her large demonstration will be allowed to go forward.  See Reply at 15 (citing Traffic Regulations § 12.4.20 n.37).  It is thus difficult to argue that such an applicant does not have fair warning of whether her group can demonstrate in a particular area.  Such an "opportunity to obtain prospective guidance" also allays "any remaining concerns about [the Traffic Regulations'] allegedly unconstitutional vagueness." U.S. Telecom Ass'n, 825 F.3d at 738–39.

In sum, even assuming that the Government deprived Mahoney of a constitutionally protected liberty interest, the Court concludes that he received all the process that he was due under the Fifth Amendment.

\*       \*       \*

With the merits of Defendants' Motion resolved, the Court turns to remedies, the lone outstanding issue.  While it obviously cannot order any relief at this early stage in the litigation, it nonetheless addresses the topic now, as the parties dispute which forms of relief are available against which Defendants.  Defendants preliminarily contend that Mahoney cannot pursue damages on his constitutional claims against the Board and the individual Defendants sued in

their official capacity.  See Motion to Dismiss at 6–7.  Plaintiff eventually agrees with that position in his Opposition, see Pl. Opp. at 37, and the Court concurs.  See, e.g., Kim v. United States, 632 F.3d 713, 715 (D.C. Cir. 2011) ("It is well established that Bivens remedies do not exist against officials sued in their official capacities.").

So, what relief remains available to Mahoney on his selective-enforcement and free-association claims?  He contends that he may (1) "recover damages on his constitutional claims from the individual defendants in their personal capacities," and (2) "obtain declaratory and injunctive relief on all of his claims."  Pl. Opp. at 37.  Plaintiff is out of luck with regard to the first point because, regardless of whether he accurately portrays the law, he has not identified any Defendant who is named in his or her personal capacity.  See Am. Compl. at 1–2.  Rather, Defendants are the Board, four individuals associated with the board — each sued in only their official capacity — and John Does 1–5, sued "in their Official and Individual Capacities."  Id. While Mahoney may eventually be able to identify the unnamed Defendants, at present there are no named Defendants sued in their individual capacities from whom he could recover damages on his remaining constitutional claims.

Plaintiff is not entirely hung out to dry, however, because he also requests declaratory and injunctive relief.  The Government does not contest that these remedies are potentially available.  See Motion to Dismiss at 6–7.  Indeed, Defendants do not so much as mention remedies in their Reply after leading with the issue in their opening brief.  See Reply at 1–15; Motion to Dismiss at 6–7.  In light of that reality, Mahoney may pursue declaratory and injunctive relief on his remaining claims as the suit proceeds.

**IV.    Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

Motion to Dismiss.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 22, 2022