### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PATRICK J. MAHONEY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 21-2314 (JEB)** |
| **UNITED STATES CAPITOL POLICE BOARD,** *et al.*, | |
| **Defendants.** | |

### MEMORANDUM OPINION

After the January 6, 2021, assault on the Capitol, Defendant U.S. Capitol Police Board imposed heightened restrictions upon entry on to the Capitol Grounds, many of which persist today. As most relevant here, the Board established various limitations on demonstration activity. Those limits range from crowd-size caps in certain areas to blanket prohibitions on demonstrations in others. The Board also has a policy predating January 6 that groups of over twenty people must apply for and secure a permit before demonstrating on the Capitol Grounds.

Plaintiff Patrick J. Mahoney, a clergyman who would like to hold large group vigils on the Grounds for a range of occasions, brought this suit challenging those limitations and the Board's practices as unconstitutional. He named the Board and its individual members as Defendants. After a long and winding procedural journey marked by repeated motions for preliminary injunctions and a partial dismissal by this Court of his First Amended Complaint, he returns now with his Third Amended Complaint. Defendants have moved to dismiss and, in the alternative, for summary judgment. The Court will grant the Motion to Dismiss in part, and it will deny summary judgment in full.

I.      **Background**

As the backdrop to this drama was painted in detail in an earlier Opinion, <u>Mahoney v.</u>

<u>U.S. Capitol Police Bd. (Mahoney I)</u>, 566 F. Supp. 3d 1 (D.D.C. 2022), the Court here will take a

somewhat higher-level approach, but hardly a cursory one.

A.  <u>Legal Background</u>

It will first lay out the pre-2021 regulations governing demonstrations around the Capitol

before proceeding to additional ones imposed after the January 6 insurrection.

1.  *Traffic Regulations*

The Board regulates traffic within the Capitol Grounds.  <u>See</u> ECF No. 69 (3d Am.

Compl.), ¶ 20.  Pursuant to its statutory authority, it has promulgated a set of regulations — the

Traffic Regulations — that govern, among other things, "demonstration activity" on those

Grounds.  <u>Id.</u>, ¶¶ 20–21; Exh. A to 3d Am. Compl. (Traffic Regulations).  Demonstration activity

is "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct

engaged in for the purpose of expressing political, social, religious or other similar ideas, views

or concerns protected by the First Amendment."  Traffic Regs. § 12.1.10.

Demonstration activity is permitted in some parts of the Capitol Grounds and prohibited

in others.  The Regulations reference the U.S. Capitol Grounds Demonstration Areas Map, which

is reproduced below, to differentiate among those areas.  <u>Id.</u> § 12.2.10.



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

Id. App'x G.

Demonstration activity is completely prohibited in areas designated "No Demonstration Permitted," including a 250-foot buffer zone around the Capitol building. See 3d Am. Compl., ¶ 22. It is also prohibited on the steps of the Capitol and on the steps of any building on the Grounds. Id., ¶ 25. Demonstrations are permitted — though subject to some limitations — in "Demonstration Permit Areas." Id., ¶¶ 26–27. As relevant here, the nature of those limits depends on the size of the group. Groups of fewer than twenty people may demonstrate without a permit. See Traffic Regs. § 12.3.10. Larger groups, by contrast, must secure one. Id. § 12.4.10. "The Board shall issue a permit authorizing peaceable and orderly demonstration activity upon proper and timely application." Id. § 12.4.30. Applications for permits must be received at least ten days before the demonstration. Id. § 12.4.20.

3

That is not all, though.  Under 40 U.S.C. § 5104(f), "a person may not (1) parade, stand, or move in processions or assemblages in the [Capitol] Grounds; or (2) display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement."  The President of the Senate and Speaker of the House may suspend that prohibition, however, to "allow the observance . . . of occasions of national interest."  Id. § 5106(a).  The Traffic Regulations, citing § 5104(f), thus prohibit "[p]arades, assemblages and display of flags, banners or devices designed to bring into public notice a party, organization or movement" without authorization by the President of the Senate and the Speaker of the House.  See Traffic Regs. § 12.1.30(a).

The Regulations do not contain criminal-enforcement provisions.  See 3d Am. Compl., ¶ 31.  The U.S. Capitol Police, however, are authorized to enforce federal and D.C. law on the Capitol Grounds, including, for example, § 5104(f), violation of which may be punishable by a fine and imprisonment.  Id., ¶¶ 31, 34.  D.C. law, moreover, makes the Regulations indirectly enforceable by rendering it unlawful to "engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."  Id., ¶ 32 (quoting D.C. Code § 22-1307(b)(1)).  Violation of that provision is similarly punishable by a fine and imprisonment.  Id., ¶ 33.

2.    *January 6 Closures*

After the insurrection on January 6, 2021, security around the Capitol changed substantially and remains a topic of review.  As relevant here, the Board began by erecting an outer and inner fence around the Capitol Grounds and prohibiting all demonstration activity within fenced areas.  Id., ¶ 35.  In late March 2021, the outer fence was removed, and the Board

opened some areas to pedestrian traffic, demonstrations in groups of fewer than twenty people, and demonstrations with permits by groups between twenty and fifty people.  Id., ¶ 36.  In July of that year, the inner fence was also removed, although the Board did not then "formally open any additional areas to demonstration activity."  Id., ¶ 37.  The result was that as of July 2021 — which is when our story begins — the only areas formally open to demonstrations were Areas 3, 5, 6, 12, 15–18, and 23 on the Demonstration Area Map.  Id., ¶ 36.

    B.  Factual Background and Procedural History

Mahoney is a Presbyterian minister who would like to hold prayer vigils for various occasions on the Capitol Grounds.  Id., ¶¶ 3, 46.  The Board and its Traffic Regulations, however, continue to stand in his way.

