## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REVEREND PATRICK J. MAHONEY,** | **Civil Action No. 21-2314 (JEB)** |
| *Plaintiff*, | |
| v. | |
| **KAREN H. GIBSON, in her Official Capacity as U.S. Senate Sergeant at Arms and Doorkeeper and Chair, United States Capitol Police Board; WILLIAM P. MCFARLAND, in his Official Capacity as U.S. House of Representatives Sergeant at Arms and Member, United States Capitol Police Board; CHERE REXROAT, in her Official Capacity as Acting Architect of the Capitol and Member, United States Capitol Police Board; and J. THOMAS MANGER, in his Official Capacity as Chief of Police, United States Capitol Police and Ex-Officio Member, United States Capitol Police Board,** | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................**3**

ARGUMENT ............................................................................................................................**19**

I.   REV. MAHONEY IS ENTITLED TO SUMMARY JUDGMENT ON HIS FIRST
     AMENDMENT SPEECH AND ASSEMBLY CLAIMS......................................................... 19

     A.   The Traffic Regulations Violate the Unbridled Discretion Doctrine .......................... 20

     B.   The Traffic Regulations are Unconstitutional Under Forum Jurisprudence ............... 22

          1.   Rev. Mahoney's Speech is Protected ........................................................... 23

          2.   The Eastern Steps are a Traditional Public Forum...................................... 23

               a.   The entire Capitol Grounds are a traditional public forum............................ 23

               b.   The Board cannot show the Eastern Steps are nonpublic. ............................. 26

          3.   The Traffic Regulations are Impermissibly Viewpoint Discriminatory ................. 29

          4.   The Traffic Regulations are Content Based and Thus Subject to Strict Scrutiny,
               Which They Fail .................................................................................................... 31

               a.   The Traffic Regulations are content based. ..................................................... 31

               b.   The Board cannot show the preference for Members of Congress (and
                    those whose speech they approve) satisfies strict scrutiny............................. 32

          5.   The No Demonstration Zone Fails Intermediate Scrutiny ...................................... 34

               a.   The No Demonstration Zone is not narrowly tailored to the Board's
                    asserted interest in security....................................................................... 35

               b.   The No Demonstration Zone does not leave open ample alternative
                    channels of communication....................................................................... 41

          6.   The No Demonstration Zone is Impermissible Regardless of the Type of
               Forum ..................................................................................................................... 41

II.  REV. MAHONEY IS ENTITLED TO SUMMARY JUDGMENT ON HIS DUE
     PROCESS (EQUAL PROTECTION) CLAIM ................................................................ 43

III. REV. MAHONEY IS ENTITLED TO A PERMANENT INJUNCTION........................... 44

CONCLUSION.........................................................................................................................**45**

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995)................................................................................................. 43

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
901 F.3d 356 (D.C. Cir. 2018) ........................................................................... 21, 24

*Amalgamated Food Emp. Union Loc. 590 v. Logan Valley Plaza, Inc.*,
391 U.S. 308 (1968)................................................................................................. 24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................. 19

*Apprio, Inc. v. Zaccari*,
No. CV 18-2180 (JDB),
2022 WL 971001 (D.D.C. Mar. 31, 2022)............................................................... 19

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)........................................................................................... 30, 41

*Ateba v. Jean-Pierre*,
No. CV 23-2321 (JDB),
2023 WL 8469743 (D.D.C. Dec. 7, 2023)................................................................ 21

*Banner v. United States*,
428 F.3d 303 (D.C. Cir. 2005)................................................................................. 43

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963).................................................................................................. 21

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987)................................................................................................. 38

*\*Boardley v. U.S. Dep't of Interior*,
615 F.3d 508 (D.C. Cir. 2010)..................................................................... 21, 40, 41

*Bolling v. Sharpe*,
347 U.S. 497 (1954)................................................................................................. 43

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)................................................................................................. 20

*Capitol Square Rev. & Adv. Bd. v. Pinette*,
515 U.S. 753 (1995)................................................................................................. 23

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006).................................................................................. 44

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*,
    457 F.3d 376 (4th Cir. 2006) ............................................................................... 30

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
    561 U.S. 661 (2010) ............................................................................................. 20

*Citizens United v. FEC*,
    558 U.S 310 (2010) ........................................................................................ 20, 31

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ............................................................................................... 38

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) ............................................................................................. 21

*Clark v. Jeter*,
    486 U.S. 456 (1988) ............................................................................................. 43

*Cmty. for Creative Non-Violence v. Kerrigan*,
    865 F.2d 382 (D.C. Cir. 1989) ............................................................................ 26

*Cmty. for Creative Non-Violence v. Turner*,
    893 F.2d 1387 (D.C. Cir. 1990) .......................................................................... 21

*Conservation L. Found. v. Ross*,
    422 F. Supp. 3d 12 (D.D.C. 2019) ...................................................................... 44

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
    473 U.S. 788 (1985) ............................................................................................. 23

*Cox v. Louisiana*,
    379 U.S. 536 (1965) ....................................................................................... 22, 30

*Dellums v. Powell*,
    566 F.2d 167 (D.C. Cir. 1977) .............................................................................. 8

*Duchesne City, Utah v. Summum*,
    555 U.S. 1210 (2009) ........................................................................................... 32

*Edwards v. District of Columbia*,
    755 F.3d 996 (D.C. Cir. 2014) ............................................................................ 40

*Edwards v. South Carolina*,
    372 U.S. 229 (1963) ....................................................................................... 25, 41

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................................. 44

*Farina v. United States*,
    622 A.2d 50 (D.C. 1993) ..................................................................................... 26

iii

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978).............................................................................................. 31

*Florida Star v. B.J.F.*,
491 U.S. 524 (1989).............................................................................................. 38

*\*Forsyth Cnty. v. Nat'list Movement*,
505 U.S. 123 (1992)........................................................................................ 21, 28

*Frederick Douglass Found., Inc. v. District of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023)............................................................................ 31

*Freedom From Religion Found. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) .............................................................................. 21

*\*Frisby v. Schultz*,
487 U.S. 474 (1988).............................................................................................. 27

*Gonzalez v. Morse*,
No. 1:17-cv-00510-DAD-BAM,
2017 WL 4539262 (E.D. Cal. Oct. 11, 2017)...................................................... 28

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)............................................................................. 45

*\*Henderson v. Lujan*,
964 F.2d 1179 (D.C. Cir. 1992)................................................................. 26, 27, 28

*\*Housing Works, Inc. v. Safir*,
101 F. Supp. 2d 163 (S.D.N.Y. 2000)........................................................ 22, 28, 34

*Hudgens v. NLRB*,
424 U.S. 507 (1976).............................................................................................. 24

*Jeannette Rankin Brigade v. Chief of Cap. Police, aff'd*,
409 U.S. 972 (1972)......................................................................................... 8, 25

*\*Jeannette Rankin Brigade v. Chief of Capitol Police*,
342 F. Supp. 575 (D.D.C. 1972)................................................................ 8, 24, 27, 29

*Kaahumanu v. Hawaii*,
682 F.3d 789 (9th Cir. 2012) ............................................................................... 30

*\*Lederman v. United States*,
291 F.3d 36 (D.C. Cir. 2002)......................................................................... passim

*\*Lederman v. United States*,
89 F. Supp. 2d 29 (D.D.C. 2000).............................................................. 9, 25, 37, 41

iv

*Mahoney v. U.S. Cap. Police Bd.*,
   No. 22-5094,
   2022 WL 1177313 (D.C. Cir. Apr. 15, 2022)........................................................ 22, 29, 30, 31

*McCullen v. Coakley*,
   573 U.S. 464 (2014)............................................................................................. 27

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009)............................................................................ 44

*Minn. Voters All. v. Mansky*,
   138 S.Ct. 1876 (2018)........................................................................................... 21, 42

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983)............................................................................................. 33

*NAACP Alamance Cnty. Branch v. Peterman*,
   No. 1:20-CV-613,
   2020 WL 4738015 (M.D.N.C. Aug. 14, 2020)...................................................... 28

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982)............................................................................................. 20

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018).......................................................................................... 31

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998)............................................................................ 44

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983)............................................................................................... 42

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009)............................................................................................. 24

*Police Dep't of City Chicago v. Mosley*,
   408 U.S. 92 (1972)............................................................................................... 34

*Pouillon v. Owosso*,
   206 F.3d 711 (6th Cir. 2000) ............................................................................... 28

*Price v. Garland*,
   45 F.4th 1059 (D.C. Cir. 2002)............................................................................ 24

*R.A.V. v. City of St. Paul, Minn.*,
   505 U.S. 377 (1992)............................................................................................. 32

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)............................................................................................. 31

*Rosenberger v. Rector & Visitors of Univ. of Virginia,
515 U.S. 819 (1995)..................................................................................... 29, 41

Se. Promotions, Ltd. v. Conrad,
420 U.S. 546 (1975)........................................................................................ 20

Shuttlesworth v. City of Birmingham,
394 U.S. 147 (1969)................................................................................... 20, 21

*Solantic, LLC v. City of Neptune Beach,
410 F.3d 1250 (11th Cir. 2005) ..................................................................... 32

Southeastern Promotions, Ltd. v. Conrad,
420 U.S. 546 (1975)........................................................................................ 20

Southworth v. Bd. of Regents of Univ. of Wisc. Sys.,
307 F.3d 566 (7th Cir. 2002) ......................................................................... 30

*Summum v. Duchesne City,
482 F.3d 1263 (10th Cir. 2007) ..................................................................... 32

*Surita v. Hyde,
665 F.3d 860 (7th Cir. 2011) ......................................................................... 32

*Thomas v. Chicago Park Dist.,
534 U.S. 316 (2002)........................................................................................ 34

Turner Broad. Sys., Inc. v. FCC,
512 U.S. 622 (1994)........................................................................................ 30

*United States v. Grace,
461 U.S. 171 (1983)................................................................................... 27, 28

*United States v. Nicholson,
Nos. 20210-69A et al.,
97 Daily Wash. L. Rptr. 1213 (D.C. Ct. of Gen. Sess. June 19, 1969)........................ 8, 28, 45

