**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**PATRICK J. MAHONEY,**

    **Plaintiff,**

      **v.**

**UNITED STATES CAPITOL POLICE**
**BOARD,** *et al.*,

    **Defendants.**

**Civil Action No. 21-2314 (JEB)**

---

## MEMORANDUM OPINION

For many years, Plaintiff Patrick J. Mahoney has sought to invalidate demonstration restrictions on federal property here in Washington. A clergyman, he has invoked the First Amendment for both its religion and speech protections throughout his challenges. Back when he filed this lawsuit in 2021 against the U.S. Capitol Police Board and its individual members, Mahoney was seeking to invalidate a number of Board limitations on demonstration activity all over the Capitol Grounds. Little of that case remains.

As things currently stand, the only matter still in need of resolution is Mahoney's speech-based challenge to the Board's near-total prohibition on expressive activities on the lower sets of steps leading to the eastern entrances of the Capitol building. He now moves for summary judgment, seeking a declaration that this regulation is unconstitutional and a permanent injunction preventing the Board from enforcing it. Defendants cross-move for summary judgment, contending that the Board's regulation is constitutionally valid. Believing that Plaintiff ultimately has the better of the argument, the Court will grant his Motion and enter a permanent injunction.

I.      **Background**

        The Court begins with a brief overview of the applicable regulations governing

demonstrations on the portion of the Capitol Grounds relevant to this dispute, then proceeds to

the factual and procedural history that has led us here.  Those interested in the extended version

of Mahoney's crusade against the Board's regulatory scheme can refer to the Court's previous

opinions.  See Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 1 (D.D.C. 2022) (Mahoney

I); Mahoney v. U.S. Capitol Police Bd., 2022 WL 1014791 (D.D.C. Apr. 5, 2022) (Mahoney II);

Mahoney v. U.S. Capitol Police Bd., 566 F. Supp. 3d 22 (D.D.C. 2022) (Mahoney III); ECF No.

80 (Op.) (D.D.C. Apr. 4, 2023) (Mahoney IV).

        A.  Legal Background

        The Board regulates traffic, both vehicular and pedestrian, within the Capitol Grounds.

See ECF No. 98-5 (Traffic Regulations) at 3.  Pursuant to its statutory authority, it has

promulgated a set of regulations — the Traffic Regulations — that governs, among other things,

"demonstration activity" on those Grounds.  Id. § 12.1.  Demonstration activity is "any protest,

rally, march, vigil, gathering, assembly, projecting of images or similar conduct engaged in for

the purpose of expressing political, social, religious or other similar ideas, views or concerns

protected by the First Amendment."  Id. § 12.1.10.

        Such activity is permitted on some parts of the Capitol Grounds and prohibited on others.

The Regulations reference the U.S. Capitol Grounds Demonstration Areas Map, which is

reproduced below, to differentiate among those areas.  Id. § 12.2.10.



UNITED STATES CAPITOL GROUNDS
DEMONSTRATION AREAS MAP

ECF No. 99-1 (Stipulation of Facts), ¶ 26 (citation omitted; circles added).

Demonstration activity is barred in areas designated "No Demonstration Permitted" — the darkest zones in the map above — including a 250-foot buffer zone around the Capitol building.  Id., ¶ 27.  Most importantly for present purposes, the "No Demonstration Permitted" areas include the three sets of steps on the eastern side of the Capitol and "the paved areas immediately around them."  Id., ¶ 29.  Those three sets — which the Court collectively calls the Eastern Steps — comprise the Eastern Senate, House, and Capitol steps.

The Eastern Senate steps, which lie between the Capitol and area 9 (marked above in a yellow circle), consist of a base that is slightly elevated above the adjoining sidewalk and a total of 37 steps leading to an entrance to the Senate chamber.  Id., ¶¶ 12–13.  The topmost 27 steps, which are cordoned off by bike racks and a chain, are currently off-limits to the public.  Id., ¶ 13; see also ECF No. 95-5 (Senate Steps Photograph).  These steps are depicted below.



The Eastern House steps, which are near area 10 on the Traffic Regulations map (marked by a green circle), are nearly identical to their Senate counterparts, with the topmost 28 steps similarly closed off to the public.  <u>See</u> Stip., ¶¶ 20–22.  These steps (depicted below), as their name suggests, lead to an entrance to the House chamber.  <u>Id.</u>, ¶ 21; ECF No. 95-11 (House Steps Photograph).



The Eastern Capitol steps, which sit in between the Senate and House steps (marked by a red circle on the demonstration map), differ slightly from the other two. They do not have an elevated base, meaning that it is less clear where the nearby sidewalk ends and the base of these steps begins. See Stip., ¶ 18. The Capitol steps (depicted below) are otherwise very similar to the Senate and House steps, and their upper steps are similarly closed to the public. Id., ¶¶ 16–17. These, too, lead to an entrance, this time to the Capitol rotunda. Id., ¶ 17; ECF No. 95-8 (Capitol Steps Photograph). Mahoney wishes to conduct his activities on the bottommost portion of all three sets of steps, and the analysis below does not distinguish among them.