    1.  *September 11, 2021, Vigil*

His troubles began when he decided to hold a vigil on the West Front Lawn (Area 1) to commemorate the twentieth anniversary of the September 11th attacks.  Id., ¶¶ 48, 51, 54. Because he expected the vigil to attract more than twenty people, he applied for a permit around July 2021.  Id., ¶ 51.  A month or so after he had submitted the application, the Board informed him that it would not be processing his application because the West Front Lawn was closed. Id., ¶ 52.  According to Mahoney, however, that was not really the case.  In the summer of 2021, the Board had allowed at least three events to occur in areas that were purportedly closed to demonstrations, including the West Front Lawn.  Id., ¶ 38.  First, the Board issued a permit for a 300-person rally on the West Front Lawn on July 27, 2021.  Id., ¶ 39.  That rally was organized by a group "seeking action by the Biden Administration against the oppressive communist dictatorship in Cuba."  Id.  Second, the Board issued a permit to the group "Marked by COVID-19" for another West Front Lawn event that took place that same day and that attracted twenty or

more people.  Id., ¶ 40.  And third, the Board allowed Representative Cori Bush to hold a large

demonstration without a permit in a "No Demonstration Permitted Area."  Id., ¶ 41.  The

demonstration, which sought an extension of the COVID-19 eviction moratorium, was attended

by "scores of people, day and night."  Id.  Mahoney alleges that the Board allowed those events

to go forward because, unlike his own proposed vigil, they were "sponsored, organized, or

advocated for by a member of Congress (or their staff)."  Id., ¶ 42 (internal quotations omitted).

The Board's refusal to process his application prompted him to file this lawsuit on

August 31, 2021.  Id., ¶ 56.  On the same day, he moved for a temporary restraining order and

preliminary injunction directing Defendants to allow him to hold the September 11th prayer vigil

on the West Front Lawn.  Id., ¶¶ 56–57.  On September 2, 2021, before the Court could rule on

the Motion, the Board reopened Area 1 (which, recall, includes the West Front Lawn) and Areas

8–11 to demonstration activity in groups of fewer than twenty.  Id., ¶ 59.  It also reopened a

number of other areas to permitted demonstrations for larger groups.  Id.  A week later, this

Court denied Mahoney's motion for a temporary restraining order.  Mahoney I, 566 F. Supp. 3d

at 7.  On September 11, he therefore "went forward with a prayer vigil on the West Front Lawn

with just his wife, as he was allowed to do."  Id.  "He then filed a six-count Amended Complaint

in November 2021, contending that Defendants had violated his First Amendment rights to

freedom of speech, freedom of association and assembly, and free exercise of religion; his Fifth

Amendment right to due process; his Fifth and Fourteenth Amendment rights to equal protection,

and the Religious Freedom Restoration Act."  Id. at 7–8.  Defendants moved to dismiss.

In an Opinion issued in February 2022, this Court granted the motion in part.  For now, it

is sufficient to understand that the Court dismissed four of the counts in the Amended Complaint

(including all religion counts) and allowed two speech counts to go forward.  Mahoney v. U.S.

Capitol Police Bd. (Mahoney (Good Friday 2022)), No. 22-760, 2022 WL 1014791, at *1 (D.D.C. Apr. 5, 2022) (summarizing, in related case, Opinion on first motion to dismiss in this case).  Later, this Court granted Mahoney's motion for reconsideration in part and allowed one more claim to proceed to discovery.  Mahoney v. U.S. Capitol Police Bd. (Mahoney II), 566 F. Supp. 3d 22, 25 (D.D.C. 2022).

> 2.  *2022 Vigils*

In the meantime, as he awaited a decision on his First Amended Complaint, Mahoney pressed on in his quest to hold a vigil on the West Front Lawn.  On January 31, 2022, he applied for a permit to hold a Good Friday event there on April 15, 2022.  See 3d Am. Compl., ¶¶ 61, 64. He expected that this vigil would attract 25 people.  Id., ¶ 63.  The Board responded in accordance with its regulations as of September 2, 2021: "[H]is permit application could not be processed because the West Front Lawn was restricted to groups of twenty or more people."  Id., ¶ 65 (internal quotations and alterations omitted).  Mahoney therefore proceeded to conduct that vigil with just three others.  Id., ¶ 66.  He had also filed a separate suit and motion for a preliminary injunction to compel the Board to grant him the Good Friday 2022 permit.  Mahoney (Good Friday 2022), 2022 WL 1014791, at *1.  This Court denied that motion and the D.C. Circuit affirmed.  Mahoney v. U.S. Capitol Police Bd. (Mahoney (Good Friday 2022 Appeal)), No. 22-5094, 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022).  While neither the denial nor the affirmance is directly relevant here, Judge Millett's concurrence in the latter raising selective-enforcement concerns could certainly become relevant down the road in any merits determination.

In May 2022, the Board shifted its position.  After declining to process Mahoney's application, it allowed a group of more than 100 people to conduct a gun-control demonstration

in Area 8, which is in Capitol Square.  See 3d Am. Compl., ¶ 68.  Like the West Front Lawn, Area 8 was at that point closed to groups larger than twenty.  Id., ¶¶ 59, 68.  The Board apparently permitted that demonstration to go forward because it was "sponsored, organized, or advocated for by a member of Congress (or their staff)."  Id., ¶ 69 (internal quotations omitted).

Mahoney continued his quest, seeking to hold two prayer vigils — one on September 10 in the Southeast Grassy Front (Area 10) and one on October 9 on the West Front Lawn — in relation to the 2022 Midterm Elections.  Id., ¶ 70.  Those locations were important to him primarily for their proximity to the Capitol and other congressional buildings.  Id., ¶ 71.  He expected the vigils to attract 25 participants and submitted applications in May so stating.  Id., ¶¶ 73–75.  The Board denied both applications on June 10, 2022.  Id., ¶ 76.