United States v. Playboy Ent. Grp., Inc.,
529 U.S. 803 (2000)................................................................................... 32, 33

Warren v. Fairfax Cnty.,
196 F.3d 186 (4th Cir. 1999) ......................................................................... 32

Zukerman v. United States Postal Serv.,
961 F.3d 431 (D.C. Cir. 2020)................................................................ 24, 29, 41

**U.S. Constitution**

U.S. Const. amend I ........................................................................................ 20

U.S. Const. art. 2 § 1 ........................................................................................................ 40

U.S. Const. art. I, amend. XII ........................................................................................... 33

## Statutes

2 U.S.C. § 1969(a) ............................................................................................................. 3

3 U.S.C. § 15 ................................................................................................................... 40

40 U.S.C. § 193f(b)(4)–(5)
  (now codified at 40 U.S.C. § 5104(e)(2)(D)-(E) ......................................................... 36

D.C. Code § 22-1307(b)(1) ............................................................................................. 18

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................................ 19

## Traffic Regulations

§ 12.1.10 .................................................................................................................... 15, 38

§ 12.1.20 .................................................................................................................... 15, 38

§ 12.1.30 ......................................................................................................................... 39

§ 12.2.10 .................................................................................................................... 15, 16

§ 12.2.20 ....................................................................................................... 16, 17, 22, 39

§ 12.3.10 ......................................................................................................................... 16

§ 12.4.10 ......................................................................................................................... 16

§ 158 ............................................................................................................................... 38

Appx. G ........................................................................................................................... 26

Traffic Regulations For The United States Capitol Grounds, amended January 2, 2024 ............. 15

## Other

https://www.c-span.org/video/?508097-1/moment-silence-victims-covid-19 ............................ 13

https://www.c-span.org/video/?514576-1/congressional-leaders-hold-september-11-
  remembrance-ceremony .................................................................................................... 13

https://www.c-span.org/video/?517013-1/congressional-vigil-january-6-anniversary ................ 13

https://www.c-span.org/video/?520225-1/lawmakers-mark-million-american-covid-19-deaths. 13

https://www.c-span.org/video/?525199-1/house-minority-leader-jeffries-marks-january-6-
    anniversary ................................................................................................................................ 14

Rev. Mahoney submits this Memorandum in Support of his Motion for Summary Judgment and permanent injunction. The Court should grant Rev. Mahoney's Motion.

**INTRODUCTION**

Rev. Mahoney is an ordained Presbyterian Minister and a peaceful man of God. He wants to hold a small demonstration on the eastern steps of the United States Capitol. But his event is illegal under the regulations governing speech on the Capitol Grounds, which create a "No Demonstration Zone" around the Capitol. If Rev. Mahoney holds his event, he could be arrested.

While *Rev. Mahoney* is prohibited from holding his event, *other people* are allowed to demonstrate on the eastern steps. Members of Congress may hold demonstrations there, and members of the public may attend those demonstrations. And Members of Congress may grant special favors to people whose speech they approve. If a Member of Congress sponsors a demonstration that a member of the public wants to hold on the eastern steps, the event may go forward, and members of the public may attend.

The No Demonstration Zone violates the Constitution, and the Court should enjoin it.

First, Members of Congress have unbridled discretion to decide what speech to sponsor in the No Demonstration Zone. Indeed, there are no standards whatsoever governing how Members of Congress decide whether to sponsor speech. This causes individuals to self-censor and violates the unbridled discretion doctrine.

Second, the No Demonstration Zone is inconsistent with forum jurisprudence. Rev. Mahoney's proposed event is protected by the First Amendment, the eastern steps are a traditional public forum, and the No Demonstration Zone violates the rules applicable to traditional public fora. For one thing, allowing Members of Congress to sponsor the demonstration activity of non-Members is viewpoint discriminatory. Members of Congress will, naturally, only sponsor speech

1

they agree with. Thus, allowing speech to go forward only if a Member of Congress approves it discriminates based on the viewpoint of the non-Members' speech.

Moreover, the No Demonstration Zone fails strict scrutiny. The preference for Members of Congress (and those whose speech they approve) is content based. In addition to allowing Members to discriminate against others based on content, the preference for Members itself is also content based. And there is no good reason for these preferences. While Members of Congress must have the ability to perform their constitutional duties—like voting on bills—their duties do not include engaging in demonstrations outside, on the Capitol Grounds. What is more, the exemption is not narrowly tailored. There is no plausible justification for why Members should have the power to delegate their privileges to non-Members. Instead, this creates a system of cronyism, where the politically connected may speak while ordinary Americans are muzzled.

The No Demonstration Zone also fails intermediate scrutiny. The government asserts the No Demonstration Zone is justified by security concerns, but it is not narrowly tailored to that end, especially considering the availability of less restrictive alternatives, like crowd-size restrictions, duration restrictions, or a permitting requirement. Moreover, there is no evidence regarding the nature—or even existence—of any current security threat, and the exemption for Members of Congress (and those whose speech they approve) fatally undermines the government's invocation of security. If the government can handle the security threat presented by demonstrations organized or sponsored by Members of Congress, it can handle demonstrations held by ordinary Americans.

Further, regardless of the type of forum, regulations of speech must always be viewpoint neutral and reasonable. The No Demonstration Zone violates these fundamental commands.

Third, the No Demonstration Zone violates the equal protection guarantee of the Fifth Amendment. It creates a classification—Members of Congress (and those whose speech they

2

approve) verses non-Members of Congress—that infringes upon the rights of speech and assembly. This infringement triggers strict scrutiny, which, as in the First Amendment context, the government cannot satisfy.

The Court should grant Rev. Mahoney's Motion in full.

## FACTUAL BACKGROUND

### THE CAPITOL GROUNDS

### Capitol Square

The United States Capitol building (the "Capitol") sits on the United States Capitol Grounds (the "Capitol Grounds"). *See* Stipulations of Fact ("Stip.") ¶ 1.[1] Within the Capitol Grounds, and immediately surrounding the Capitol, is a 58-acre park with grassy areas, trees, sidewalks, and several paved plazas. Stip. ¶ 2. This park, which is bounded by Constitution Avenue NW and NE to the north, First Street NE and SE to the east, Independence Avenue SW and SE to the south and First Street NW and SW to the south, is commonly referred to as Capitol Square. *Id.*

The United States Capitol Police (the "USCP") is authorized to police the Capitol Grounds at the direction of the United States Capitol Police Board (the "Board"). Stip. ¶ 3. The Board has "exclusive charge and control of the regulation and movement of all vehicular and other traffic" on the Capitol Grounds. 2 U.S.C. § 1969(a). Pursuant to that authority, the Board has installed barricades preventing automobiles from entering Capitol Square except through designated entry points. Stip. ¶ 5. But pedestrians generally have access to Capitol Square. *Id.* ¶ 6. As a result, members of the public—whether alone or in groups—use Capitol Square extensively, commuting, sightseeing, posing for pictures, exercising, and walking dogs. *Id.* ¶ 6.

---

[1] The parties agreed that the Stipulations of Fact and its exhibits, supplemented by facts that are the subject of judicial notice, shall govern summary judgment proceedings. ECF 92 ¶ 6. The Stipulations of Fact, along with its exhibits, has been filed seperately. ECF 95–96.

3

**The East Front Plaza**

The area to the east of the Capitol is commonly referred to as the East Front Plaza. *Id.* ¶ 7. The East Front Plaza contains two rectangular grassy areas, an area covered in pavers, two reflecting skylights, and raised sidewalks. *Id.* The United States Capitol Visitor Center ("Visitor Center") is located beneath the East Front Plaza, underground. *Id.* ¶ 8. Tourists generally enter the Capitol through the Visitor Center. *Id.* Below is an overhead photograph of the Capitol and the East Front Plaza, oriented with north at the top of the photograph:



*Id.* ¶ 10 and Exhibit 1.

The construction of the Visitor Center was completed in 2008. Stip. ¶ 11. It did not materially alter the areas at issue in this lawsuit. *Id.*

4

**The Eastern Steps**

The eastern side of the Capitol has three sets of marble steps—the eastern Senate steps lead to the Senate at the northeast side of the Capitol, the eastern Capitol steps lead into the due-east side of the Capitol, and the eastern House steps lead to the House of Representatives at the southeast side of the Capitol (collectively, the "Eastern Steps"). *Id.* ¶ 9; *see also id.* ¶¶ 12, 16, 20. Below is a photograph of the Capitol and the Eastern Steps from the northeast:



*Id.* ¶ 10 and Exhibit 2.

The eastern Senate and House steps are almost identical. The base of these steps is three-sided, facing north, east, and south. *Id.* ¶¶ 12–15, 20–23. The eighth and eighteenth steps have a small landing. *Id.* There is a divider (metal posts with a chain) between the large stone blocks at the second landing. *Id.* A sidewalk borders the base of the steps on all three sides. *Id.* Below are photographs of the eastern Senate and House steps, respectively, from the east:

5



*Id.* ¶ 67 and Exhibit 40; *Id.* ¶ 23 and Exhibit 11; *see also id.* Exhibits 5–7 (additional photographs



of eastern Senate steps) and Exhibits 10–12 (additional photographs of eastern House steps).

The eastern Capitol steps are configured differently from the eastern Senate and House steps. *Id.* ¶¶ 16–19. The base of the eastern Capitol steps is three-sided, facing north, east, and south. *Id.* The seventh step has a small landing. *Id.* There is currently a divider between the large stone blocks. *Id.* The paved area at the base borders the steps on all three sides. *Id.* Unlike the eastern House and Senate steps, the paved area at the base of the eastern Capitol steps is not raised. Below is a photograph of the eastern Capitol steps from the south:



*Id.* ¶ 67 and Exhibit 41; *see also id.* Exhibits 7–9 (additional photographs of eastern Capitol steps).

When not otherwise prohibited by temporary security restrictions or special events (like the State of the Union), members of the public may—and regularly do—sit, stand, and congregate on the Eastern Steps (up to the dividers) and areas at the base of the steps, as long as they do not impede ingress or egress or pose a security issue. *Id.* ¶ 67 and Exhibits 40–42; *see also id.* Exhibits 10–12. While it is possible for people who work in the Capitol to use the Eastern Steps for ingress and egress, they typically enter and exit the Capitol through other avenues. *Id.* ¶ 68.