While previous iterations of the Traffic Regulations allowed members of the public to engage in demonstration activity on the Eastern Steps, <u>see</u> Stip., ¶¶ 43–46 (citing examples), the Board has prohibited such conduct since the September 11, 2001, terrorist attacks.  <u>Id.</u>, ¶ 47.

This proscription is not absolute, however.  Based on a longstanding (but implicit) interpretation of its prior regulations, the Board (now explicitly) permits members of Congress and their invitees to engage in demonstration activity on the Eastern Steps.  <u>See</u> Traffic Regs. § 12.2.20.  A Member-led event qualifies for this exemption as long as: "(a) it is being done" in the Member's "official capacity"; "(b) it is being organized or sponsored" by the Member; and "(c) the Member[] is personally in attendance at the demonstration activity at all times."  <u>Id.</u> Should the sponsoring Member leave the event at any time, the exemption will cease to apply. <u>Id.</u>

The Regulations do not contain criminal-enforcement provisions.  The U.S. Capitol Police, however, is authorized to enforce federal and D.C. law on the Capitol Grounds — including, for example, 40 U.S.C. § 5104(f)(a)'s ban on "parad[ing]" on the Grounds, violation of which may be punishable by a fine and imprisonment.  See 2 U.S.C. § 1967(a)(4), (b)(1); Stip., ¶ 31.  D.C. law, moreover, makes the Regulations indirectly enforceable by rendering it unlawful to "engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."  D.C. Code § 22-1307(b)(1). Violation of that provision is similarly punishable by a fine and imprisonment.  Id. § 22-1307(c); Stip., ¶ 31; see also Stip., ¶¶ 39–40.

B.  Factual and Procedural Background

With this statutory and regulatory backdrop in mind, the Court proceeds to the facts, as reflected in the parties' stipulation.  Mahoney is a Presbyterian minister who has brought myriad suits over the decades seeking to conduct demonstrations on federal property.  See, e.g., Mahoney v. Babbitt, 105 F.3d 1452 (D.C. Cir. 1997).  This time around, he has been battling the Board since 2021 over his desire to hold prayer vigils and other demonstrations on the Capitol Grounds that run afoul of the latter's regulations.  See Stip., ¶¶ 35–40; ECF No. 1 (Compl.).

The history of this years-long dispute has wound a tortuous path.  See Mahoney IV, ECF No. 80 at 5–11 (recounting said history); Mahoney I, 566 F. Supp. 3d at 7–8 (same).  Suffice it to say that after, inter alia, numerous preliminary-relief requests, two motions to dismiss, a motion for reconsideration, a trip to the Circuit, see Mahoney v. U.S. Capitol Police Bd., 2022 WL 1177313 (D.C. Cir. Apr. 15, 2022), and various revisions to the Traffic Regulations, the parties have finally narrowed their disagreements to one: Plaintiff's proposed demonstration activity on

the bottommost portion of the Eastern Steps — *i.e.*, below the barriers currently blocking off access to the public.  Specifically, Mahoney wishes to put on events "that will involve praying, gathering, assembly, and protest" on these steps and the adjoining sidewalks, and he expects that his wife and another few individuals will join him.  See Stip., ¶ 35.  As before, he wants to engage in these activities on specific days such as Good Friday, Thanksgiving, and Christmas and plans to do so not just this year but "every subsequent year for the foreseeable future."  Id., ¶ 37.

Because these proposed vigils and protests, which would not be sponsored by a Member of Congress, would violate the prohibition on demonstration activity in this area, Mahoney seeks the Court's intervention.  He contends that the Board's designation of the Eastern Steps as a "No Demonstration Permitted" area violates both the First Amendment on its face and the Fifth Amendment's equal-protection guarantee.  See ECF No. 69 (3d Am. Compl.), ¶¶ 97–98, 160–63. He asks the Court to enter a permanent injunction to prevent the Board from enforcing this portion of the regulations.  Id. at 45–46.  The parties have now cross-moved for summary judgment.  See ECF Nos. 97 (Pl. MSJ); 102-1 (Defs. MSJ).

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550

U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

## III.   Analysis

Like ships passing in the night, the parties open with two completely different doctrinal frameworks for resolving this case. Plaintiff believes that a straightforward application of First Amendment forum analysis shows why he is entitled to summary judgment and a permanent injunction against the Traffic Regulations. Defendants, meanwhile, insist that a forum analysis would be improper because the First Amendment does not apply at all. That is so, they posit, because the regulatory scheme at issue limits only government speech. The Court will take these

in the reverse order, beginning with government speech and then turning to forum analysis. Given the resolution in Plaintiff's favor on the First Amendment question, it need not consider his Fifth Amendment claim.

A.  Government Speech

There is no dispute that Mahoney's proposed activities constitute speech covered by the First Amendment.  See Stip., ¶ 35.  While that Amendment typically does not permit discrimination based on the content or viewpoint of the speech, when the Government is the one speaking — which it does, at times, through private individuals — it is allowed to so discriminate in determining what messages it wishes to disseminate or sponsor.  See Walker v. Texas Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); Raven v. Sajet, 334 F. Supp. 3d 22, 32 (D.D.C. 2018) ("Even political discrimination is allowed when the government chooses to sponsor speech."); Nat'l Endow. for Arts v. Finley, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view[.]").  "Indeed, it is not easy to imagine how government could function if it lacked this freedom."  Pleasant Grove City v. Summum, 555 U.S. 460, 468 (2009).  Because this doctrine is one "susceptible to dangerous misuse," however, courts must "exercise great caution before" declaring a particular activity government speech.  Matal v. Tam, 582 U.S. 218, 235 (2017).