That prompted Mahoney to file a Second Amended Complaint and yet another motion for preliminary injunction to compel issuance of those permits.  Id., ¶ 77; ECF No. 52 (2d Am. Compl.).  Before this Court could hold a hearing on that motion, however, the Board changed its restrictions once more in light of the "security posture of the Capitol complex."  3d Am. Compl., ¶ 77.  It expanded the group-size limits for demonstrations from twenty to 250 for the West Front Lawn and from twenty to 150 for the East Grassy Front (Areas 8–11).  Id.  The Board accordingly began processing Plaintiff's two permit applications, and this Court held Mahoney's motion in abeyance pending a decision on those permits.  See ECF No. 57 (Notice of Mootness) at 2; Minute Order of July 28, 2022.

The Board eventually granted him a permit for his September 10 vigil but denied him a permit for his October 9 one because the West Front Lawn would be closed for a turf-restoration project.  See ECF No. 62 (Joint Status Report of Sept. 8, 2022) at 1.  Mahoney accordingly

withdrew his motion and his application for the October 9 vigil.  See 3d Am. Compl., ¶ 79.  He then moved to amend his Complaint once more.  See ECF No. 63 (Mot. to File 3d Am. Compl.).

      3. *2023 Vigils*

He filed his Third Amended Complaint — which, at least as of now, is the operative one — last December.  See 3d Am. Compl.  According to that pleading, Mahoney has many plans to hold vigils in 2023 and in years to come.  For example, "on Good Friday 2023 and every Good Friday of every year for the foreseeable future," he would like to engage in prayer vigils alone or with his wife in certain areas of the Grounds that are designated "no-demonstration zone[s]."  Id., ¶¶ 80–81.  Also on Good Friday 2023 and on "every Good Friday of every year for the foreseeable future," he would like to hold prayer vigils with twenty or more people on the West Front Lawn.  Id., ¶ 83.  Mahoney is in luck for now: his application for a permit for his Good Friday 2023 vigil was recently granted.  See ECF No. 77-1 (Supp. Decl. of Scott Grossi), ¶ 20.  But he has yet to file applications for future vigils because the Board does not permit applications to be submitted more than a year before the proposed event.  See 3d Am. Compl., ¶ 27.

On top of his Good Friday vigils, Mahoney also plans to hold a 5,000-person demonstration on the West Front Lawn around June 24, 2023, to celebrate the one-year anniversary of the Supreme Court's decision in Dobbs.  See 3d Am. Compl., ¶ 85.  Recall that the Board currently restricts demonstrations on the West Front Lawn to 250 people.  Id., ¶ 77.  Mahoney, believing it to be futile to apply for a permit to hold his event there, applied for and obtained a permit to hold the event on Union Square (Area 15) instead.  Id., ¶¶ 87–88; but see Supp. Grossi Decl., ¶ 21 (suggesting this application is still pending).  He would still like to hold the event on the West Front Lawn if allowed, however, as "Union Square . . . is not an adequate

substitute for the West Front Lawn."  3d Am. Compl., ¶ 88.  He also "desires to hold

demonstration of a similar nature . . . on or about June 24th of every year for the foreseeable

future."  Id., ¶ 90.  He anticipates such events attracting more than 250 participants.  Id.

        4.  *Third Amended Complaint*

The operative Complaint contains four causes of action.  Because Plaintiff takes a

kitchen-sink approach and crams various and sundry claims and sub-claims into each count, the

contours of those causes of action are difficult to make out.  Generally, however, they are as

follows.  Count I alleges violations of Mahoney's free-speech rights under the First Amendment.

He contends that the Traffic Regulations, the Board's permitting scheme, and its temporary

closures of various parts of the Grounds are both facially invalid and invalid as applied to him.

Id., ¶¶ 100–11, 118–20.  He also challenges § 5104(f) as facially overbroad and

unconstitutionally vague.  Id., ¶¶ 113–17.

In Count II, Plaintiff alleges that the Regulations as well as the Board's permitting

scheme, temporary closures, and other acts and practices violated his First Amendment rights to

assembly and association.  Id., ¶¶ 132–41.  Count III claims that the Regulations, the Board's

practices, and § 5104(f) are unconstitutionally vague and overbroad in violation of the Fifth

Amendment.  Id., ¶¶ 148–55.  It also challenges the Board's failure to publish or otherwise make

known temporary limitations on demonstrations on the Capitol Grounds.  Id., ¶ 150.  Finally, in

Count IV, Mahoney alleges that the Board's refusal to grant him a permit to demonstrate in

certain areas while allowing demonstrations sponsored by members of Congress to move

forward is a violation of his rights to equal protection as protected by the Fifth and Fourteenth

Amendments.  Id., ¶¶ 160–66.

The Complaint names as Defendants the Capitol Police Board and four of its members in their official capacity: Karen H. Gibson, William J. Walker, J. Brett Blanton, and J. Thomas Manger.  Id. at 1–2.  Plaintiff seeks declaratory and injunctive relief.  On the former, he would like a declaratory judgment holding that § 5104(f), the Regulations, the Board's permitting scheme, its temporary closures of the Grounds, and its other challenged practices are unconstitutional on their face and as applied to his permit applications.  Id. at 45.  He also seeks an injunction barring the Board from enforcing any of those practices and its Regulations and directing it to permit him to conduct his proposed vigils and demonstration activity.  Id. at 45–46.  He also asks the Court to require the Board to publish its restrictions on speech on the Capitol Grounds.  Id. at 46.

Defendants have moved to dismiss and, in the alternative, for summary judgment.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(1) permits dismissal of a complaint for lack of subject-matter jurisdiction.  In general, courts must first address jurisdictional arguments before turning to the merits.  See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co., 549 U.S. 422, 430–31 (2007).  A plaintiff bears the burden of proving that a court has subject-matter jurisdiction to hear her claims.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 1350 (2d ed.

1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), a court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005); see also Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Federal Rule of Civil Procedure 12(b)(6), on the other hand, permits dismissal of a complaint for failure to state a claim upon which relief may be granted.  In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  A court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

Finally, summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248.  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, Inc., 477 U.S. at 248.