**HISTORY OF DEMONSTRATION ACTIVITY ON THE EASTERN STEPS**

**Pre-1976**

In 1972, the Supreme Court first concluded that the Capitol Grounds are a traditional public forum. *See Jeannette Rankin Brigade v. Chief of Cap. Police,* 342 F. Supp. 575, 578 (D.D.C. 1972), *aff'd* 409 U.S. 972 (1972), Pl.'s Request for Judicial Notice ("RJN") Exhibit A. Since that time, there has been a rich history of protests, rallies, assemblies, and other forms of demonstration activity on the Capitol Grounds generally, and on the Eastern Steps in particular. Stip. ¶¶ 34, 42–46, 50–66. Before 1976, demonstration activity on the Eastern Steps was governed by an unwritten permit system administered by the USCP. *Id.* ¶ 42; *see also Dellums v. Powell*, 566 F.2d 167, 179–83 (D.C. Cir. 1977); *United States v. Nicholson*, Nos. 20210-69A *et al.*, 97 Daily Wash. L. Rptr. 1213, at (5-6) (D.C. Ct. of Gen. Sess. June 19, 1969), *aff'd*, 263 A.2d 56 (D.C. App. 1970), RJN Exhibit B.[2] Under this permit system, Members of Congress were allowed to engage in demonstration activity on the Eastern Steps, and Members of Congress could—and did—grant unwritten permits for non-Members to engage in demonstration activity there. Stip. ¶ 42; *see also Nicholson*, 97 Daily Wash. L. Rptr. 1213, at (5-6).

**1976-September 11, 2001**

In 1976, the Board enacted the Traffic and Motor Vehicle Regulations for the Capitol Grounds (the "Traffic Regulations"), which imposed certain restrictions on demonstration activity on the Capitol Grounds. Stip ¶ 41. As relevant here, the Traffic Regulations allowed members of the public to engage in demonstration activity on the Eastern Steps on certain terms and conditions that changed throughout the years. *Id.*; *see also id.* ¶¶ 44, 46. At times, the Traffic Regulations did

---

[2] The trial court's decision in *Nicholson* is not available on Westlaw, but that decision is attached as Appendix A to the D.C. Circuit's decision in *Dellums*. *See* 566 F.2d at 197–205.

not require a permit for small groups to conduct demonstration activity on the Eastern Steps, *id.* ¶ 46, at other times a permit was required, and, sometimes, demonstration activity was prohibited on certain of the Eastern Steps but not others. *Lederman v. United States*, 89 F. Supp. 2d 29, 33 (D.D.C. 2000) ("*Lederman I*") (noting that the then-current version of the Traffic Regulations allowed "[d]emonstration activity . . . on the East Front Center steps" with a permit), *on reconsideration in other part*, 131 F. Supp. 2d 46 (D.D.C. 2001), RJN Exhibit C.

In the late 1980s, Rev. Mahoney began engaging in demonstration activity on the Capitol Grounds, including the Eastern Steps. Stip. ¶ 46. For the next fifteen years or so, Rev. Mahoney participated in at least forty events on the Eastern Steps. *Id.* Below is a photograph from Rev. Mahoney's demonstration activity on the Eastern Steps in May 1999:



*Id.* ¶ 46 and Exhibit 18; *see also id.* Exhibit 19.

Historically, the Board interpreted the Traffic Regulations to create an implied exemption for Members of Congress. *Id.* ¶¶ 49, 69 and n.14. Under this exemption, the Board allowed

9

demonstration activity that was: (1) organized by a Members of Congress; (2) organized by a non-Member but sponsored by a Member; or (3) organized by a non-Member but advocated for by a Member. *Id.*; *see also* Declaration of Scott Grossi, dated September 8, 2021 ("Grossi Decl."), ¶¶ 19–20 (ECF 10-1) (explaining scope of exemption), RJN Exhibit D.[3] The Board interpreted the Traffic Regulations to have these exemptions until January 2, 2024, when the Board adopted a narrower exemption pursuant to the partial settlement of this lawsuit. Stip. ¶¶ 49, 69 and n.14.

**September 11, 2001**

In response to the events of September 11, 2001, the Board began prohibiting members of the public from conducting demonstration activity on the Eastern Steps. *Id.* ¶ 47. Members of Congress retained their exemption even after September 11, 2001. *Id.* ¶¶ 49, 69 and n.14.

There is no evidence in the record regarding the ongoing threat (if any) to the safety of the Capitol Grounds or Members of Congress posed by the events of September 11, 2001.

**Post-January 6, 2021**

In response to the events of January 6, 2021, the Board temporarily restricted public access to many areas within the Capitol Grounds, but it has long since lifted those access restrictions. *See* Grossi Declaration ¶¶ 11–14  (ECF 10-1). And while the events of January 6, 2021 themselves plainly posed a threat to the security of the Capitol Grounds and Members of Congress, there is no evidence in the record regarding the existence of any ongoing threat.

Pursuant to the Member exemption, the Board has regularly allowed Members of Congress to organize demonstration activity on the Eastern Steps and surrounding areas, including protests, ceremonials, and press conferences, despite the fact members of the general public may not

---

[3] In this context, "organize" means that the Member him- or herself is coordinating the activity and "sponsor" means that the Member is supporting the activity of another who is organizing the activity, including the activity of a non-Member. Stip. ¶ 69 n.12 and 13.

conduct demonsrtation activiy in those areas. Stip. ¶ 50; *see also id.* ¶¶ 24–30 (setting forth restrictions on demonstration activity in effect from February 17, 2019 through January 1, 2024) . Without attempting to catalogue all such demonstration activity, Rev. Mahoney identifies the following examples since January 6, 2021:

*Protests*

After Congress adjourned for its August 2021 recess, House Representative Cori Bush (D–MO) organized a protest on the eastern House steps up to the divider at the second landing and sidewalks at their base from approximately July 30–August 3, 2021. *Id.* ¶ 53. The purpose of this event was to seek to convince the Biden Administration to issue an executive order continuing the residential eviction moratorium first implemented in the wake of COVID-19. *Id.* Below is a photograph from Rep. Bush's event:



11

*Id.* ¶ 54 and Exhibit 25; *see also id.* Exhibits 18–27 (additional photographs of this event).

On or about July 25, 2023, Representative Greg Casar (D–TX) organized a protest on the eastern House steps up to the divider at the second landing and sidewalks at their base that lasted approximately eight hours. *Id.* ¶ 61. The purpose of this event was to protest a Texas law blocking local ordinances that mandated water breaks for workers. *Id.* ¶ 61. Below is a photograph of Rep. Casar's event:



*Id.* ¶ 62 and Exhibit 32; *see also id.* Exhibits 28–32 (additional photographs of this event).

Rep. Bush's and Rep. Casar's protests attracted scores of attendees for the duration of the events, most of whom were not Members of Congress. *Id.* ¶¶ 55–56, 63–64. Most of the attendees did not receive an invitation. *Id.* Instead, the attendees were generally members of the public who simply "showed up" to support Reps. Bush and Casar and their causes. *Id.* Rep. Bush, Rep. Casar, the Board, and the USCP did not know who most of the attendees were, and the Board did not require attendees to register or otherwise make their identities known to it or the USCP. *Id.*

12

*Ceremonials*

On January 19, 2021, four Members of Congress held a "moment of silence" on the eastern House steps to honor the victims of COVID-19. *Id.* ¶ 52. The "moment of silence" lasted approximately five minutes. *Id.; see also* https://www.c-span.org/video/?508097-1/moment-silence-victims-covid-19 (last visited October 1, 2023).

On September 13, 2021, approximately fifty Members of Congress held an event on the eastern House steps and sidewalks at their base in remembrance of September 11, 2001. *Id.* ¶ 57. The event involved prayer by a religious leader, singing by a United States miliary band, and statements by several members of Congress regarding September 11, 2001. *Id.; see also* https://www.c-span.org/video/?514576-1/congressional-leaders-hold-september-11-remembrance-ceremony  (last visited October 1, 2023).

On January 6, 2022, approximately seventy-five Members of Congress held an event on the eastern House steps and sidewalks at their base in remembrance of January 6, 2021. *Id.* ¶ 58. The event involved prayer by a religious leader, singing by a United States military band, a statement by Rep. Pelosi (D–CA), and a "moment of silence" to remember January 6, 2021. *Id.* The event lasted approximately ten minutes. *Id.; see also* https://www.c-span.org/video/?517013-1/congressional-vigil-january-6-anniversary (last visited October 1, 2023).

On May 12, 2022, approximately thirty members of Congress held an event on the eastern House steps and sidewalks at their base to honor the victims of COVID-19. *Id.* ¶ 59. The event involved prayer by a religious leader, singing by a United States military band, and a "moment of silence" to honor the victims of COVID-19. *Id.* ¶ 59. The event lasted approximately ten minutes. *Id.; see also* https://www.c-span.org/video/?520225-1/lawmakers-mark-million-american-covid-19-deaths (last visited October 1, 2023).

13

On January 6, 2023, over 100 members of Congress held an event on the eastern House steps and sidewalks at their base in remembrance of January 6, 2021. *Id.* ¶ 60. The event involved prayer by a religious leader, singing, statements by members of Congress, recitations by family members of deceased police officers, and a "moment of silence." *Id.* The event lasted approximately twenty minutes. *Id.*; *see also* https://www.c-span.org/video/?525199-1/house-minority-leader-jeffries-marks-january-6-anniversary (last visited October 1, 2023).[4]

*Press Conferences*

Members of Congress regularly hold press conferences on a wide array of topics on the Eastern Steps and areas at their base. *Id.* ¶ 65. The Board allows members of the press and the public to attend these press conferences, and it does not require attendees to register or otherwise make their identity known. *Id.* Below is a photograph of a press conference that was held on the eastern House steps and areas at their base on June 24, 2022:



---

[4] Rev. Mahoney will mail an electronic copy of the videos referenced herein to the Court.