Defendants here appear to contend that all speech on the Eastern Steps is government speech.  In other words, as the events are organized or sponsored by Members, any expression constitutes government speech.  See Defs. MSJ at 6–11; see also ECF No. 108 (Defs. Reply) at 10 ("[S]peech by Members of Congress during Member events on the East Front Steps

constitutes government speech[.]").  Mahoney believes that even this is a contestable proposition, as a Member may do no more than sponsor an event and attend as a mere bystander. See ECF No. 105 (Pl. Reply) at 18–20 (citing examples).  He conceivably has a point.  Cf. Shurtleff v. City of Bos., Massachusetts, 596 U.S. 243, 252 (2022) ("The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program.").  But that is neither here nor there.  The more significant weakness in the Government's position is that the presence of government speech in a public forum (which the Court below concludes this is) does not exempt from First Amendment scrutiny its restrictions on other speakers.

The circumstances here, in fact, are indistinguishable from those in ANSWER Coalition v. Jewell, 153 F. Supp. 3d 395 (D.D.C. 2016).  The challenged regulations there, much like the ones here, reserved certain areas along the presidential inaugural parade route for the exclusive use of the Presidential Inaugural Committee, a private organization controlled by the President-Elect and tasked with organizing inauguration-related events.  Id. at 401–04.  The court concluded that the Committee's speech within the reserved areas was government speech, id. at 412–13, but nevertheless analyzed whether the exclusion of other speakers from those areas was permissible under the First Amendment.  Id. at 413–14.  While "[the Committee's] speech itself is not subject to First Amendment scrutiny," the court explained, "the restriction of the expressive activities of [the plaintiff] and all other private persons and entities to limited portions of the parade route . . . is."  Id. at 414.  So it is here.  The Court thus rejects the Board's halfhearted effort to take the First Amendment out of the equation altogether.

B. <u>Forum Analysis</u>

With the Government's top-line argument dispensed, the Court now turns to the meat of the parties' disagreement: should the Eastern Steps be classified as a public or non-public forum? Plaintiff advocates for the former, while Defendants push for the latter. <u>See</u> Pl. MSJ at 23; Defs. MSJ at 11–12. As the Court cannot determine the correct standard of scrutiny that applies to the restrictions until it answers this question, it will begin there. In addition, since Mahoney wishes to engage in demonstration activity only on the steps below the dividers, the Court's conclusions will be cabined to those lower areas of the three sets of steps. <u>See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.</u>, 473 U.S. 788, 801 (1985) (in defining forum, courts should "focus[] on the access sought by the speaker").

1. *Designation of Forum*

When the Government restricts speech on its own property — as it does here — the Court's review under the First Amendment initially inquires into the nature of the forum. <u>See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.</u>, 901 F.3d 356, 364 (D.C. Cir. 2018). Such property may be classified, for example, as a "traditional" or "designated" public forum — a space that the state has opened to the public for expressive activity either as a matter of longstanding tradition (*e.g.*, sidewalks and parks) or by fiat. <u>Id.</u> (citing <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45–46 (1983)). Alternatively, the property may be one that "is not by tradition or designation a forum" for public speech — in which case, the forum is "non-public." <u>Perry Educ. Ass'n</u>, 460 U.S. at 46, 53. The Government can also create a kind of in-between forum, known as a "limited public forum," which is open to discussion only on some specific topics or to some groups, such as public-university facilities. <u>See Price v. Garland</u>, 45 F.4th 1059, 1068 (D.C. Cir. 2022); <u>Rosenberger v. Rector and Visitors of Univ. of Va.</u>, 515 U.S.

819 (1995).  In classifying public property, courts must "take[] into account the nature and

traditional uses of the particular" property involved.  Boardley v. U.S. Dep't of Interior, 615 F.3d

508, 515 (D.C. Cir. 2010) (citation omitted).

a.   Public Forum

While no case has squarely addressed the forum designation of the portion of the Eastern

Steps at issue here, the Court is hardly writing on a blank slate.  On various occasions, as

Plaintiff correctly points out, our Circuit and other courts in this district have held that various

portions of the Capitol Grounds are traditional public fora.  See Pl. MSJ at 24–26.  Start with

Jeannette Rankin Brigade v. Chief of Capitol Police, 342 F. Supp. 575 (D.D.C. 1972), where a

three-judge court here held that the Grounds "have traditionally been open to the public."  Id. at

584.  The court noted that the Grounds received thousands of visitors per year and that the main

purpose of the Capitol building (i.e., making laws) was compatible "with the existence of all

parades, assemblages, or processions which may take place on the grounds."  Id.  Notably, the

court's holding did not draw any distinction between the precise area where the plaintiffs there

wanted to protest — the east front plaza near the east Capitol steps — and the rest of the

Grounds, but instead announced that as a whole they are a traditional public forum.  Id.  Since

the Supreme Court summarily affirmed the district court's decision in Jeannette Rankin, this

decision is now "binding precedent."  Lederman v. United States, 291 F.3d 36, 41 (D.C. Cir.