## III.    Analysis

Defendants assert three threshold theories for dismissal, which the Court will address in separate sections.  It will last consider the Motion for Summary Judgment.

### A.  Sovereign Immunity

Defendants first posit that this Court lacks jurisdiction to hear Plaintiff's claims because they are barred by sovereign immunity.  See ECF No. 71-1 (MTD) at 9.  Mahoney responds that his suit falls within the Ex parte Young exception to sovereign immunity.  See ECF No. 73 (Pl. Opp.) at 13–18.  The Court agrees in large part.

"The Ex parte Young doctrine allows suits for declaratory and injunctive relief against government officials in their official capacities — notwithstanding the sovereign immunity possessed by the government itself."  Vann v. U.S. Dep't of Interior, 701 F.3d 927, 929 (D.C. Cir. 2012).  The exception applies only to suits alleging that government officials acted unconstitutionally or beyond their statutory authority.  Clark v. Libr. of Cong., 750 F.2d 89, 102 (D.C. Cir. 1984); Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645 (2002) (noting that Ex parte Young inquiry is "straightforward" and requires only an allegation

of violation of federal law) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997)).

For the most part, Plaintiff's suit falls comfortably within the Ex parte Young exception. His Complaint alleges a litany of ongoing violations of the Constitution.  See 3d Am. Compl., ¶¶ 96–169.  And he seeks only injunctive and declaratory relief, not damages.  Vann, 701 F.3d at 929 (permitting suit for declaratory and injunctive relief under Ex parte Young).  The one exception is that Mahoney also names the U.S. Capitol Police Board, which is an entity and not an official sued in her official capacity.  See 3d Am. Compl. at 1; Papasan v. Allain, 478 U.S. 265, 276 (1986) (noting that where an agency or department is named as a defendant, Ex parte Young cannot apply).  The Court will therefore dismiss the Board as a Defendant and allow the suit to proceed only as against the individually named officers.

Defendants, for their part, address the Ex parte Young doctrine for the first time in their Reply, raising several half-baked objections to its application.  First, they contend that the exception applies only to state officers, not federal ones.  See ECF No. 77 (Reply) at 9, 11. While Ex parte Young was indeed a case about state officials, the Supreme Court has recognized that doctrine's applicability to "violations of federal law by federal officials," too.  Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015).

Second, Defendants suggest that Ex parte Young cannot apply here because "Plaintiff is alleging that the Board is acting in accordance with the authorities delegated to it by Congress," as opposed to in contravention of federal law, as the doctrine requires.  See Reply at 11; see also id. at 10 ("Plaintiff has not alleged . . . that the Board or its individual members . . . is not exercising the powers delegated to [it/them] by the sovereign.") (internal quotations omitted). The Board may well be acting within its statutory authority, but Defendants have apparently

forgotten that statutes are not the only source of federal law.  Pollack v. Hogan, 703 F.3d 117, 120 (D.C. Cir. 2012).  Plaintiff's Complaint is replete with allegations that the Board and its officials acted and continue to act outside the scope of what the U.S. Constitution permits.  See generally 3d Am. Compl.  And to the extent that Defendants mean to dispute the merits of those allegations, those arguments would be misplaced at this juncture: "The inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim."  Verizon, 535 U.S. at 636–37.  A mere allegation of extra-legal action is sufficient.  The Court therefore concludes that sovereign immunity does not bar the suit against individual officers in their official capacities.

One final argument is worth a brief mention.  Defendants suggest in passing that this Court may lack jurisdiction because "Plaintiff cannot bring an action for declaratory and injunctive relief directly under the . . . Constitution," and so subject-matter jurisdiction cannot exist under 28 U.S.C. § 1331.  See MTD at 9.  Both that premise and its conclusion are incorrect. For one, Ex parte Young and other cases stand for the proposition that suits for equitable relief may indeed be brought directly under the Constitution.  See, e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 491 n.2 (2010); Reuber v. United States, 750 F.2d 1039, 1061 (D.C. Cir. 1984).  Second, the text of § 1331 could not be clearer that district courts have jurisdiction over claims "arising under the Constitution."  This jurisdictional argument therefore falls flat.

B.  Justiciability

Defendants next contend that Mahoney's suit is non-justiciable for various reasons.  To analyze this portion of the Motion, the Court finds it useful to split Plaintiff's claims into three categories: first, as-applied challenges to the Board's past denials of his permit applications;

second, as-applied challenges to anticipated future denials; and third, facial challenges to the Regulations and the Board's practices.

      1. *As-Applied Challenges: Past Denials*

Begin with claims premised on past denials of his permit applications — namely, those for "September 11th [of 2021] and Good Friday 2022 vigils."  Pl. Opp. at 25.  Mahoney alleges that the denials were unconstitutional for two reasons: (a) they were based on overbroad crowd-size restrictions that interfered with his speech and assembly rights, and (b) they were based on a practice of more favorably treating speech endorsed by a member of Congress.  See id. at 25–26.  As for the remedy, he seeks only a "declaration that [those] denials were impermissible."  Id. at 26; see also 3d Am. Compl. at 45.

Defendants respond that these claims are moot because the dates of the vigils have long passed, rendering this Court powerless to affect Mahoney's rights by issuing a decision on his claim.  See Reply at 14; DeFunis v. Odegaard, 416 U.S. 312, 317 (1974) (finding claim moot in case where it was clear that "in no event will the status of [plaintiff] now be affected by any view this Court might express on the merits of this controversy").