*Id.* ¶ 66 and Exhibit 36; *see also id.* Exhibits 35–39.

In the future, the Board will continue to allow members of the press and the public to attend demonstration activity conducted on the Eastern Steps by Members of Congress—like the protests, ceremonials, and press conferences described above—and the Board will not require attendees to register or otherwise make their identity known to it or the USCP. *Id.* ¶ 65.

**THE CURRENT VERSION OF THE TRAFFIC REGULATIONS**

On January 2, 2024, the Board revised the Traffic Regulations pursuant to the partial settlement in this lawsuit. *Id.* ¶ 69; *see also* Traffic Regulations For The United States Capitol Grounds, amended January 2, 2024, RJN Exhibit E. Under the current Traffic Regulations, "[d]emonstration activity" is defined as "any protest, rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution." Traffic Regulations § 12.1.10. This definition applies "to any one . . . person or group of persons engaged in demonstration activity." *Id.* § 12.1.20.

"Demonstration activity" is only allowed "in designated areas as indicated on the 'United States Capitol Grounds Demonstration Areas Map,'" as approved December 5, 2012 (the "Demonstration Map"). *Id.* § 12.2.10 and n.3; *see also* Appx. G, RJN Exhibit F. The Demonstration Map, oriented with east at the top, follows:

15



*Id.* Appx G.

Under the Demonstration Map, areas in green are designated "Demonstration Permit Area." In these areas, demonstration activity is allowed for (1) individuals and groups of up to thirty people without a permit and (2) groups of more than thirty people with a permit. *Id.* §§ 12.3.10, 12.4.10. Areas in yellow are designated "Pedestrian Walkway – must not be impeded at any time." In these areas, demonstration activity is allowed for individuals and groups of up to thirty people without a permit, subject to the requirement that such activity may not impede the flow of pedestrian or other traffic. Stip. ¶ 27. Areas in red are designated "No Demonstration Permitted" areas. In these areas, no demonstration activity is allowed, even if being undertaken by a single person. *Id.*; *see also* Traffic Regulations §§ 12.2.10, 20.

As relevant here, the sidewalks immediately to the east of the eastern Senate and House steps are designated yellow—*i.e.*, "Pedestrian Walkway[s]." Stip. ¶¶ 27–28, 30. The eastern Senate

16

and House steps themselves and other sidewalks around them are designated red—*i.e.*, "No Demonstration Permitted." *Id.*; *see also* Traffic Regulations § 12.2.20 ("No person or group of any size may engage in demonstration activity on the steps of the United States Capitol . . . ."). Both the eastern Capitol steps themselves and the paved areas around them are designated red—*i.e.*, "No Demonstration Permitted." Stip. ¶ 29.

The Traffic Regulations now expressly set forth the terms of the Member exemption, which is different from what it has been historically. Traffic Regulations § 12.2.20; Stip. ¶ 69. Now, demonstration activity is exempt if: (1) "it is being done in [the Member's] official capacity"; (2) "it is being organized or sponsored by a Member of Congress"; and (3) "the Member(s) is personally in attendance . . . at all times." Traffic Regulations § 12.2.20. Non-Members may attend exempted demonstration activity, but the exemption will cease "if the organizing or sponsoring Member(s) departs." *Id.* Finally, the Member exemption no longer applies "when a Member of Congress merely advocates for demonstration activity organized or sponsored by others." *Id.*

## REV. MAHONEY'S PROPOSED DEMONSTRATION ACTIVITY

Rev. Mahoney wants to engage in demonstration activity—in the form of prayer, assembly, and protest—with a small group of other participants (3–5 others) on the Eastern Steps (below the dividers) and areas at their base (the "Proposed Demonstration Activity"). *Id.* ¶ 35. Rev. Mahoney wants to engage in the Proposed Demonstration Activity on Good Friday, the National Day of Prayer, September 11 (or thereabouts), Thanksgiving (or thereabouts), and Christmas (or thereabouts) of 2024 and each subsequent year for the foreseeable future. *Id.* ¶ 37.

The Eastern Steps and certain areas at their base are "No Demonstration Permitted" areas. *Id.* ¶ 38. Indeed, in August of 2021, Rev. Mahoney was engaged in demonstration activity on the eastern House steps (below the divider) and areas at their base that was materially indistinguishable

17

from the Proposed Demonstration Activity. *Id.* ¶ 39. Below is a photograph from Rev. Mahoney's August 2021 demonstration activity before it moved to the eastern House steps:



*Id.* ¶ 39 and Exhibit 14; *see also id.* Exhibits 15–16. Once Rev. Mahoney and the other participants moved to the eastern House steps, the USCP directed him to stop engaging in demonstration activity, informed him that he would be arrested if he did not comply, arrested him when he did not comply, and charged him with violating D.C. Code § 22-1307(b)(1). *Id.* ¶ 39. The USCP's enforcement of § 22-1307(b)(1) has not changed since August 2021. *Id.*

Based on these facts, Rev. Mahoney reasonably fears that he will be arrested for violating § 22-1307(b)(1) if he were to engage in the Proposed Demonstration Activity, and he will not engage in it. *Id.* ¶ 40. If Rev. Mahoney were to engage in the Proposed Demonstration Activity, the USCP would instruct him to cease, he would refuse, and he would be arrested. *Id.*

## ARGUMENT

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not "weigh the evidence and determine the truth" of the facts but instead must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Only disputes over facts that might affect the outcome of the suit" will "preclude the entry of summary judgment." *Id.* at 248. The Court's essential role is to "resolve legal questions." *Apprio, Inc. v. Zaccari*, No. CV 18-2180 (JDB), 2022 WL 971001, at *3 (D.D.C. Mar. 31, 2022).

Rev. Mahoney challenges the "No Demonstration Permitted" area around the Capitol (the "No Demonstration Zone"), both facially and as applied, insofar as he is prohibited from engaging in demonstration activity on the Eastern Steps and areas at their base.[5] Rev. Mahoney asserts claims under the First Amendment's Speech and Assembly Clauses and the Fifth Amendment's Due Process Clause. Rev. Mahoney is entitled to summary judgment on each of his claims.[6]

## I.    REV. MAHONEY IS ENTITLED TO SUMMARY JUDGMENT ON HIS FIRST AMENDMENT SPEECH AND ASSEMBLY CLAIMS

The Speech and Assembly Clauses of the First Amendment provide that the government "shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to

---

[5] For ease of reference, this Memorandum will refer to these areas as the "Eastern Steps." This term includes the eastern House and Senate steps and sidewalks at their base and the eastern Capitol steps and paved areas at their base (extending to the sidewalk traversing north to south).

[6] Under the terms of the partial settlement, the parties agreed that (1) Rev. Mahoney could maintain his challenge to the Traffic Regulations' prohibition of demonstration activity on the Eastern Steps and (2) Rev. Mahoney could invoke any argument in support of that challenge, including but not limited to the argument that the revisions to the Traffic Regulations made effective January 2, 2024 were inadequate to cure the constitutional deficiency in the prohibition of demonstration activity on the Eastern Steps. ECF 92 ¶ 5.a, c.

assemble." U.S. Const. amend. I. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government . . . ." *Citizens United v. FEC*, 558 U.S 310, 339 (2010). And "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982) (cleaned up); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (holding that the Constitution protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"). "The same ground rules" generally apply to claims under the Speech and Assembly Clauses. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 681 (2010).

The Traffic Regulations violate the Speech and Assembly Clauses, facially and as applied.

**A.  The Traffic Regulations Violate the Unbridled Discretion Doctrine**

The Traffic Regulations are facially unconstitutional because they impermissibly give unbridled discretion to Members of Congress to determine whether demonstration activity goes forward on the Eastern Steps. This is true regardless of what type of forum the Eastern Steps are.

The Traffic Regulations generally prohibit demonstration activity on the Eastern Steps, but members of the public may hold demonstration activity there if it is sponsored by a Member of Congress. This paradigm creates a prior restraint on speech. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975) (holding prior restraint existed where government board was "empowered to determine whether the applicant should be granted permission [to speak]").  While prior restraints are not *per se* unconstitutional, regulations that confer "virtually unbridled discretion" in government officials are. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). Such discretion presents two threats to the exercise of protected expression. First, the lack of standards

20

"intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757; *see also Boardley v. U.S. Dep't of Interior,* 615 F.3d 508, 517 (D.C. Cir. 2010) ("Even a content-neutral licensing scheme may raise significant censorship concerns if it vests government officials with unrestricted freedom to decide who qualifies for a permit and who does not."). Second, "the absence of express standards" makes it difficult for courts to differentiate between a "legitimate" denial of access and an "illegitimate abuse of censorial power." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

For these reasons, a prior restraint "comes to [court] bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). To meet this burden, the government must show that its regulations "contain 'narrow, objective, and definite standards'" to guide the decisionmaker. *Forsyth Cnty. v. Nat'list Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth*, 394 U.S. at 151); *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1390 (D.C. Cir. 1990) (same). Importantly, definite standards are required regardless of the type of forum. *Forsyth Cnty.*, 505 U.S. at 131 (traditional public forum); *Minn. Voters All. v. Mansky*, 138 S.Ct. 1876, 1891 (2018) (requiring existence of "objective, workable standards" to guide decisionmaker in nonpublic forum); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 372 (D.C. Cir. 2018) ("*AFDI*") (same); *Ateba v. Jean-Pierre*, No. CV 23-2321 (JDB), 2023 WL 8469743, at *11 (D.D.C. Dec. 7, 2023) (same); *see also Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) ("[T]here is broad agreement that, even in limited and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment." (collecting cases)).