2002); see also Cmty. for Creative Non-Violence v. Kerrigan, 865 F.2d 382, 387 (D.C. Cir. 1989)

("There is no doubt that the Capitol Grounds are a public forum.").

Thirty years later, the D.C. Circuit held that the sidewalks at the bases of the Eastern

Senate and House steps were traditional public fora.  See Lederman, 291 F.3d at 44.  The court

there focused on the sidewalks and declined to "consider the public forum status of 'no-

demonstration zones' other than" those.  Id. at 41.  It stated that, since "the Capitol Grounds as a whole meet the definition of a traditional public forum," the burden was on the Government to show that the sidewalks were used for a special purpose.  Id. at 41–42 (emphasis added).  In attempting to do so, the defendants there pointed to three differences: 1) the sidewalks (like the steps here) abut the Capitol Building, 2) the eastern-front sidewalks were never open for public expression, even if they were generally open to the public, and 3) the sidewalks were primarily used for ingress and egress by members of Congress.  Id. at 42–44.

The Lederman court was unconvinced.  As to the Government's first distinction, it breezily noted that it was unavailing because "the entire Capitol Grounds are a public forum," so the fact that the sidewalks were near the Capitol building did not by itself make them non-public. Id. at 42.  The court was equally dismissive of the second, as the sidewalks were only unavailable for public expression because "such expression was prohibited anywhere on the Capitol Grounds by the very statute declared unconstitutional in Jeannette Rankin."  Id. at 43. Last, the court found that the use of the sidewalks by Congressmembers did not alter its conclusion because members already had to avoid "tourists, joggers, dogs, and strollers," so there was no reason to assume "they are [not] also capable of circumnavigating the occasional protester."  Id.

Fast forward another 20+ years to the Circuit's recent opinion in United States v. Nassif, 97 F.4th 968 (D.C. Cir. 2024).  In concluding that the interior of the Capitol building is a non-public forum, the court there highlighted that it has "long recognized" the exterior Capitol Grounds as a traditional public forum, thus distinguishing the former from the latter.  Id. at 975. In support of its conclusion as to the interior, the Circuit also suggested that the "physical threshold separating" the Grounds from the interior was the doorway.  Id.  This, it reasoned, was

14

"a familiar signal that the building's interior differs from the remainder of the public Grounds in ways that make it uniquely nonpublic." Id. (cleaned up).

What is more, our Circuit has held that Vietnam-war protesters arrested on the very Capitol steps that Mahoney now wishes to demonstrate on could bring a First Amendment Bivens claim against Capitol police. See Dellums v. Powell, 566 F.2d 167, 173, 194–96 (D.C. Cir. 1977); see also Hartley v. Wilfert, 918 F. Supp. 2d 45, 50 (D.D.C. 2013). While the court's opinion did not engage in any forum analysis as such, it described the plaintiff's demonstrations on the steps as the exercise of "basic constitutional rights in their most pristine and classic form." Id. at 194-95 (citation omitted). It further reasoned that a cause of action for damages was necessary to prevent the "loss of an opportunity to express to Congress one's dissatisfaction" in a location likely to attract "the attention of a mass audience." Id. at 195.

Stepping back from the Capitol and looking at legislatures more generally, courts in the District of Columbia are hardly alone in thinking that legislative buildings — and the steps that lead to them — "occupy a special place in our First Amendment tradition." Hulbert v. Pope, 70 F.4th 726, 738 (4th Cir. 2023); Occupy Columbia v. Haley, 738 F.3d 107, 121 (4th Cir. 2013) (entire state-house grounds are traditional public forum); Wells v. City & County of Denver, 257 F.3d 1132, 1146 (10th Cir. 2001) (steps leading to county building are public forum); Pouillon v. City of Owosso, 206 F.3d 711, 716–17 (6th Cir. 2000) (steps leading to city hall are traditional public forum as they are "in the highest degree linked, traditionally, with the expression of opinion"); see also Watters v. Otter, 986 F. Supp. 1162, 1173 (D. Idaho 2013) (state house and surrounding area are traditional public forum because "expressing grievances at the site of the State Government is the most pristine and classic form" of First Amendment speech) (cleaned up); Kanelos v. County of Mohave, 893 F. Supp. 2d 1001, 1012 (D. Ariz. 2012) ("Where a

15

government building houses legislative activities, courts have typically held that the building's grounds are a traditional public forum.") (collecting cases).

Nor should this come as a surprise.  Throughout this country's history, legislative grounds have been the stage for movements seeking to voice their displeasure with official policy.  Many protests during the civil-rights movement, for instance, took place at or near state legislative buildings.  See, e.g., Cox v. Louisiana, 379 U.S. 536, 539, 545–46 (1965) (college students gathered "at the site of the old State Capitol Building" before marching to courthouse to protest segregation); Edwards v. South Carolina, 372 U.S. 229, 235 (1963) (describing anti-segregation demonstration on statehouse grounds as "pristine and classic form" of First Amendment activity); Henry v. City of Rock Hill, 376 U.S. 776, 777 (1964) (similar).  The same was true of demonstrations against the United States' involvement in Vietnam; indeed, many anti-war protests took place on the Capitol Grounds themselves, as described above.  See Jeannette Rankin, 342 F. Supp. at 578 (anti-war protest at east front plaza); Dellums, 566 F.2d at 173 (anti-war protest at Eastern Capitol Steps).  In fact, the parties agree that the Eastern Steps themselves were the site of protests and other demonstrations prior to 9/11, including "no fewer than forty" events in which Mahoney participated.  See Stip., ¶¶ 43–46.