Article III of the Constitution limits federal courts' jurisdiction to "actual, ongoing controversies."  Honig v. Doe, 484 U.S. 305, 317 (1988).  If "events have so transpired that [a judicial] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," the case is moot, and this Court lacks jurisdiction to entertain the suit.  Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 534 (D.C. Cir. 2015) (internal quotations omitted).  However, "[i]n at least two kinds of cases the fact that the specific conduct that gave rise to the case has ceased does not mean that the challenge to the legality of that conduct is moot."  Del Monte Fresh Produce Co. v. United States, 570 F.3d

316, 321 (D.C. Cir. 2009).  First, a plaintiff may seek declaratory relief as to an "ongoing

policy."  Id.  Second, a claim for declaratory relief will not be moot if the claim "fits the

exception for cases that are capable of repetition, yet evading review, or falls within the

voluntary cessation doctrine."  Id. (internal quotations omitted).  The Court will consider the

mootness of his two substantive challenges in turn.

> a.  Crowd-Size Restrictions

As for his objection to the crowd-size restrictions, Plaintiff contends that his challenge is

not moot, largely citing the "capable of repetition, yet evading review" exception.  See Pl. Opp.

at 28–30.  The Court disagrees.

The "capable of repetition" exception "applies if (1) the challenged action was in its

duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a

reasonable expectation that the same complaining party would be subjected to the same action

again."  J. T. v. D.C., 983 F.3d 516, 523 (D.C. Cir. 2020).  Plaintiff has not shown that the

second requirement is satisfied.  As this Court explained in its prior Opinion in this case, there is

(a) no good reason to expect that Mahoney's pending or future permit applications would be

subjected to the closures in place in September 2021, or to the 20-person limit in place in April

2022, and (b) no reason, in any event, for this Court to prematurely intervene in anticipation of

the Board's reinstatement of long-rescinded restrictions:

> Because the Board implemented the restrictions at issue in this case
> "[i]n response to the events of January 6, 2021," and the restrictions
> have been progressively eased since then, there is no reasonable
> expectation that the old restrictions will be reinstated absent a
> change in security conditions at the Capitol.  While a novel security
> threat always remains a possibility, it would be premature for the
> Court to evaluate the potential return of narrower restrictions on
> speech at the Capitol in response to a future, hypothetical threat,
> which may implicate different government interests.  Instead, should
> such a contingency come to pass, Mahoney could bring a new

> challenge to any newly implemented restrictions that prevent him
> from demonstrating in his desired manner, and a court could then
> evaluate such a challenge based on the particular restrictions and
> conditions present at that time.

Mahoney II, 566 F. Supp. 3d at 27.  Indeed, that is exactly what Mahoney does in the operative

Complaint: he challenges newly implemented restrictions on crowd size.  See 3d Am. Compl.,

¶¶ 85–88 (alleging that 250-person restriction on West Front Lawn precludes him from

conducting vigils of desired size there).

Plaintiff retorts that the restrictions from September 2021, at least, have in fact recurred:

on January 6, 2023, the Board closed Capitol Square (which includes the West Front Lawn) to all

demonstration activity.  See Pl. Opp. at 29–30.  Such a position entirely disregards the distinctive

nature of the date January 6.  As this date marked the two-year anniversary of a violent

insurrection and unprecedented security breach of the Capitol Grounds, the Board's security

concerns are obviously greater on January 6 than on an average date, and by a considerable

margin.  As a result, this is not some random closure that Mahoney can invoke.  His mootness-

exception argument thus gains no traction.

### b.  Preferential Treatment of Congress

Consider next Plaintiff's as-applied challenges to the Board's past denials of his

applications while simultaneously giving preferential treatment to speech by (or sponsored by) a

member of Congress.  While Mahoney invokes the "capable of repetition yet evading review"

exception, that does not apply here.  See Pl. Opp. at 26.  Instead, this set of claims is best

analyzed through the lens of the exception for challenges to ongoing policies.  Del Monte, 570

F.3d at 321.

Once again, the Court cannot go back to September 2021 or to April 2022 and relieve

Mahoney from the harm caused by the prior denials of his applications; his chances to hold those

vigils have come and gone, and his as-applied challenges stemming from those denials are moot. That is not the end of the issue, however.  The Complaint also alleges that the Board <u>currently</u> interprets the Traffic Regulations in the same way as it did back then: to mean that "members of Congress — and those whose speech they favor — are not subject to the limitations" that the Regulations impose.  <u>See</u> 3d Am. Compl., ¶ 45.  Nowhere in their briefs do Defendants disavow this practice.  The Court must therefore assume at this stage that their preferential-treatment policy is an ongoing one.

Circuit precedent dictates that, in such a context, while Mahoney's "challenge to the standards as applied to [his] specific [permit applications] is, in fact, moot," there is "no question that [his] other arguments concerning the <u>facial</u> validity of the [policy] [are] <u>not</u> moot."  <u>Better Gov't Ass'n v. Dep't of State</u>, 780 F.2d 86, 91 (D.C. Cir. 1986) (formatting altered); <u>see also</u> <u>id.</u> (reaching same conclusion in case where plaintiffs' as-applied challenges to certain DOJ standards for FOIA had been mooted because "the Government clearly intends to apply these . . . standards . . . in the future").  The proper vehicle for challenging the Board's preferential treatment of members of Congress, then, is through such facial challenge, not an as-applied one. The Court will thus address that claim later in this Opinion.

        2.   *As-Applied Challenges: Future Denials*

To the extent that Mahoney wishes to make as-applied challenges predicated on future denials of his permit applications, those claims are for the most part not yet ripe.

"Jurisdiction requires that a claim be ripe for decision," <u>Colorado Wild Horse & Burro Coal., Inc. v. Salazar</u>, 890 F. Supp. 2d 99, 102 (D.D.C. 2012), as "Article III does not allow a litigant to pursue a cause of action to recover for an injury that is not 'certainly impending.'" <u>Wyoming Outdoor Council v. U.S. Forest Serv.</u>, 165 F.3d 43, 48 (D.C. Cir. 1999) (citation

omitted); see also Full Value Advisors, LLC v. SEC, 633 F.3d 1101, 1107 (D.C. Cir. 2011) ("A claim is not ripe where the 'possibility that further consideration will actually occur before [implementation] is not theoretical, but real.'") (quoting Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 735 (1998)).  The doctrine's purpose is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . until [a] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148–49 (1967).