The Board cannot make that showing here. The Traffic Regulations allow members of the public to organize demonstration activity on the Eastern Steps only if it is sponsored by a Member

21

of Congress. Traffic Regulations § 12.2.20. But there are no standards that govern whether Members of Congress will sponsor an individual's demonstration activity. Rather, that decision is left up to Members of Congress in their absolute discretion. This violates the unbridled discretion doctrine. Indeed, in Rev. Mahoney's separate case involving the Board's denial of his permit application to hold a prayer vigil on the Capitol Grounds on Good Friday 2022, Judge Millett concluded the Traffic Regulations' prior exemption for demonstration activity that was "sponsored" or "advocated" for by a Member of Congress violated the unbridled discretion doctrine. She stated:

> A law . . . cannot "provide[ ] that there [can] only be peaceful parades or demonstrations in the *unbridled discretion* of the local officials." [*Cox v. Louisiana*, 379 U.S. 536, 557 (1965).] "A long line of cases in th[e] [Supreme] Court makes it clear that [the government] cannot 'require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a *discretion* in the [government] to say some ideas may, while others may not, be disseminated.'" *Id.*

*Mahoney v. U.S. Cap. Police Bd.*, No. 22-5094, 2022 WL 1177313, at *3 (D.C. Cir. Apr. 15, 2022) (emphasis added) (Millett, J., concurring). This conclusion is no less true here. Because the exception for demonstration activity in the No Demonstration Zone that is sponsored by a Member of Congress lacks "any constraining [or] objective standards," it violates the First Amendment. *Id.*; s*ee also Housing Works, Inc. v. Safir*, 101 F. Supp. 2d 163, 170 (S.D.N.Y. 2000) (enjoining regulations under unbridled discretion doctrine where organization may speak if it has "political connections to City officials . . . whereas [a politically] unpopular group . . . may be limited").

**B.  The Traffic Regulations are Unconstitutional Under Forum Jurisprudence**

In addition, the Traffic Regulations' prohibition of speech on the Eastern Steps is also unconstitutional under the Supreme Court's forum jurisprudence, both facially and as applied. When evaluating a First Amendment claim involving the regulation of speech on government

22

property, the Court proceeds in three steps. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). First, the Court must decide whether the speech is protected. *Id.* Second, the Court must "identify the nature of the forum." *Id.* Third, the Court must "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id.* Under this test, Rev. Mahoney's speech is protected, the Eastern Steps are a traditional public forum, and the Board cannot justify its prohibition of demonstration activity.

### 1.   Rev. Mahoney's Speech is Protected

Rev. Mahoney wants to express the views—through group prayer, verbal speech, and signs—that "the solutions for the challenges facing America must involve God" and that "abortion is morally wrong, should not be supported by federal funds, and should be prohibited by law." Stip. ¶ 36. These ideas and forms of expression are protected by the First Amendment. *See Capitol Square Rev. & Adv. Bd. v. Pinette*, 515 U.S. 753, 760 (1995) ("[R]eligious speech, far from being a First Amendment orphan, is as fully protected under the [First Amendment] as secular . . . expression"). Indeed, the Board has stipulated that Rev. Mahoney's speech is protected. Stip. ¶ 35.

### 2.   The Eastern Steps are a Traditional Public Forum

The entire Capitol Grounds—other than building interiors—are a traditional public forum. Moreover, the Board cannot satisfy its burden of demonstrating that the Eastern Steps are somehow different from the rest of the Capitol Grounds.

#### a.   The entire Capitol Grounds are a traditional public forum.

"Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Cornelius*, 473 U.S. at 802 (cleaned up). This includes "streets, sidewalks, parks, and other similar public places" that are "historically associated with the exercise of First Amendment rights." *Amalgamated Food Emp. Union Loc. 590 v. Logan*

*Valley Plaza, Inc.*, 391 U.S. 308, 315 (1968), *abrogated on other grounds by Hudgens v. NLRB*, 424 U.S. 507 (1976). A designated public forum, by contrast, is "public property which the state has opened for use by the public as a place for expressive activity." *AFDI*, 901 F.3d at 364. In other words, "a designated public forum is a nontraditional public space the Government has opened to speech without restriction." *Id.* In a limited public forum, the government "has created a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2002) (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). And a nonpublic forum is "public property which is not by tradition or designation a public forum for expressive activity." *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020).

It has long been settled that the Capitol Grounds—other than building interiors, *Bynum v. U.S. Cap. Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000)—are a traditional public forum. In *Jeannette Rankin Brigade,* a woman's coalition wanted to hold a 5,000-person march throughout the Capitol Grounds to demonstrate their opposition to the Vietnam war. 342 F. Supp. at 578. The Board refused to allow the march, invoking 40 U.S.C. § 193g (now codified at 40 U.S.C. § 5104(f)), which prohibited "parad[ing], stand[ing], or mov[ing] in processions or assemblages" on the Capitol Grounds. *Id.* at 577. The Court disagreed. First, the Court observed that the Capitol Grounds, like other traditional public fora, "have traditionally been open to the public." *Id.* at 584. Second, the Court noted that "the primary purpose for which the Capitol was designed— legislating—[is entirely consistent] with" demonstration activity. *Id.* Indeed, as the Court pointed out, the Capitol Grounds are *uniquely* suited for demonstration activity, because "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion." *Id.*; *see also id.* ("[D]emonstrating on the grounds of the . . . legislature [is] 'an exercise of . . . basic

24

constitutional rights in their most pristine and classic form.'" (quoting *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)). Based on these considerations, the Court concluded that the "[t]he Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, *etc.*)" were a traditional public forum. *Id.* Accordingly, the Court held that § 5104(f) was unconstitutional. The Supreme Court affirmed, 409 U.S. 972 (1972), making *Jeannette Rankin Brigade* "binding precedent." *Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002) ("*Lederman II*"), RJN Exhibit G.

In *Lederman II*, the D.C. Circuit acknowledged the continuing vitality of *Jeannette Rankin Brigade*. There, the USCP had arrested the plaintiff, Robert Lederman, for demonstrating on the sidewalk in front of the eastern House and Senate steps, which were in the No Demonstration Zone under the then-applicable version of the Traffic Regulations. *Id.* at 40. In sustaining Mr. Lederman's challenge to the No Demonstration Zone, the D.C. Circuit observed that "the Capitol Grounds *as a whole* meet the definition of a traditional public forum." *Id.* at 41–42 (emphasis added); *see also id.* at 42 ("[T]he *entire* Capitol Grounds are a public forum." (emphasis added and cleaned up)); *id.* at 44 ("*[L]ike the rest of the Capitol Grounds*, the sidewalk is a traditional public forum." (emphasis added)); *see also Lederman I*, 89 F. Supp. 2d at 36–37 ("The notion espoused by the [government] that the area in the shadow of the Capitol Dome is something other than a traditional public forum is contrary to the weight of legal authority."). And on remand, this Court entered an order holding that the "core Capitol Grounds"—which the Court defined as all of Capitol Square—was a traditional public forum. Case No. 1:99-cv-3359-RWR, Memorandum Opinion (ECF 137) at 3 n.2, 4, 6 ("*Lederman III*"), RJN Exhibit H.

Thus, under *Jeannette Rankin Brigade, Lederman I, Lederman II*, and *Lederman III*, the entire Capitol Grounds are a traditional public forum. *See also Cmty. for Creative Non-Violence*

25

*v. Kerrigan*, 865 F.2d 382, 387 (D.C. Cir. 1989) ("There is no doubt that the Capitol Grounds are a public forum."); *Farina v. United States*, 622 A.2d 50, 55 (D.C. 1993) (noting that Capitol Grounds are "a quintessential public forum").

> b.    *The Board cannot show the Eastern Steps are nonpublic.*

Even if the question were not settled, the Court should conclude that the Eastern Steps are a traditional public forum. Because of *Jeannette Rankin Brigade*'s holding that the entire Capitol Grounds are a traditional public forum, the *government* bears the burden of establishing that a particular area of the Capitol Grounds is *not* a traditional public forum. *Lederman II*, 291 F.3d at 42 ("[T]o convince us the sidewalk is not a public forum, the Government must establish that the sidewalk differs from the remainder of the . . . Grounds in ways that make it uniquely 'nonpublic.'"). To make this showing, the Board must demonstrate that the property in question is "overwhelmingly specialized." *Id.* at 433 (quoting *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992) (holding sidewalk within Vietnam Veterans Memorial is a traditional public forum)). Only "when [the] government has dedicated property to a use inconsistent with conventional public assembly and debate" will the dedication "preclude[] classification" of the property as a public forum. *Henderson*, 964 F.2d at 1182. The Board cannot make this showing here.

First, the sidewalks around the eastern House and Senate steps are not overwhelmingly specialized. Indeed, it appears the Board agrees that the sidewalks immediately to the east of the eastern House and Senate Steps are a traditional public forum; those areas are designated yellow, or "Pedestrian Walkway[s]." Traffic Regulations Appx. G. And in *Lederman II*, the D.C. Circuit specifically held that the "East Front sidewalk is a public forum," 291 F.3d at 44, and there is no reason to think the D.C. Circuit did not mean what it said. In any event, these sidewalks are indistinguishable from one another—and from other sidewalks—for all relevant purposes. Thus,

the entire East Front sidewalk—including the north, east, and south sidewalks around the eastern Senate and House Steps—is a traditional public forum. *Lederman II*, 291 F.3d at 44; *see also Frisby v. Schultz*, 487 U.S. 474, 480 (1988) ("Ordinarily, a determination of the nature of the forum would follow automatically from this identification [as street or sidewalk]"); *United States v. Grace*, 461 U.S. 171, 177 (1983) (holding sidewalks surrounding Supreme Court are a traditional public forum); *Henderson*, 964 F.2d at 1182 (holding sidewalks that were "physically indistinguishable from ordinary sidewalks" were a traditional public forum).

Second, the Board cannot demonstrate that the paved area around the eastern Capitol steps is overwhelmingly specialized. That area differs from the area around the base of the Eastern Senate and House steps only insofar as it is not raised. *See* Stip. Exhibits 7–9, 41. But this is immaterial. The paved area—no less than the sidewalks—is open to tourists, joggers, dog-walkers, and strollers. Stip. ¶ 6. Moreover, the paved area is akin to a street, which the Supreme Court has characterized as "the archetype of a traditional public forum." *Frisby*, 487 U.S. at 480; *see also McCullen v. Coakley*, 573 U.S. 464, 476 (2014) ("Even today, [streets] remain one of the few places where a speaker can be confident that he is not simply preaching to the choir."). Further, this area, like the sidewalks nearby, is "entirely consistent with" demonstration activity. *Jeannette Rankin Brigade*, 342 F. Supp. at 584. The paved area is a traditional public forum.