In light of all this, the Court ultimately agrees with Plaintiff that at least the lower portion of the Eastern Steps on which he wishes to demonstrate are the kind of public property that has been "historically associated with the exercise of First Amendment rights."  Pl. MSJ at 23 (citation omitted).  Like the sidewalks immediately next to them, the steps are "continually open, often uncongested, and . . . a place where people may enjoy the open air or the company of friends and neighbors."  Lederman, 291 F.3d at 44 (citation omitted).  More importantly, these steps and others like them have historically "been used for purposes of assembly . . . and

16

discussing public questions." Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939).  The nature of the steps and the function they have played thus support their designation as a traditional public forum.  Perry Educ. Ass'n, 460 U.S. at 45.

### b.  Defense Counterarguments

All is not necessarily lost for Defendants, however, as they could rebut the "working presumption" that these steps are a public forum by establishing that they are reserved for a unique use that "outweigh[s] the attributes that would otherwise mark them as public forums." Henderson v. Lujan, 964 F.2d 1179, 1182 (D.C. Cir. 1992).  In attempting to do so, Defendants offer three principal arguments for why the Eastern Steps are distinguishable from the rest of the Capitol Grounds, which the Court reorders for ease of analysis.  First, they stress that the Eastern Steps have now been a "No Demonstration Zone" in the two decades following 9/11 and that the Capitol Grounds were "informally" closed to public demonstrations even before then.  See Defs. MSJ at 11.  Second, they argue that the Board was entitled to close the steps in light of security threats like 9/11 and the events of January 6, 2021.  See Defs. Reply at 3.  Third, they contend that the steps are "part of the Capitol Building itself" and serve as a secure entryway for Members and staff, rendering them structurally distinct from the adjoining sidewalks and used for a different purpose.  See Defs. MSJ at 13; Defs. Reply at 2–4.

The Board's initial point fails to move the needle.  The Government cannot turn a traditional public forum into a non-public one by its own say so.  See U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 133 (1981) (Government "may not by its own *ipse dixit* destroy the 'public forum' status of" locations "which have historically been public for[a]").  Nor can the "unconstitutional restrictions" that informally closed off the steps until the court's decision in Jeannette Rankin, "by their mere existence, bootstrap subsequent

restrictions into validity." Lederman, 291 F.3d at 43.  This argument, it turns out, is simply a recapitulation of one of the arguments the court in Lederman considered and rejected.  See id. at 43 (dismissing argument that east-front sidewalks are non-public because they "ha[d] never been available to the public for expressive activity").  Indeed, it is a weaker version of it, as the regulations here have been in place for only two decades, as compared to the "century" of regulation deemed irrelevant in Lederman.  Id.

Defendants' second argument founders for the same reason.  The Court is certainly mindful of the security concerns that animate the Board's restrictions here and has acknowledged them previously.  See Mahoney I, 566 F. Supp. 3d at 10 ("Well before [January 6, 2021], the events of September 11, 2001 — the very event that Mahoney sought to commemorate in his vigil — dramatically changed the security landscape on the Capitol Grounds.").  Serious as these are, however, they do not lead to the conclusion that the Eastern Steps were designed for a use that is incompatible with their status as a traditional public forum — unlike sidewalks within a military base, for example, which are.  See Greer v. Spock, 424 U.S. 828, 838 (1976).  Of course, these interests are weighty and will be considered when the Court turns to the validity of the regulations being challenged, but they do not suffice to turn an otherwise public forum into a non-public one.

This leaves Defendants' contention that the steps are specialized because they are part of the Capitol building itself and were designed "only to provide access to non-public entrances to the Capitol Building."  Defs. Reply at 2.  They accordingly analogize the steps, not to the sidewalks next to them, but to interior post-office sidewalks and the staircase leading to the plaza in front of the Supreme Court, both of which were previously declared non-public by our Circuit. Id. at 2, 5; Initiative & Referendum Inst. v. U.S. Postal Serv., 685 F.3d 1066 (D.C. Cir. 2012)

(interior post-office sidewalks); <u>Hodge v. Talkin</u>, 799 F.3d 1145 (D.C. Cir. 2015) (Supreme Court plaza and staircase).

The Court remains unconvinced, although this is Defendants' strongest argument and the only one that directly addresses the issue here: whether the Eastern Steps are designed for a specialized use that is incompatible with their being a traditional public forum. For one, the record here belies any notion that these steps exist only to serve as an entryway for Members and their staff. It indicates that the public can and does access the steps for "sightseeing, posing for pictures, . . . and walking dogs." Stip., ¶ 6; <u>see also</u> <u>id.</u>, ¶ 67 (noting that anyone can "sit, stand[,] or congregate on the Eastern Steps (up to the dividers)" absent special events like State of the Union). In addition, Members and their staff typically use other entrances to enter the Capitol building. <u>Id.</u>, ¶ 68.