    "In testing whether the facts of a particular case meet th[e] standard of ripeness, we have often applied a two-part analysis, evaluating [1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." Devia v. Nuclear Regul. Comm'n, 492 F.3d 421, 424 (D.C. Cir. 2007) (internal quotations omitted).  "Among other things, the fitness of an issue for judicial decision depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." Id. (citations and internal quotations omitted).  But "if a plaintiff's claim, though predominantly legal in character, depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe." Id. at 425 (quoting McInnis–Misenor v. Maine Medical Ctr., 319 F.3d 63, 72 (1st Cir. 2003)); see Chamber of Com. of U.S. v. Reich, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (claim not ripe "when deferring consideration might eliminate the need for review altogether").  Given that resolution of this first fitness factor is controlling, the Court need not assess the hardship factor.

    Mahoney would like to conduct a prayer vigil on Good Friday of 2023 and on Good Friday of every successive year, as well as on June 24, 2023, and on June 24 of every successive year, to celebrate the anniversary of Dobbs.  See Pl. Opp. at 19.  He brings as-applied challenges

20

to <u>anticipated</u> denials of permits.  But those challenges hinge entirely on future events that may

never come to pass — *i.e.*, Board decisions to reject his applications.  After all, the Board could

grant any given requested permit and obviate the need for judicial intervention as to that vigil.

Factual developments that have transpired during the briefing of this Motion prove that point.  In

the time between when Mahoney filed his Opposition and Defendants filed their Reply, the

Board approved Plaintiff's permit application for his Good Friday 2023 vigil.  <u>See</u> Supp. Grossi

Decl., ¶ 20.  Had the Court unwittingly weighed in before said action, its decision would have

been entirely advisory.  Waiting would have been the prudent approach.  So, too, for the

remaining future vigils.  The permit application for June 24th is pending before the Board, and

Mahoney is still in the planning stages for that vigil.  <u>Id.</u>, ¶ 21; 3d Am. Compl., ¶¶ 85-89.  The

other permit applications have yet to be filed.  The "[r]esolution of [his] challenge to" the denial

of those permits thus "has all the earmarks of a decision that we may never need to make."

<u>Devia</u>, 492 F.3d at 425 (internal quotations omitted).  These claims are unripe.

   To the extent that Mahoney wishes to bring as-applied challenges to denials based on

<u>futility</u>, however, the Court will allow those to go forward to the extent they do not collapse into

the facial challenges discussed below.  Specifically, he alleges that he did not bother applying for

a permit to (a) hold his <u>Dobbs</u> 2023 event on the West Front Lawn, as he anticipates it will

attract 5,000 participants and the Board has imposed a 250-person limit; and (b) demonstrate in a

no-demonstration zone, as doing so would be futile.  <u>See</u> Pl. Opp. at 21–22.  He would still like

to bring as-applied challenges to both the crowd-size restriction and the no-demonstration zone.

The Court will allow him to do so.  It agrees that applying for both permits would have been

futile.  Unlike with the just-discussed applications, the claims thus do not depend on events that

may never come to pass; the denial of such permits is all but certain, and so the claims are ripe for review.

### 3.  *Facial Challenges*

That leaves the bulk of Mahoney's Complaint, which is composed of facial challenges to various regulations, policies, and practices.  Specifically, he objects to: existing crowd-size limitations for the West Front Lawn; the Board's preferential treatment of speech from or sponsored by members of Congress; the creation of "no demonstration zones"; limitations on the display of flags and banners imposed by § 5104(f) and § 12.1.30(a); and the Board's failure to publish its temporary restrictions on speech.  See Pl. Opp. at 21–22, 25–26.  These claims are ripe.

"A purely legal claim in the context of a facial challenge . . . is presumptively reviewable."  Sanchez v. Off. of the State Superintendent of Educ., 959 F.3d 1121, 1124 (D.C. Cir. 2020) (quoting Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 440 F.3d 459, 464 (D.C. Cir. 2006)).  Mahoney's facial challenges here are purely legal.  That is, they rest "not on the assumption that the agency will exercise its discretion unlawfully in applying the regulation[s or practices] but on whether [their] faithful application would carry the agency beyond" constitutional limitations on its authority.  Nat'l Ass'n of Home Builders, 440 F.3d at 465 (citation and internal quotations omitted).  Waiting for the point at which Plaintiff has applied for a permit and been denied one under these policies, or waiting until he has been punished for violating those regulations separate from the permitting scheme, would thus not render these challenges any more concrete or fit for judicial review.  Unlike the bulk of his as-applied challenges, moreover, the facial challenges do not depend on events that may never come to pass.

Defendants do not intimate otherwise.  They never argue that the legality of their crowd-size limitations, preferential treatment of Congress, and other policies would "change from case to case or become clearer in a concrete setting."  Id. at 464.  Nor do they dispute that the practices to which Mahoney objects are ongoing.  Finally, Defendants make no suggestion that the Board is or ever will be declining to enforce these policies, or even that enforcement is discretionary.  Cf. Sanchez, 959 F.3d at 1124 (implying that challenge to administration of discretionary rule would not be purely legal question that is presumptively reviewable); see, e.g., ECF No. 71-2 (Decl. of Scott Grossi), ¶ 20 ("Traditionally events sponsored or organized by Members of Congress are not subject to the rules regarding demonstrations on Capitol Grounds.").  Instead, they suggest only that the Court should wait until the "effects" of the challenged policies are felt by Mahoney.  See Reply at 13.  According to Plaintiff, however, those effects have been and continue to be felt, as the regulations and practices to which he objects affect his ability to speak and demonstrate freely.  See, e.g., Pl. Opp. at 24 (describing deterrent effect of Regulations).  In sum, Defendants offer no good reason for this Court to depart from the presumption of reviewability of Plaintiff's purely legal challenges.