Third, the Board cannot demonstrate that the Eastern Steps themselves are overwhelmingly specialized. Like the areas around the Eastern Steps, the Eastern Steps are open to the public—tourists, joggers, dog-walkers, and strollers—who may generally "sit, stand, or congregate" on them. Stip. ¶ 67 and Exhibits 40–42. And while people who work in the Capitol can technically access the building interior by way of the Eastern Steps, they typically enter through other avenues. *Id.* ¶ 68. In any event, the Eastern Steps are not so specialized that their only practical use is ingress

27

and egress. *Id.* ¶¶ 12, 16, 20 and Exhibits 4–12, 40–42. Instead, the physical characteristics of the Eastern Steps are consistent with demonstration activity. *Id.* The steps are wide, have short risers, and are open on three sides up to the dividers. *Id.* People can—and Members of Congress regularly do—conduct demonstration activity on the Eastern Steps. *Id.* ¶¶ 52–66; *see also id.* ¶ 42–46. On similar facts, case after case holds that steps to government buildings—even those not dedicated to legislating—constitute traditional public fora. *See, e.g.*, *Forsyth Cnty.*, 505 U.S. at 128 (courthouse steps); *Pouillon v. Owosso*, 206 F.3d 711, 717 (6th Cir. 2000) (steps to City Hall); *NAACP Alamance Cnty. Branch v. Peterman*, No. 1:20-CV-613, 2020 WL 4738015 (M.D.N.C. Aug. 14, 2020) (courthouse steps); *Gonzalez v. Morse*, No. 1:17-cv-00510-DAD-BAM, 2017 WL 4539262, at *2 (E.D. Cal. Oct. 11, 2017) (courthouse steps); *Housing Works*, 101 F. Supp. 2d at 167 (steps to City Hall). Indeed, the only court that has addressed the question of whether the Eastern Steps are a traditional public forum—the D.C. Court of General Sessions—held they are, a decision that was affirmed unanimously on appeal. *Nicholson*, 97 Daily Wash. L. Rptr. 1213, at (1-3), *aff'd* 263 A.2d 56.

It is true that, today, the Board generally prohibits members of the public from engaging in demonstration activity on the Eastern Steps, subject to the exemption for Members of Congress (and those whose speech they approve). But this prohibition does not undermine the conclusion that the Eastern Steps are a traditional public forum. Prohibitions on speech in a traditional public forum cannot "bootstrap themselves into validity by their mere existence, even if prolonged." *Lederman II*, 291 F.3d at 43 (quoting *Henderson*, 964 F.3d at 1183); *see also Grace*, 461 U.S. at 180–81 (concluding that the government "may not by its own *ipse dixit* destroy [a property's] public forum status" (cleaned up)). In other words, restrictions on speech in a traditional public forum—even those with a long history—do not change the nature of the forum. *Lederman II*, 291

F.3d at 43. Rather, the long history just means that the government has been violating the Constitution for a long time. *Id.*; *see also Jeannette Rankin Brigade*, 342 F. Supp. at 586 (enjoining 40 U.S.C. § 193g despite the fact it was enacted in 1882). And while the Board generally prohibits members of the public from engaging in demonstration activity on the Eastern Steps, it does not prohibit members of the public from sitting, walking, or congregating on the Eastern Steps, nor does it prohibit Members of Congress (or those whose speech they approve) from engaging in demonstration activity there. Granting favored speakers discriminatory rights in a traditional public forum does not change the nature of the forum either. Instead, for reasons discussed below, such discriminatory access is based on viewpoint, is unreasonable, and violates the Constitution.

For all these reasons, the Eastern Steps are a traditional public forum.

3. The Traffic Regulations are Impermissibly Viewpoint Discriminatory

The government engages in viewpoint discrimination when it discriminates against "particular views taken by speakers on a subject" or the speaker's "specific motivating ideology," "opinion," or "perspective." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). Viewpoint discrimination is impermissible regardless of the type of forum. *Id.* ("It is axiomatic that the government may not regulate speech based on . . . the message it conveys."); *see also Zukerman*, 961 F.3d at 444 (similar).

Similar to the unbridled discretion doctrine, the Traffic Regulations' exemption for demonstration activity that is sponsored by a Member of Congress also impermissibly authorizes Members to engage in viewpoint discrimination on the Eastern Steps. As Judge Millett stated in her concurrence in *Mahoney II*, Members of Congress will only sponsor demonstration activity when they approve its message. 2022 WL 1177313, at *2 (noting that a non-Member was "able to

29

obtain a permit [only] because" a Member "approved of the [non-Member's message"). But this amounts to viewpoint discrimination:

> Making the right to speak in a public forum wholly dependent on the approval and sponsorship . . . of a governmental official flies in the teeth of the First Amendment. The First Amendment does not tolerate a procedure by which government officials may indicate a "preference for the substance of what the favored speakers have to say[.]" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994). . . . Said another way, it is "clearly unconstitutional for a law to "enable a public official to determine which expressions of view will be permitted and which will not." *Cox v. Louisiana*, 379 U.S. 536, 557 (1965).

*Id.* In other words, it is viewpoint discriminatory for a government actor to "grant or deny access to a [forum] on the basis of whether [he] agrees with a [speaker's] views." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 676 (1998). Yet that is exactly what the Traffic Regulations allow. And because the Traffic Regulations fail to impose meaningful guardrails to ensure viewpoint discrimination does not occur, they are *per se* viewpoint discriminatory. *Mahoney II*, 2022 WL 1177313, at *3 (Millet, J., concurring); *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012) (holding that the "viewpoint neutrality requirement includes the prohibition on a licensing authority's unbridled discretion"); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006) ("[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to protect against the improper exclusion of viewpoints."); *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002) ("[W]e conclude that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."). Because the Traffic Regulations' exemption for demonstration activity that Members of Congress sponsor in the No Demonstration Zone is viewpoint discriminatory, they are unconstitutional.

30

4. <u>The Traffic Regulations are Content Based and Thus Subject to Strict Scrutiny, Which They Fail</u>

Even if the Traffic Regulations were not viewpoint discriminatory (and they are), they are content based, thus triggering strict scrutiny, which they do not satisfy.

*a. The Traffic Regulations are content based.*

The Traffic Regulations are content based for two reasons. First, as Judge Millett concluded, the exemption for demonstration activity that is "sponsored" by a Member of Congress "is not remotely content neutral." *Mahoney II*, 2022 WL 1177313, at *2 (Millett, J., concurring). Indeed, because viewpoint discrimination is a "more blatant and egregious form of content discrimination," *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) (cleaned up), the fact the Traffic Regulations are viewpoint discriminatory necessarily means they are content based, *Mahoney II*, 2022 WL 1177313, at *2 (Millett, J., concurring).

Second, the Traffic Regulations' exemption for demonstration activity that is "organized" by a Member of Congress is also content based. The Supreme Court's "precedents are deeply skeptical of laws that "distinguis[h] among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018); *see also Citizens United*, 558 U.S. at 340 (noting that "restrictions distinguishing among different speakers, allowing speech by some but not others" are impermissible); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–85 (1978) (noting that the government "is constitutionally disqualified from dictating . . . the speakers who may address a public issue"). "It is fundamental to our free speech rights that the government cannot pick and choose between speakers . . . when regulating." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023).

For this reason, "[r]estrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based." *Surita v. Hyde*, 665 F.3d 860, 870

31

(7th Cir. 2011); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005) (noting that "discrimination among different users of the same medium for expression . . . is another form of content-based speech regulation" (cleaned up)); *see also Summum v. Duchesne City*, 482 F.3d 1263, 1273 (10th Cir. 2007) (noting that "exclusions [from a public forum] based on the speaker's identity trigger strict scrutiny"), *cert. granted, judgment vacated on other grounds sub nom. Duchesne City, Utah v. Summum*, 555 U.S. 1210 (2009); *Warren v. Fairfax Cnty.*, 196 F.3d 186, 192 (4th Cir. 1999) ("Exclusion [from a public forum] on the basis of speaker-identity is valid only where the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest."). And importantly, when the government discriminates based on speaker identity, there is no requirement that the affected speaker must also prove that the government had "an intention to suppress [his] ideas." *Surita*, 665 F.3d at 871. Rather, discrimination based on speaker identity *is* content-based discrimination. *Id.* ("Actual disagreement . . . is not necessary for . . . [a speaker-based] regulation . . . to be content based.").

The Traffic Regulations' preference for Members of Congress (and those whose speech they approve) is content based on its face. The preference is also content based as applied to Rev. Mahoney's Proposed Demonstration Activity. Rev. Mahoney is not a member of Congress, nor has any Member of Congress sponsored his speech. Because the Traffic Regulations discriminate against him on the basis of speaker identity, they are content based both facially and as applied.

> b. *The Board cannot show the preference for Members of Congress (and those whose speech they approve) satisfies strict scrutiny.*

The Traffic Regulations' content-based restriction on speech is "presumptively invalid" and must satisfy strict scrutiny. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). That is, the Board must demonstrate that the regulation is "narrowly tailored to promote a compelling [g]overnment interest . . . . by the

32

[least] restrictive means." *Playboy*, 529 U.S. at 813; *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 584 n.6 (1983) (noting that "the government [must] justify any burdens on First Amendment rights"). The Board cannot make that showing here.

The Board will likely argue—as it has before—that the exemption for Members of Congress (and those whose speech they approve) is based on the fact that Members of Congress enjoy special "privilege[s] due to the unique nature of [their] constitutional duties." Case No. 22-760, Defs' Mem. Opp. Mot. Prelim. Inj. (ECF 11) at 11. But this argument is insufficient to satisfy strict scrutiny.