The Eastern Steps are therefore readily distinguishable from Defendants' first analogue, an interior post-office sidewalk. <u>See</u> <u>Initiative & Referendum Inst.</u>, 685 F.3d at 1070. The Circuit determined that the latter was a non-public forum because it was "typically used <u>only</u> by customers and employees of the post office" and was "built solely to provide efficient access to the post office." <u>Id.</u> at 1071 (emphasis added). Nor, the court continued, was there a tradition of using these sidewalks — which typically ran from the parking lot directly to the front door of the post-office building — for "expressive activities." <u>Id.</u> at 1071–72. Here, by contrast, the steps are not used solely for access and typically are not even put to that use by the individuals who work in the Capitol building. And, as discussed above, these steps were frequently used for private expressive activities before 9/11 and are still used for that purpose by Members and their non-member, non-staff invitees. <u>See, e.g.</u>, Stip, ¶¶ 52 (moment of silence to honor COVID-19

victims led by House Speaker), 53 (protest against end of executive eviction moratorium led by Rep. Cori Bush), 61 (protest against state law led by Rep. Greg Casar).

The second example on offer, the Supreme Court plaza, is closer to the mark. After all, the Circuit found the entire plaza (staircase included) to be non-public in part because its "architectural integration" with the Court's building elevated it, both literally and figuratively, to the status of a "special type of enclave." Hodge, 799 F.3d at 1158–59 (quoting United States v. Grace, 461 U.S. 171, 180 (1983)); see id. at 1158 ("The plaza is elevated from the sidewalk by a set of marble steps."). Since the Eastern Steps could be said to be part of the Capitol building, and since the base of the House and Senate Steps are slightly elevated from the east-front sidewalk, Defendants suppose that the public would be aware that they have "entered some special type of enclave" upon ascending these steps. See Defs. Reply at 2.

Even assuming that the Eastern Steps bear a resemblance to the Supreme Court plaza, as Defendants say, this does not affect the Court's conclusion. In fact, the Circuit's opinion in Hodge only serves to reinforce it. After the court there determined that the Supreme Court's plaza was distinct from the perimeter sidewalks, it went on to explain that courthouse grounds have historically "not been considered a forum for demonstrations and protests." Hodge, 799 F.3d at 1159 (citing Cox, 379 U.S. at 560, 562). These grounds were no different, it continued, as Congress had heavily restricted demonstrations on the plaza, and the Supreme Court police had strictly enforced these regulations. Id. at 1161–62. More to the point, the Circuit underscored its conclusion by contrasting the Supreme Court's grounds with the Capitol Grounds, which "are a public forum by requirement of the First Amendment." Id. at 1661. While the "fundamental function of a legislature in a democratic society" invites expressions of

public opinion, the "judiciary does not decide cases by reference to popular opinion." Id. at 1159

(quoting Jeannette Rankin, 342 F. Supp. at 584).

Simply put, just as "[j]udges are not politicians," courthouses are not legislative

buildings. Williams-Yulee v. Fla. Bar, 575 U.S. 433, 437 (2015); Hodge, 799 F.3d at 1161

("[P]oliticians are expected to be appropriately responsive to the preferences of the public[;] . . .

the same is not true of judges.") (cleaned up). Demonstrations and other First Amendment

activities are perfectly compatible with the nature and purpose of the latter, as explained above,

but not necessarily the former. So, even if the Eastern Steps are architecturally similar to the

Supreme Court plaza, the First Amendment rightly treats them as fundamentally different

because responsiveness to public clamor is a virtue in elected officials, and only these officials

should expect frequent "public expression" around their workplaces. Hodge, 799 F.3d at 1161.

\*     \*     \*

To recap: the Court here need not determine the forum status of every single tread and

riser within the Eastern Steps or of the upper landing areas that they lead to. Nor does it need to

demarcate once and for all where the eastern portion of the Capitol Grounds ends and the Capitol

building begins. All it decides is that the real property on which Mahoney wishes to demonstrate

— viz., the steps below the dividers on the three sets of steps near the east front plaza — are a

traditional public forum.

2.  *Application of Scrutiny*

Having classified the relevant portion of the Eastern Steps as a traditional public forum,

the Court can now assess the appropriate level of scrutiny to apply to the Board's Traffic

Regulations. The Government's regulatory authority is at its lowest ebb in a forum like this one,

as it "must respect the open character of these for[a]." Oberwetter v. Hilliard, 639 F.3d 545, 551

21

(D.C. Cir. 2011); Grace, 461 U.S. at 177 (in traditional public forum, "the government's ability to permissibly restrict expressive conduct is very limited").  Content-based restrictions on expressive activities in such fora must pass strict scrutiny — *i.e.*, "the restriction must be narrowly tailored to serve a compelling government interest."  Pleasant Grove City, 555 U.S. at 469.  On the other hand, even in a public forum the Government has a freer hand to impose content-neutral time, place, and manner restrictions.  See Mahoney I, 566 F. Supp. 3d at 9.  Such regulations need only satisfy intermediate scrutiny, meaning they must be "narrowly tailored to serve a significant government interest" and must "leave open ample alternative channels of communication."  Mahoney v. Doe, 642 F.3d 1112, 1117 (D.C. Cir. 2011) (citation omitted).