The hardship prong of the ripeness test points in the same direction.  As Defendants make no mention of hardship and none is otherwise apparent, see, e.g., Reply at 13–15 (citing no hardships to agency), the Court assumes that there is none for them.  Where, as here, "there are no significant agency or judicial interests militating in favor of delay," the balance is likely to favor judicial review.  Nat'l Ass'n of Home Builders, 440 F.3d at 465 (citation and internal quotations omitted).  Mahoney, moreover, asserts that the hardship to him of delaying review is substantial because "the statutes and regulations [he] is challenging both inhibit and deter his constitutionally protected speech."  Pl. Opp. at 24.  The Court agrees with him that the

alternatives to resolving his claims now are unpalatable.  As to any challenges stemming from the permitting regime, he must either apply for a permit under what he believes to be an unlawful regime or be penalized for demonstrating without a permit.  As to challenges stemming from regulations that bar certain activities altogether — *e.g.*, the creation of no-demonstration zones — he must either engage in the futile exercise of applying for a permit he knows will be denied or risk being punished for not abiding by the restrictions.  In sum, both ripeness prongs militate in favor of reviewability.

C.  Law of the Case

Defendants next invoke the law-of-the-case doctrine.  They argue that many of Mahoney's remaining claims — *viz.*, those not being dismissed here — appeared in his First Amended Complaint, and this Court dismissed them in its 2022 Opinion.  They insist that the Court should not revisit those decisions.

The law-of-the-case doctrine dictates that absent "extraordinary circumstances," "the same issue presented a second time in the same case in the same court should lead to the same result."  Al Bahlul v. United States, 967 F.3d 858, 875 (D.C. Cir. 2020) (citations and internal quotations omitted).  "[W]hile the law of the case doctrine does not necessarily apply to interlocutory orders, district courts generally consider the doctrine's underlying rationale when deciding whether to reconsider an earlier decision."  Malewicz v. City of Amsterdam, 517 F. Supp. 2d 322, 328 (D.D.C. 2007).  "Effective trial-court management . . .  demands that parties be able to rely on the rulings that progressively direct proceedings toward trial," and judges must also protect judicial resources and those of the parties from delay and burden.  See 18B Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 4478.1 (3d ed. 2022).

For purposes of this analysis, it is helpful to place Mahoney's extant claims into three categories: (1) those that are in the operative Complaint but that were not in the First Amended Complaint; (2) those that were included in both Complaints and that the 2022 Opinion permitted to go forward; and (3) those that were included in both Complaints but that the 2022 Opinion dismissed.

Causes of action that fall into the first category survive because the law-of-the-case doctrine does not extend to previously undecided issues. These clearly include: (a) challenges to § 5104(f) and to § 12.1.30(a) of the Traffic Regulations, see Pl. Opp. at 11–12 (breaking out his four counts into nine claims and labeling this one Claim 7), and (b) challenges to current crowd-size restrictions on the West Front Lawn. Id. at 12 (Claim 9); see also id. at 35–36 (explaining why these claims should proceed). Similarly, law of the case cannot stand in the way of counts that fall into the second category since they were never dismissed. These include: (a) the challenge to no-demonstration zones, Mahoney II, 566 F. Supp. 3d at 30–31 (reinstating this claim on reconsideration); Pl. Opp. at 11 (Claim 3), and (b) the freedom-of-assembly claims, to the extent that they have not been dismissed for other reasons like mootness. Mahoney I, 566 F. Supp. 3d at 16. Finally, claims that fall into the third category, which the Court will identify shortly, are the only ones that may be barred by law of the case.

Now on to the less straightforward exercise. Some of Mahoney's causes of action straddle the line between the first and third category; in other words, while Defendants believe that the Court has previously decided these issues, Plaintiff would distinguish his new iterations of the claims from the original ones. The Court considers these arguably in-between claims in turn.

First up are Mahoney's facial Speech Clause challenges to the permitting regime.  In 2022, this Court dismissed his counts alleging that the Traffic Regulations are "facially unconstitutional because they both fail intermediate scrutiny and constitute an impermissible prior restraint on speech."  Id. at 8–13 (emphasis omitted).  The Third Amended Complaint reasserts numerous facial Speech Clause challenges to the Board's permitting framework.  See Pl. Opp. at 11 (Claims 1, 5–6).  Mahoney contends that these counts are materially different from those that were dismissed in 2022, largely because this Court evaluated the original claims in the context of Mahoney's admission that the Regulations are content neutral.  Id. at 33.  In his Third Amended Complaint, Mahoney makes no such admission.  Quite the opposite.  He specifically alleges that the Regulations are content based and challenges them on that ground.  Id. at 11 ("The Traffic Regulations are facially invalid . . . because . . . [they are] impermissibly content based.").  In light of his new factual and legal allegations, the Court will decline to rely on law of the case to dispose of these counts.

His related facial challenges under the Equal Protection Clause may go forward, too.  Id. (Claim 2, alleging facial invalidity of Regulations under Equal Protection Clause because allowing speech "based on whether it is 'organized,' 'sponsored,' or 'advocated' for by a member of Congress . . . does not comport with the concept of equal protection of the laws").  Defendants try to prevent him from invoking the Equal Protection Clause on the ground that this Court previously dismissed his as-applied equal-protection challenge in 2022.  See MTD at 17.  That is inaccurate.  In fact, that claim, which this Court construed as a selective-enforcement challenge, was one of the few that survived the motion to dismiss the First Amended Complaint.  Mahoney I, 566 F. Supp. 3d at 13–16.