First, it does not reflect a compelling government purpose. While members of Congress assuredly have unique constitutional duties, they do not conduct official Congressional business outdoors, on the Capitol Grounds, nor is it within their unique constitutional duties to engage in demonstration activity on the Capitol Grounds or elsewhere. *See* U.S. Const. art. I, amend. XII, amend. XX (listing duties of Members of Congress). Members of Congress must, of course, enjoy some special rights of *access to the Capitol building*—where their offices are located, where the House and Senate floors are located, *etc.*—so they can perform their duties. But it is unreasonable to give them special privileges with respect to *demonstration activity on the Capitol Grounds* or elsewhere. After all, they are our elected representatives, not royalty.

Second, the exemption is not narrowly tailored. Even if *Members'* constitutional duties were a viable justification for the Member exemption (and it is not), the exemption applies beyond demonstration activity conducted by Members. Instead, Members may sponsor the demonstration activity of *non-Members*, and *non-Members* may participate with Members in demonstration activity the Member either organizes or sponsors. Even if it were permissible to give Members *themselves* special privileges to conduct demonstration activity on the Capitol Grounds, it is

33

unreasonable to (1) give them the power to authorize the speech of non-Members that they deem worthy or (2) authorize non-Members to participate in demonstration activity with them.

By granting an exemption from the Traffic Regulations to Members of Congress (and those whose speech they approve), the Board has, by mere fiat, converted the Capitol Grounds from a traditional public forum, open to all, to a place where ordinary Americans are muzzled while the select few are free to speak where and how they please. This is impermissible. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers . . . would of course be unconstitutional. . . ."); *Police Dep't of City Chicago v. Mosley*, 408 U.S. 92, 96 (1972) ("Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say."). This system of cronyism, where Members of Congress—and those whose speech they approve—are empowered to speak, while ordinary Americans are precluded from fully participating in public debate, is anathema to the First Amendment. *Housing Works*, 101 F. Supp. 2d at 170 (holding regulation that created "two standards governing the right to assemble on the steps . . . of City Hall, one for demonstrators, and another for City-sponsored speech" violated the First Amendment). The Court should not countenance it any longer.

### 5.   The No Demonstration Zone Fails Intermediate Scrutiny

Even if the Traffic Regulations were not content based (and they are), they do not satisfy intermediate scrutiny. To satisfy intermediate scrutiny, the government must demonstrate that content-neutral restrictions on speech (1) are "narrowly tailored to serve a significant government interest" and (2) "leave open ample alternative channels of communication." *Lederman II*, 291 F.3d at 44. The Board will presumably argue—as it has argued before—that the No Demonstration Zone is justified by security concerns due to the events of January 6, 2021. *See* Defs' Reply to

34

Mot. Summ. J. (ECF 77) at 21–22. But while security is undoubtedly a significant governmental purpose in the abstract, the Board has not come close to satisfying its burden of demonstrating that the No Demonstration Zone is narrowly tailored toward that goal or that it leaves open ample alternative channels for speech.

> a. *The No Demonstration Zone is not narrowly tailored to the Board's asserted interest in security.*

In *Lederman II*, after reaffirming *Jeannette Rankin Brigade*'s holding that the Capitol Grounds are a traditional public forum, the D.C. Circuit turned to Mr. Lederman's argument that the then-applicable No Demonstration Zone failed intermediate scrutiny. A copy of the Demonstration Map at issue in *Lederman II* is set forth below:



The Court held the No Demonstration Zone was not narrowly tailored to the Board's asserted interest in security for four reasons.

First, the Court noted that "per se bans on expressive conduct are inherently suspect." *Id.* at 45. Because the No Demonstration Zone almost entirely prohibited "certain types of speech (parading, picketing, leafleting, vigils, sit-ins, and speechmaking)," it raised serious constitutional concerns. *Id.* at 45.

Second, the Court explained that "the Constitution does not tolerate regulations that, while serving their purported aims, prohibit a wide range of activities that do not interfere with the Government's objectives." *Id.* (cleaned up). As the Court stated, "a single leafleteer standing on the East Front sidewalk" is not likely to "block traffic or threaten security." *Id.*

Third, the Court found problematic the fact that the Traffic Regulations prohibited demonstration activity but allowed other acts that seemingly presented similar security risks. *Id.* As the Court put it, "[f]reedom of expression would rest on a soft foundation indeed if government could distinguish between demonstrators and pedestrians on a wholesale and categorical basis, without providing evidence that demonstrators pose a greater risk to identified government interests than do pedestrians." *Id.* (cleaned up).

Fourth, the Court concluded that "the ready availability of substantially less restrictive alternatives that would equally effectively promote safety" put the nail in the No Demonstration Zone's coffin. *Id.* at 45 (cleaned up). Specifically, rather than prohibit all demonstration activity, the Board could strictly enforce existing laws that bar visitors to the Capitol Grounds from engaging in disorderly conduct. *Id.* (quoting 40 U.S.C. § 193f(b)(4)–(5) (now codified at 40 U.S.C. § 5104(e)(2)(D)-(E)). Or "the Board could require permits . . ., limit the duration of . . . demonstrations, restrict the number of individuals who may demonstrate simultaneously, [or] require that demonstrators present . . . personal possessions to police officers for screening." *Id.*

36

Because the No Demonstration Zone was not narrowly tailored, the Court "declare[d it] unconstitutional" and "remand[ed] for entry of an injunction barring [its] enforcement." *Lederman II*, 291 F.3d at 48. On remand, the district court entered an order—proposed by the parties—that permanently enjoined the government from enforcing the No Demonstration Zone, but only against Mr. Lederman. Case No. 1:99-cv-3359-RWR, Amended Order For Permanent Injunction, (ECF 138) ("*Lederman IV*"), RJN Exhibit I.

*Lederman II* controls the outcome here. As evident from a visual comparison of the Demonstration Map at issue in *Lederman II* and the Demonstration Map in place today (*compare infra* at 35 with *infra* at 16) and an evaluation of the Courts' description of the Demonstration Map in *Lederman*, *Lederman I,* 89 F. Supp. 2d at 32 and n.2; *Lederman II*, 291 F.3d at 39-40, the No Demonstration Zone in *Lederman* is almost identical to the one today. Because the two No Demonstration Zones are almost identical, it is straightforward that the current No Demonstration Zone is also unconstitutionally overbroad.[7]

Indeed, three features of the current version of the Traffic Regulations render today's No Demonstration Zone even more deficient than the one in *Lederman II*. First, today, the Traffic Regulations restrict even *more* speech than they did in *Lederman II*. In *Lederman II*, the Traffic Regulations only prohibited demonstration activity that had the "intent, effect or propensity to attract a crowd or onlookers," and they specifically excluded "wearing Tee shirts, buttons, or other similar articles of apparel that convey a message." 291 F.3d at 39 (quoting Traffic Regulations

---

[7] There appear to be only two minor differences in the two No Demonstration Zones. First, as previously noted, at the time *Lederman I* was decided, individuals were allowed to engage in demonstration activity on the eastern Capitol steps with a permit. 89 F. Supp. 2d at 33; see also *infra* at 35. Second, and presumably in response to *Lederman*, the current map now designates some of the sidewalks within the No Demonstration Zone—including two slivers of a portion of the East Front sidewalk immediately to the east of the eastern House and Senate steps—as "Pedestrian Walkway[s]." *Cf. infra* at 16. These differences do not impact the analysis here.

§ 158 (repealed)). The Traffic Regulations today, by contrast, contain neither of these limitations. Accordingly, the Traffic Regulations prohibit a dizzyingly broad array of activity in the No Demonstration Zone, including but not limited to two friends discussing politics while picnicking on the Capitol Grounds, an individual wearing a "Pro Choice" button while walking to work, a lone demonstrator standing with his fist in the air, or a religious leader quietly praying. Traffic Regulations § 12.1.10, 12.1.20. This does not remotely satisfy narrow tailoring. *Lederman II*, 291 F.3d at 40; *see also Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574–75 (1987) (invalidating regulation that prohibited "all First Amendment activities" in Los Angeles International Airport because "no conceivable governmental interest would justify such an absolute prohibition of speech"); *Bynum*, 93 F. Supp. 2d at 53, 58–59 (holding prohibition of demonstration activity in prior version of Traffic Regulations unconstitutionally overbroad).

Second, the exemption for Members of Congress (and those whose speech they approve) is unconstitutionally underinclusive and thus undermines "the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994); *see also Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (observing that when a regulation is underinclusive to the harm it was allegedly designed to address, that fact "raises serious doubts about whether [the government] is, in fact, serving . . . the . . . interests which [it] invokes").[8]

When a Member of Congress organizes or sponsors demonstration activity on the Capitol Grounds, members of the public may join them without "signing in," and there is no requirement that the Member, the Board, or the USCP approve the attendees or even know who they are. Stip. ¶¶ 56, 64, 65. Indeed, the only meaningful limitation on the demonstration activity is that the

---

[8] While the Member exemption existed at the time of *Lederman*, the Courts there did not consider the exemption's impact on narrow tailoring, presumably because Mr. Lederman did not raise the issue.

Member must be present at all times. Traffic Regulations § 12.2.20. Thus, in all material respects—*i.e.*, those related to security—demonstration activity that is organized or sponsored by a Member of Congress is no different from demonstration activity conducted by ordinary Americans. In fact, demonstration that is organized or sponsored by a Member of Congress presents *heightened* security risks. For one thing, under the Member exemption, there is no limitation on either the size of the group that may engage in the demonstration activity or the length of time in which they may engage in it. Stip. ¶ 69 and n.14; *see also* Traffic Regulations § 12.2.20. For another thing, demonstration activity that is organized or sponsored by Members of Congress necessarily involves personal attendance by a Member of Congress, which further heightens the security risks.

This is particularly true for Rev. Mahoney's Proposed Demonstration Activity. Rev. Mahoney is a peaceful man of God, and there is no evidence that a single one of his hundreds of protests on the Capitol Grounds over the past thirty-five years has presented a security threat to the Capitol. Stip. ¶¶ 33–34. Moreover, Rev. Mahoney's Proposed Demonstration Activity will involve only 3–5 other people, none of whom are a Member of Congress, and it will last no longer than ninety minutes. Stip. ¶¶ 35–36. The Board cannot legitimately prohibit events with a negligible risk to security, allow those with a significant security risk, and then hide behind claims that its actions are required by security concerns.