Given that the level of scrutiny hinges on whether the Traffic Regulations target speech based on its content, the parties vigorously dispute whether these do.  See Pl. MSJ at 31–32 (arguing affirmatively); Defs. MSJ at 17–18 (arguing negatively).  Interesting though it may be, the Court will not settle this disagreement one way or another.  That is because the near-total ban on expression here would fail under either standard because it is not narrowly tailored.  Lederman, 291 F.3d at 44; cf. Nassif, 97 F.4th at 980 ("A categorical prohibition on all expressive activity within Capitol Buildings would likely not pass constitutional muster even under the relaxed standard applicable to a nonpublic forum.") (emphasis added).  That is so even if Defendants unquestionably have a "compelling interest in the security of the Capitol Building."  Mahoney, 2022 WL 1177313, at *3 (Millett, J., concurring).

To begin, the Board's ban on expressive activities on the eastern steps is troublingly overinclusive.  See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 121–23 (1991) (law that is "significantly overinclusive" is not narrowly tailored).  While the Court is well aware of the "significant security concerns presented when groups are in

close proximity to the Capitol" following January 6, see Defs. MSJ at 18, the applicable portion of the Traffic Regulations prevents even a single person from holding a quiet vigil on the bottom House or Senate steps.  See Traffic Regs. §§ 12.1.10 (defining demonstration activity to include a "vigil"); 12.1.20 (prohibition applies to "any one . . . person or group of persons").  It would also seem to cover a pair of individuals gathering on the Eastern Steps to oppose or support the latest editorial in the *New York Times*.  Id. § 12.1.10 (prohibiting "gathering . . . for the purpose of expressing political, social, religious[,] or other similar ideas").  In short, it beggars belief that "all listed demonstration activities could reasonably be expected to interfere with" Defendants' security priorities.  Lederman, 291 F.3d at 45; cf. Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. 569, 574–75 (1987) (ban on "all First Amendment activities" not narrowly tailored as "no conceivable governmental interest would justify such an absolute prohibition on speech") (cleaned up).

These regulations, moreover, suffer from the opposite problem, too — they are seriously underinclusive.  See Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.").  Neither these regulations nor any others stop members of the public from merely "sitt[ing], stand[ing] or congregat[ing] on the Eastern Steps."  Stip., ¶ 67.  In large enough groups, these people could presumably pose a serious threat to the Capitol building and Grounds.  Yet "the Board has made no effort to keep any of these . . . individuals away from the Capitol."  Lederman, 291 F.3d at 45.

Worse still, the Traffic Regulations allow Members to invite an untold number of private individuals to join in expressive activities without undergoing any security vetting by them or the Board.  See Stip., ¶¶ 56, 64 (highlighting how attendees of two Member-organized events

"simply showed up" and were not even known to organizing Member).  The only explicit limits

on this set-aside are that the sponsoring Member must be acting in her official capacity and must

be present at all times.  See Traffic Regs. § 12.2.20.  The Traffic Regulations thus seem to permit

a large and temporally interminable protest on the Eastern Steps — regardless of the

dangerousness or size of the crowd — so long as a Member sponsors the demonstration and

stands nearby, all while preventing a lone individual from sharing his views on the controversy

*du jour* with passersby.  This comes nowhere close to narrow tailoring.

What ultimately seals this prohibition's fate, however, is the availability of less restrictive

alternatives to promote Defendants' crucial security objectives.  Granted, a regulation "'need not

be the least restrictive or least intrusive means of' serving the government's interests." McCullen

v. Coakley, 573 U.S. 464, 468 (2014) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799

(1989)).  But the number of alternative regulatory options at the Board's disposal is so vast as to

confirm what the under- and over- inclusiveness intimated: that Defendants are "sacrificing

speech" by burdening "substantially more [of it] than necessary" in pursuit of their admittedly

noble goals. Id. at 486, 490 (cleaned up); Lederman, 291 F.3d at 45 ("Perhaps the most troubling

aspects of the Board's virtually per se ban on expressive activity on the East Front sidewalk

[abutting Eastern Steps] is the ready availability of 'substantially less restrictive' alternatives[.]").

Defendants, for example, could limit the number of people who can demonstrate on the

Eastern Steps at one time, or they could require individuals like Plaintiff to obtain a permit, as

they already do for groups wishing to demonstrate on different areas of the Capitol Grounds.  See

Traffic Regs. §§ 12.3.10 (allowing groups under thirty to demonstrate in most of Grounds

without permit); 12.4.20 (laying out permit-application requirements for groups over thirty);

Mahoney I, 566 F. Supp. 3d at 10–11 (holding more restrictive size and permit restrictions are

narrowly tailored).  They could also ban the use of props, see <u>Cmty. for Creative Non-Violence,</u> 865 F.2d at 383 (upholding 24-hour limit on use of props on Capitol Grounds), ban expressive activities at certain times of the day, or force prospective demonstrators to submit to police screening.  Indeed, they could also strictly enforce the federal law that prohibits engaging in "disorderly or disruptive conduct . . . with the intent to impede" congressional proceedings, "imped[ing] passage through" the Capitol Grounds, and "engag[ing] in an act of physical violence in the Grounds."  40 U.S.C. § 5104(e)(2)(D), (E), (F).  What they cannot do is ban nearly all expressive conduct on the Eastern Steps in the name of security while looking the other way as to non-expressive or Member-sponsored activities that may present as great a threat to the Capitol and its Grounds.  Defendants, moreover, offer no explanation whatsoever for why these alternatives would be unworkable.