Consider next Mahoney's vagueness and discretion-based challenges to the Regulations, a version of which this Court previously dismissed. Id. at 20–21. In his First Amended Complaint, Plaintiff alleged that "the Traffic Regulations . . . allow the Government 'unfettered discretion' over permitting decisions[] and are unconstitutionally vague." Id. at 20. He invoked both the Due Process Clause and the First Amendment in support of these claims. Id. At first blush, these allegations seem to reappear in a very similar form in his Third Amended Complaint. See, e.g., 3d Am. Compl., ¶¶ 100, 104, 148–50. In his Opposition, however, Mahoney argues otherwise. He clarifies that the current iterations take a different, narrower approach than did his previously dismissed ones. Whereas his First Amended Complaint alleged that the Board provided "no standards regarding how it determines which areas of the Capitol Grounds will be open," Mahoney I, 566 F. Supp. 3d at 12 (emphasis added), his operative Complaint takes issue only with the fact that allowing speech based on whether it is "organized, sponsored, or advocated for by a member of Congress" is vague and confers too much discretion on the Board. See Pl. Opp. at 33 (internal quotations omitted).

The Court accepts that distinction and rejects Defendants' contention that the new claims are "nearly identical in purpose" to the old ones. See Reply at 18. The analysis in this Court's 2022 Opinion, which focused on Mahoney's theory that the Board's permitting decisions were standardless, is completely unresponsive to a challenge that objects to the open-endedness of existing standards. The Court will therefore allow the vagueness and discretion-based claims to go forward. It also clarifies that to the extent Mahoney's vagueness challenges pertain to § 5104(f) and to § 12.1.30(a) of the Regulations, those may go forward, too, as this is the first time in this case that Plaintiff has raised those provisions. See, e.g., 3d Am. Compl., ¶¶ 113–17.

Finally, there is one claim that plainly falls into the third category and is therefore barred from relitigation: Mahoney's due-process challenge to the Court's failure to publish its restrictions.  In his First Amended Complaint, Plaintiff had alleged that the Regulations were unconstitutional because the "Board opens and closes areas of the Capitol Grounds through secret Board Orders, which are not published in such a way that the general public is aware of them."  Mahoney I, 566 F. Supp. 3d at 21.  The Court rejected that contention and dismissed the claim, reasoning:

> [A]n applicant need only ask which areas are available for the proposed demonstration to understand whether her large demonstration will be allowed to go forward.  It is thus difficult to argue that such an applicant does not have fair warning of whether her group can demonstrate in a particular area.

Id. (citations and internal quotations omitted).  Plaintiff later moved for reconsideration, and this Court stood by its prior decision on this count.  Mahoney II, 566 F. Supp. 3d at 31.  It held that "[w]hile it is not absurd for Plaintiff to seek public posting of all Board orders[,] . . . Mahoney has not demonstrated that declining to do so . . . runs afoul of the Constitution."  Id.

In his operative Complaint, Mahoney asks for another bite at the reconsideration apple. He once again brings a due-process challenge to the Board's failure to "publish [its] orders . . . or otherwise make known to the public the temporary limitations on speech it imposes."  3d Am. Compl., ¶ 150.  For the third time now, the Court rejects this cause of action.  In a last-ditch effort to convince the Court to reverse course, Mahoney argues that his Complaint "alleges new facts in connection" with the due-process claim.  Apparently, Plaintiff was "impermissibly directed by a United States Capitol Police Officer to disperse when he was engaging in permissible demonstration activity on Capitol Square in a group of fewer than twenty people.  At that time, Rev. Mahoney did not know — and had no way to learn — whether the Board had

imposed new restrictions on speech." Pl. Opp. at 34 (internal citation omitted). But Mahoney did have a way to know whether there were new restrictions on the Capitol Grounds: "[A]ll he (or any other citizen) need[ed] to do [was] contact the Special Event Section of the U.S. Capitol Police for information about which areas of the Capitol Grounds are available for demonstration activity." Mahoney II, 566 F. Supp. 3d at 31. That Plaintiff failed to do so and thereby suffered an inconvenience does not change the conclusion that the Board's practices are constitutional.

The Court will therefore dismiss this due-process claim for the same reasons it did so in 2022.

### D. Summary Judgment

Defendants' final argument, which is their basis for summary judgment, is the only one that attacks Plaintiff's Complaint on the merits. They submit that Mahoney's "'as applied' claim fails because Congresspersons are not comparators." MTD at 17. As a threshold matter, the Court notes (and Plaintiff also points out) that the Motion never specifies which as-applied claim must fail. Mahoney infers from the context, however, that Defendants seek summary judgment on his as-applied claim under the Equal Protection Clause in connection with the September 11th permit denial. See Pl. Opp. at 37. The Court also believes that this is the correct inference, and Defendants in their Reply do not dispute this. The Court therefore proceeds on the understanding that said Motion extends only to that claim. As a reader who has followed along thus far will recall, however, the Court has already indicated that it will dismiss that as-applied challenge as moot. See supra section III.B.1. Mahoney's equal-protection cause of action, however, goes beyond the September 11th permit denial and challenges the Board's current practices as unlawful. That part of his action may proceed for the reasons stated in section III.B.3.

Finally, Defendants in their Reply brief seek, for the first time, summary judgment on Mahoney's challenge to the no-demonstration zones.  The Court declines to consider this new argument presented for the first time in the Reply.  See, e.g., Alston v. D.C., 561 F. Supp. 2d 29, 37 (D.D.C. 2008) ("Generally, arguments raised for the first time in a reply are waived.").  The argument, it bears noting, is also flawed.  Defendants' sole ground for summary judgment is that Mahoney's case can be distinguished from a single D.C. Circuit case, Lederman v. United States, 291 F.3d 36 (D.C. Cir. 2002), which opined on First Amendment demonstration rights around the Capitol.  The Court struggles to understand why making such a distinction would justify summary judgment for the Defendants when Plaintiff's claim is based on far more than just an analogy to Lederman.

## IV.   Conclusion

For the foregoing reasons, the Court will grant the Motion to Dismiss in part and deny it in part, and it will deny the Motion for Summary Judgment.  A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  April 4, 2023