Third, the fact that the Traffic Regulations today expressly allow non-demonstration activity, such as tour groups organized for sightseeing purposes, Traffic Regulations § 12.1.30, to occur in groups of *any* size at *any* location within the No Demonstration Zone—including but not limited to the Eastern Steps, *see* Stip. Exhibits 10–12 (photograph of large group on eastern House steps)—solidifies the conclusion that the Traffic Regulations are not narrowly tailored. *Boardley*,

615 F.3d at 522 (observing that the "desire to be communicative is [not] a strong proxy for the likelihood that [the communicator] will pose a threat to . . . security").

The Board's invocation of January 6, 2021 does not change this outcome. While the events of January 6, 2021 certainly presented a security threat while they were ongoing, to satisfy its burden of demonstrating narrow tailoring, the Board must demonstrate that: (1) "the harms it recites are real"; (2) "its restriction will in fact alleviate [those harms] to a material degree"; and (3) "the challenged regulations directly advance its asserted interests." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014); *see also Boardley*, 615 F.3d at 519 (noting that "court[s] must closely scrutinize [a restriction on speech] to determine if it indeed promotes the Government's purposes in more than a speculative way" (cleaned up)). On the record before the Court, the Board has not demonstrated: (1) that there is any lingering threat to security associated with January 6, 2021, the events of which occurred on a specific day tied to a specific constitutional procedure that occurs only once every four years, *see* U.S. Const. art. 2 § 1; 3 U.S.C. § 15; (2) that prohibiting all demonstration activity in the No Demonstration Zone will alleviate the threat, whatever it may be; or (3) that the No Demonstration Zone restricts no more speech than necessary to achieve the Board's putative goals. Instead, the Board has simply trotted out the word "security" and waived it around like a talisman insulated from constitutional review. This does not remotely establish narrow tailoring. *Id.* ("[D]espite the [Government's] seemingly talismanic reliance on [its assertion of harm], the record contains no evidence [supporting the Government's assertions.]").

The Court should not allow the events of January 6, 2021 to give the Board a blank check to restrict peaceful speech on the Capitol Grounds, particularly considering the No Demonstration Zone was not even adopted in response to those events. *See infra* at 37 (noting effective date of

September 15, 1995); Traffic Regulations Appx. G (noting effective date of December 5, 2012). While security of the Capitol is certainly a compelling interest in the abstract, the Board has utterly failed to demonstrate that the No Demonstration Zone is narrowly tailored to that end.

> b.  *The No Demonstration Zone does not leave open ample alternative channels of communication.*

Capitol Square, and the Eastern Steps in particular, has a rich history of robust First Amendment expression.  Indeed, "there is perhaps no more important a place [for the freedom of speech] than the Capitol, the epicenter of our nation's democracy, where debate on public issues should be uninhibited, robust, and wide-open." *Lederman I,* 89 F. Supp. 2d at 36 (cleaned up). Indeed, that is precisely why Members of Congress engage in protests, conduct ceremonial events, and hold press conferences on the Eastern Steps—they convey a gravitas associated with the legislative process that no other public place in the Nation can. *See Edwards*, 372 U.S. at 235 (noting that "peaceably assembl[ing] at the site of . . . Government" reflects "exercise of . . . basic constitutional rights in their most pristine and classic form."). The Court should not countenance the Board's efforts to force disfavored speakers off this venerable platform for speech. *See Boardley*, 615 F.3d at 524 (rejecting prohibition on speech *at* national parks despite Government's argument that individuals can speak *near* national parks because proximity was inadequate).

### 6.  The No Demonstration Zone is Impermissible Regardless of the Type of Forum

Even if the Eastern Steps were not a traditional public forum (and they are), the No Demonstration Zone is unconstitutional. Regardless of the forum type, regulations governing speech must be viewpoint neutral and "reasonable in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829 (limited public forum); *Forbes*, 523 U.S. 682 (nonpublic forum); *Zukerman*, 961 F.3d at 444 (noting that viewpoint discrimination is prohibited in all forums). The Board cannot demonstrate the No Demonstration Zone satisfies these fundamental commands.

First, for reasons already discussed, the Traffic Regulations' exemption for Members of Congress (and those whose speech they approve) is viewpoint discriminatory. *Supra* at Section I.B.3. This conclusion renders the No Demonstration Zone unconstitutional regardless of which type of forum the Eastern Steps are.

Second, reserving access to the No Demonstration Zone for Members of Congress (and those whose speech they approve) is unreasonable in light of the purposes of the forum. A restriction is "reasonable" when it is "consistent with the [government's] legitimate interest in preserving the property for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 50–51 (1983) (cleaned up). "The [government] must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888. Here, for reasons already discussed, reserving access to the Capitol Grounds for Members of Congress (and those whose speech they approve) is unreasonable: (1) there are no standards for Members to apply when determining whether to sponsor demonstration activity of a non-Member; (2) Members' constitutional duties do not include conducting demonstration activity on the Capitol Grounds; (3) there is no colorable basis for allowing the Member exemption to apply as through the transitive property to those whose speech the Member sponsors or attendees at Member-organized or -sponsored events; and (4) demonstration activity organized or sponsored by Members of Congress stands in the same shoes as demonstration activity organized ordinary Americans vis-à-vis the Board's regulatory interest in security. *Supra* at Sections I.A, I.B.4.b, I.B.5.a.

In short, the exemption for Members of Congress (and those whose speech they favor) is both viewpoint discriminatory and constitutionally unreasonable, both facially and as applied. The

No Demonstration Zone thus fails under forum jurisprudence regardless of which type of forum the Eastern Steps are.

## II.    REV. MAHONEY IS ENTITLED TO SUMMARY JUDGMENT ON HIS DUE PROCESS (EQUAL PROTECTION) CLAIM

Rev. Mahoney is also entitled to summary judgment on his claim that the No Demonstration Zone violates his equal protection rights under the Due Process Clause of the Fifth Amendment, both facially and as applied. U.S. Const. amend. V.

The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws to the same extent the Equal Protection Clause of the Fourteenth Amendment does against the states. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995). Under these Clauses, "classifications affecting fundamental rights," such as the freedom of speech and assembly, "are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) ("Strict scrutiny . . . is warranted if the restriction jeopardizes exercise of a fundamental right . . . .").

Here, the Traffic Regulations' classification between Members of Congress (and those whose speech they approve), on the one hand, and non-Members, on the other hand, implicates Rev. Mahoney's First Amendment rights. Those in the favored group may speak in the No Demonstration Zone, while those who are outside of the group—like Rev. Mahoney—may not. Thus, strict scrutiny applies. And for reasons already discussed, the Board cannot demonstrate that the classification satisfies strict scrutiny. *Supra* at Section I.B.4.b. In short, Rev. Mahoney—like all other ordinary Americans—is similarly situated to Members of Congress (and those whose speech they approve) for all relevant purposes. Accordingly, the Traffic Regulations' classification violates the Due Process Clause of the Fifth Amendment, both facially and as applied.

43

### III.    REV. MAHONEY IS ENTITLED TO A PERMANENT INJUNCTION

In addition to entering a declaratory judgment in Rev. Mahoney's favor, the Court should permanently enjoin the Board from enforcing the No Demonstration Zone insofar as it prohibits demonstration activity on the Eastern Steps. To obtain a permanent injunction, the plaintiff must demonstrate: (1) "irreparable injury"; (2) inadequacy of "remedies available at law"; (3) that "the balance of hardships" tips in his favor; and (4) that "the public interest would not be disserved." *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) (cleaned up). This Court has "broad discretion in awarding injunctive relief." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998).

Rev. Mahoney is entitled to a permanent injunction. First, Rev. Mahoney is suffering irreparable harm because his First Amendment rights are "in fact being impaired." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (noting that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.))). Second, Rev. Mahoney's legal remedies are inadequate. Indeed, under *Bivens*, Rev. Mahoney is not entitled to legal relief. *See also Nat'l Min. Ass'n*, 145 F.3d at 1409 (noting that declaratory relief is "itself more equitable than legal in nature"). Third, an injunction will not impose hardship on the Board. The Board has no legitimate interest in enforcing an unconstitutional regulation, and the Traffic Regulations already allow (1) the general public to engage in non-demonstration activity on the Eastern Steps and (2) select groups to engage in demonstration activity on the Eastern Steps. These facts show that the Board can handle any security issues associated with allowing demonstration activity on the Eastern Steps. Fourth, the public interest would be served by an injunction. "[E]nforcement of an

44

unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). On these facts, a permanent injunction is warrented. *See also Lederman II*, 291 F.3d at 48 (directing this Court to enter an injunction "barring enforcement" of the No Demonstration Zone).

\* \* \*

The events of January 6, 2021 were unprecedented. The security threat to the Capitol was unlike anything we have seen in our lifetimes. But we have survived prior periods of national unrest *precisely because* of our constitutional values of free expression and assembly. And those individual freedoms are nowhere more important than the grounds around the Capitol, the building where our elected representatives gather to vote on laws that will govern the pressing issues of the day. As the Court in *Nicolson* put it over fifty years ago:

> In this day of the violent confrontation, the harsh, non-negotiable demand, the disregard of the most elementary forms of civilized discourse, it is especially important that peaceful speech and courteous persuasion be given their rightful chance. It would be strange, indeed, if our constitutional system, and especially the First Amendment, were to countenance the congregation on the grounds occupied by the national legislature of all manner of groups except those who wish to speak out peacefully on the controversial issues of the day. That is not the mark set by the Bill of Rights.

97 Daily Wash. L. Rptr. 1213, at (12). These conclusions are no less true today. The Constitution protects Rev. Mahoney's right to speak peacefully on the Eastern Steps.

## CONCLUSION

The Court should grant Rev. Mahoney's Motion for Summary Judgment and Permanent Injunction.

45

January 17, 2024

Respectfully submitted,

By:*/s/Joshua Wallace Dixon*
Joshua Wallace Dixon*
Eric A. Sell
(D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6200

Harmeet K. Dhillon
(D.C. Bar ID: CA00078)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
(415) 433-1700

*Counsel for Plaintiff Patrick J. Mahoney*
*\*Admitted pro hac vice*

46