In sum, assuming *arguendo* that the Traffic Regulations are content neutral, and acknowledging that Defendants' interests here are about as weighty as they come, the Court nevertheless concludes that the ban on all non-sponsored speech on the Eastern Steps is not narrowly tailored and thus would not survive intermediate (let alone strict) scrutiny.  It is, in a word, unconstitutional.

C.  <u>Remedies</u>

With the finish line finally in sight, the Court turns to Mahoney's request for remedies. Having determined that Defendants' prohibition violates the First Amendment, the Court will grant his demand for declaratory relief.

He also seeks a permanent injunction preventing the Board from enforcing its ban on expressive activities on the bottommost Eastern Steps.  A permanent injunction is an "exceptional form of relief" that should not be awarded lightly.  <u>Salazar by Salazar v. Dist. of</u>

Columbia, 896 F.3d 489, 497 (D.C. Cir. 2018).  To obtain such remedy, Plaintiff must show that:
(1) he "suffered an irreparable injury"; (2) "remedies available at law, such as monetary
damages, are inadequate to compensate for that injury"; (3) the "balance of hardships" shakes
out in his favor; and (4) "the public interest would not be disserved by a permanent injunction."
Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 31 (D.D.C. 2019) (quoting Monsanto Co.
v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010)).  While the irreparable-harm requirement
is recited in the past tense, it is clear that future harm may qualify.  See, e.g., Loving v. IRS., 917
F. Supp. 2d 67, 81 (D.D.C. 2013).

　　　The Court's analysis in the previous Section all but decides this in Plaintiff's favor;
Defendants, in fact, do not address the propriety of injunctive relief either in their Motion or their
Reply, thereby forfeiting any objections they may have had.  Id. at 80; see Defs. MSJ at 2–15
(arguing only that Traffic Regulations do not violate First Amendment); Defs. Reply at 6–22
(same).  In any event, the Court believes that this remedy is called for here.

　　　Beginning with the first factor, it is black-letter law that the impairment of First
Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable
injury."  Mills v. Dist. of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v.
Burns, 472 U.S. 347, 373 (1976)).  As Mahoney has succeeded on his First Amendment claim, he
has thus established that he was and continues to be irreparably injured by the challenged Board
regulations.

　　　The second factor is more of a mixed bag.  On the one hand, Plaintiff incorrectly assumes
that he would not have a cause of action for damages under Bivens in relation to his 2021 arrest,
see Stip., ¶ 39, which ignores binding Circuit precedent to the contrary.  See Dellums, 566 F.2d at
194–96 (holding that demonstrators arrested on steps of Capitol could bring First Amendment

Bivens claim).  To be sure, the Supreme Court may decide that the Circuit's decision in Dellums is no longer good law in light of more recent precedent on Bivens, see, e.g., Hernandez v. Mesa, 589 U.S. 93 (2020), but that is that Court's decision to make, not this one's.  See Hartley, 918 F. Supp. 2d at 52 ("Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent.").

On the other hand, it is unclear that Plaintiff has suffered any economic damages resulting from the constitutional violation at hand.  See Zukerman v. U.S. Postal Serv., 567 F. Supp. 3d 161, 177 (D.D.C. 2021) (suit for damages not adequate when plaintiff "suffered no economic damages").  Nor is a declaratory judgment an adequate alternative at law, as "this brand of relief is itself more equitable than legal in nature."  Nat'l Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998).  All in all, then, this factor slightly favors Mahoney, too.

The last two factors — which merge when the Government is the defendant, see Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv., 64 F.4th 1354, 1364 (D.C. Cir. 2023) — take Plaintiff all the way home.  The Court agrees with him that Defendants have no interest "in enforcing an unconstitutional regulation."  Pl. MSJ at 44; see Kiakombua v. Wolf, 498 F. Supp. 3d 1, 57–58 (D.D.C. 2020) ("[T]he government cannot suffer harm from an injunction that merely ends an unlawful practice.") (cleaned up).  There is thus no valid hardship on the Government side of the ledger against which to balance Plaintiff's harms.  And the public would be served by the kind of relief Mahoney seeks, since "enforcement of an unconstitutional law is always contrary to the public interest."  Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013).  With all of the factors pointing in the same direction, the Court accordingly concludes

that a permanent injunction preventing the Board from enforcing its prohibition on the portion of

the Eastern Steps on which Mahoney wishes to demonstrate is also an appropriate remedy here.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion for Summary Judgment,

deny Defendants', and enter a permanent injunction barring Defendants from enforcing their

prohibition on non-Member-sponsored speech on the bottommost portion of the Eastern Steps.  A

separate Order to that effect will issue this day.

/s/ _James E. Boasberg_
JAMES E. BOASBERG
Chief Judge

Date:  May 17, 2024