IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICK J. MAHONEY,

    *Plaintiff,*

v.

UNITED STATES CAPITOL POLICE
BOARD et al.,

    *Defendants.*

Civil Action No. 1:21-cv-2314 (JEB)

## SECOND DECLARATION OF SEAN P. GALLAGHER

I, Sean P. Gallagher, have personal knowledge of the following facts and will testify to them, if called to do so:

1.    I am currently the Assistant Chief for Uniformed Operations with the United States Capitol Police ("USCP" or "Department"). I began my career with the USCP in 2001 as a recruit officer and have been promoted through the ranks of Sergeant, Lieutenant, Captain, Inspector, and Deputy Chief to attain my current position of Assistant Chief. In my current role, I oversee and am responsible for all operational facets of three bureaus: Uniformed Services, Operational Services, and Command and Coordination. Uniformed Operations represents the largest percentage of the Department's sworn workforce; it comprises approximately 1,287 officers out of a total of 2,213. The Capitol Division is one of the divisions within the Uniformed Services Bureau, and therefore, the protection of the U.S. Capitol Building is under my command.

***Ongoing, Significant Security Threats to U.S. Capitol and Members of Congress***

2.    I have reviewed the Court's March 14, 2025 Order, which states: "Defendants hang their hat largely on their belief that significant security threats persist, even after the Inauguration.

That may well be true."[1] I can assure the Court that, in my considered judgment, the current threat environment at the U.S. Capitol and for Members of Congress has not significantly decreased since the Inauguration and continues to present ongoing security concerns. These concerns increase significantly if the USCP is unable to enforce a No Demonstration Zone on the Eastern Steps for demonstration activity other than that of the Plaintiff in this case.

3. The security threats to the U.S. Capitol are ongoing and significant. As described below and in my previous declaration, the frequency of demonstration activity on U.S. Capitol grounds, combined with the ever-present risk that peaceful demonstration activity may devolve into a security incident, as well as a generally high security threat level, means that any reduction in security protections poses a risk of harm to Members of Congress and others inside and near the U.S. Capitol Building. The ability to enforce a No Demonstration Zone on the lower Eastern Steps is one tool that the USCP relies on to maintain security. Recent incidents show the persistence of a high threat environment, including in areas very close to the Eastern Steps. For example, on January 27, 2025, the USCP arrested a man who, armed with Molotov Cocktails and knives, threatened to kill a Member of Congress and two Cabinet nominees.[2] That man reached the South Door of the U.S. Capitol, which is located very close to the East Front Steps leading to the House of Representatives. In addition, an individual was arrested on January 22, 2025, because he brought a firearm into the U.S. Capitol.[3]

4. The threat of violence during demonstration activity remains a constant threat as

---

[1] Order at 2 (citation omitted).
[2] Filip Timotija, *Capitol Police arrest man with Molotov cocktails attempting to target Johnson, Hegseth, Bessent*, The Hill (Jan. 28, 2025), *available at* https://perma.cc/6D32-W9LU.
[3] Man who took a US Capitol Tour with a gun is arrested, police say, *Associated Press* (Jan. 23, 2025, *available at* https://apnews.com/article/capitol-tour-gun-arrest-85cbd34d7752a9ecb72da54df81f39b7.

2

well. For example, on February 28, 2025, the USCP arrested an individual during an event for assaulting a protestor on the grass near the Capitol's East Front.[4]

5. As a further indication of the ongoing, significant security threat to the U.S. Capitol and Members of Congress, the most recent Capitol Police threat assessment found that threats have increased to almost 9,500 in all of 2024, more than 1,400 greater than in 2023.[5] So far, in 2025, I see no indication that this high threat environment has abated; on the contrary, I expect these numbers are likely to remain constant, or even increase, this year.

6. The ongoing, significant threat environment is not the only thing that has remained unchanged over the past 5 months. Based on my decades of experience as a U.S. Capitol Police officer and now Assistant Chief, I continue to have deep concerns about the security of the U.S. Capitol and the safety of Members of Congress based on the particular security vulnerabilities of demonstration activity on the East Front steps. As such, I reiterate the concerns below that I have raised in my prior declaration, and they remain as true today as they did when the Court first granted its stay in October 2024.

***Capitol Square and the Eastern Steps***

7. The grounds surrounding the U.S. Capitol Building cover an area of 58.8 acres. Its boundaries are Independence Avenue on the south, Constitution Avenue on the north, First Street NE/SE on the east, and First Street NW/SW on the west ("Capitol Square").

8. The U.S. Capitol and the surrounding grounds are often the site of demonstrations and other forms of public expression on matters of great public interest and controversy,

---

[4] Kyle Cheney, *Jan. 6 defendants wanted a defiant Capitol photo op. It ended with Enrique Tarrio's arrest.*, Politico (Feb. 21, 2025), https://perma.cc/5BWM-CCBQ.
[5] https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2024.

particularly given the fact that the U.S. Supreme Court is adjacent to the Capitol Square. Demonstrations at the U.S. Capitol are subject to restrictions, including limiting such activity to designated areas on U.S. Capitol Grounds.

9. The U.S. Capitol houses both the U.S. House of Representatives and the U.S. Senate. Due to the vital role that the U.S. Capitol plays in the functioning of the United States Government, the security of both the building and its occupants is a matter of national security.

10. The eastern side of the U.S. Capitol has three sets of steps along the front face of the U.S. Capitol building leading from the East Front Plaza into the building ("Eastern Steps"). These sets of steps constitute the main paths of ingress and egress for Members of Congress, their staff, and visitors. The Eastern Senate steps lead to the Senate at the northeast side of the building, the Eastern Capitol Steps lead into the due-east side of the building, and the Eastern House steps lead to the House of Representatives at the southeast side of the building. Stip. ¶ 9, pg. 3. On the East Front Plaza level there are entrances to the Capitol between the Eastern House steps and the Eastern Capitol Steps, and between the Eastern Senate steps and the Eastern Capitol Steps. These entrances are commonly referred to as the Carriage doors or entrance.[6] The USCP Dignitary Protection Division motorcades use the Carriage doors to drop off and pick up visiting Dignitaries.

11. Prior to this Court's recent injunction, the Eastern Steps, as well as the entrances to the Carriage doors, were designated as No Demonstration Zones due to security concerns. The use of No Demonstration Zones for these areas has been a fundamental part of the USCP's plan to defend the Capitol Building for decades. In order to control any group of demonstrators, it is a critical police tactic to create enough space, i.e., buffer zone, between demonstrators and places of concern. Prior to the injunction, the space between the base of the steps and the building was the

---

[6] https://www.senate.gov/general/resources/pdf/Capitol_Door_Map_Hours.pdf.

4

buffer zone and it provided an elevated platform from which to take defensive action essential to the defense of the Capitol. This buffer zone enabled the Department to establish areas of last resort denial using less than lethal resources (or lethal if warranted) and provided room to establish civil disturbance unit formations. These formations could then be used to push a surging crowd back from the entrances. Unlike other government locations, such as the White House or a military base, there is no permanent fence surrounding the Capitol, so maintaining the ability for officers to form a "human fence" close to the building is critical. Allowing demonstrators behind that "human fence" is a crucial breach of that security posture.

12. Under this Court's injunction, a demonstration on the lower steps of the Eastern Steps, which are cordoned off from the upper level of steps by barriers, would be closer to the Capitol than any other demonstration area on the Capitol Grounds. This situation poses a pressing new security risk to the safety of Members of Congress and the security of the Capitol Building, particularly at a time when there are heightened threats to lawmakers, and the Capitol has numerous large events where security of the Capitol is paramount.

*Increased Security Risk on the Eastern Steps*

13. The Eastern Steps span the entire front face of the U.S. Capitol Building and could conceivably allow hundreds of demonstrators to mass together in areas where this activity was previously prohibited for security reasons.

14. In my experience, the potential for security risks increases in direct proportion to the number of demonstrators that are allowed to gather on or around the U.S. Capitol Building, as well as the proximity in which they are allowed to stage. The distance from the dividing barrier on the House Steps to the House Chamber is less than 123 feet; and the distance from the dividing

barrier of the Senate Steps to the Senate Chambers is less than 139 feet. Thus, if a large number of demonstrators in such close proximity to the Chambers becomes unruly and violent, , it would present a significant threat to the safety of Members, employees, and visitors, and require a swift augmentation of USCP officers.

15. Many demonstrations take place on the Capitol Grounds peacefully and without incident. However, anyone may enter the Capitol Grounds, and it is often not possible to predict in advance whether a demonstration will pose a security threat. A small demonstration that begins peacefully may become larger and more violent, and the circumstances that may cause this to occur are not always known. The USCP's job is to monitor for potential threats, and to be prepared to respond in the event a security concern arises.

16. Because of the unique security concerns regarding the Eastern Steps and the crucial tactical importance of the Eastern Steps to maintaining the defense of the Capitol in a worst case scenario, the USCP would need to plan accordingly if unknown groups of demonstrators gather on the Eastern Steps. Even with a group of 30 demonstrators on one of the set of steps—the current maximum for demonstrations without a permit in other areas of the Capitol Grounds—the Department would need to have a greater number of officers, likely in excess of 50, in positions on the steps in order to be sufficiently prepared to respond if too many people start to join the demonstration on the steps or if the demonstration turns violent. This is especially true given the operational and logistical difficulties that officers face defending non-level surfaces, such as the steps, which can create jarring and unpredictable results in violent crowd control situations.

17. Since the events of January 6, 2021, the USCP has made great strides in rebuilding police force numbers, but there remains a continuing need to build up the force to ensure the security of the Capitol and the safety of Members, staff, and visitors. Quite simply, the force

mobilization that will be required for steps demonstrations will be a huge resource re-allocation, requiring the USCP to pull resources from other posts throughout the Capitol Building and Grounds, or other Congressional Buildings. This new security obligation will have a material impact on policing around the Capitol and the surrounding grounds ("Capitol Complex"), as it will pull officers from other crucial postings to defend the Capitol against demonstrations that could turn violent on the very steps of the Capitol. I note that the court has suggested that the USCP could address the new security concerns by instituting limits on the number of demonstrators, requiring permits, banning the use of props, or limiting expressive activities to certain times of day. First and foremost, USCP officers must focus on security concerns rather than counting the number of demonstrators at any given moment. Furthermore, requiring permits, banning props and implementing time restrictions do not eliminate the logistical, operational and tactical issues described herein. Finally, it is unclear how the USCP would be able to set up security screening without permanent fencing around the expansive East Front Plaza.

18. The challenge of resource allocation and the need to have time and space to respond to unexpected conditions that arise, such as demonstrations that become acts of civil disobedience or deteriorate and turn violent, were on full display with respect to the following:

  a. **January 6, 2021:** The USCP did not anticipate that thousands of protesters would storm the U.S. Capitol Building and the steps, breaking windows and doors, and attacking the USCP officers guarding the campus and Capitol Building. Protesters were armed with weapons that included bricks, baseball bats, hockey sticks, construction tools, and flag poles, and the violence escalated quickly and overwhelmed the USCP. If this attack had begun on the bottommost steps of the Eastern Steps, where demonstrations are now allowed, the results could have been

far worse. As it was, over 140 officers were injured and a USCP officer lost his life.

b. **April 11, 2016:** Over 400 participants led by a group called Democracy Spring attempted to stage a demonstration on the lower steps of the Eastern Steps, which were part of the no demonstration zone prior to the Court's injunction. Prior to the demonstration, the USCP had no way of knowing exactly how many people would participate or whether the situation was likely to deteriorate into violence. During the demonstration, in order to ensure the safety of the U.S. Capitol, the USCP blockaded the staircase with a physical chain and a line of officers. They were quickly overwhelmed by the sheer number of demonstrators that were intent on being arrested for civil disobedience. Fortunately, the demonstrators did not turn violent; otherwise, the situation could have been much worse. On that particular day, over 400 demonstrators were arrested.

The Democracy Springs event is an example of how some demonstrators that come to the Capitol Grounds do so in order to draw attention or publicity to themselves and their cause. The demonstrators at this event used the common tactic of risking or inviting arrest by demonstrating in an area where demonstrations are not allowed. By now allowing demonstrations on the lower steps of the Eastern Steps, a natural transition for civil disobedience is that groups will try to demonstrate on the upper level of steps of the Eastern Steps, an area not affected by this Court's injunction, but an area that poses a substantially greater security risk to Members of Congress given the proximity to the Chambers.

19. These concerns about mass demonstrations on the lower steps of the Eastern Steps and the potential for violence threatening the security of the Capitol are wholly different from the

daily situations in and around the Eastern Steps. On a normal day, the USCP can easily monitor tourists or visitors who might temporarily walk on the steps for short periods of time to take pictures or meet briefly with a Member of Congress. However, the strategies and tactics for regular, routine matters such as monitoring tourists and visitors do not present the logistical, operational, and protection issues posed by demonstrations that can be for sustained periods of time, may involve a growing group of unknown people, and are unpredictable in how they may evolve over the course of one or more hours. In those situations, the USCP must be prepared to react quickly, especially if the demonstration devolves into violence or an attempt to breach the Capitol via the steps, as happened on January 6, 2021.

20.     A similar comparison can be made regarding Members and/or staff that occasionally stage demonstrations on the Eastern Steps. While the USCP's permission is not sought, the USCP is typically given advance notice of the intention of the planned activities of the Members and/or staff, allowing for consideration and planning for any security concerns. The USCP is unaware of a Member-led event on the steps that devolved into violence or presented the type of operational and logistical concerns that are presented by random, spontaneous or even planned events involving demonstrators who may mass upon the lower steps of the Eastern Steps and then decide to breach the barriers leading to the upper-level steps or the Capitol Building.

21.     Even Plaintiff in this case, who has a long history of demonstrating on Capitol Grounds, is a known quantity to the USCP, and has described during the litigation the types of demonstrations he wishes to hold, such that the USCP can anticipate any security concerns with respect to his demonstrations. The same cannot be said about other demonstrations by unknown persons or groups that will now be conducted on the lower steps of the Eastern Steps. My understanding is that the Court's injunction currently allows demonstrations on the steps not only

by Plaintiff, but also by other individuals or groups, known or unknown to the USCP.

***Other Concerns Regarding Demonstrations on the Lower Steps of the Eastern Steps***

22. Allowing demonstrations on the lower steps of the Eastern Steps could also impede an emergency evacuation of the building, creating a life safety issue. There are a limited number of ways to exit or evacuate the Capitol Building, and potentially having an unknown contingent of people demonstrating on the lower steps of the Eastern Steps is certainly an additional concern that is particularly challenging to handle. For risks coming from inside the Capitol, such as fire or chemical hazards, exiting out of the Capitol doors, the House doors or Senate doors may be the most efficient evacuation route. Allowing demonstrations to block these potential evacuation routes is a critical security risk.

23. The USCP tracks threats against Members of Congress. Over the course of the past seven years, these threats have increased significantly:

- 3,939 in 2017,
- 5,206 in 2018,
- 6,955 in 2019,
- 8,613 in 2020,
- 9,625 in 2021,
- 7,501 in 2022,
- 8,008 in 2023, and.
- 9,474 in 2024.[7]

My expectation, based on the number of threats received to date, is the number of threats in 2025

---

[7] https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2024.

10

could again approach, and even exceed, 10,000.

24. In the last few years, the USCP has seen an increase in the number of demonstrations and acts of civil disobedience at the U.S. Capitol, as well as the surrounding Capitol Grounds. Based on internal USCP statistics, unpermitted events accounted for the majority of demonstrations that resulted in arrests in 2022, 2023, and 2024. The number of USCP demonstration arrests increased by approximately 98% between 2022 and 2023 and in 2024 remained at 2023 levels (716 in 2024 versus 717 in 2023).

25. "No demonstration zones" have also proven to be an extremely effective tool in reducing the potential for suspicious packages. In the past two years, on the grounds surrounding the exterior of the U.S. Capitol, the number of suspicious packages found in areas where demonstrations were allowed were significantly greater than the number of those found in areas where demonstrations were not allowed. Therefore, as a result of lifting the No Demonstration Zone, I anticipate an increase in suspicious packages in the area around the lower steps of the Eastern Steps. Proximity remains a significant concern in this regard as well – the closer a suspicious package is to the Capitol Building itself, the more damage could be done should it contain an explosive device.

26. Although the recent election and Inauguration passed without any largescale disruption at the Capitol, I assess, as described above, that the threat environment remains high risk. Since the Inauguration, groups of demonstrators, some involving several hundred people, have regularly congregated on or near the Capitol Complex. Even though the vast majority of such activity is peaceful, the frequency of these events means that the USCP must remain constantly vigilant against the risk that violence may break out. In addition, most such activity currently occurs either near the reflecting pool on the west side of the Capitol, or on the lawn on the east

side of the Capitol. If the Court's injunction is not stayed for demonstration activity other than the plaintiff's, I assess that the Eastern Steps are likely to become an attractive site for further demonstrations, which will increase the risk of an unpredictable security incident in close proximity to the Capitol entrances and generally increase security concerns for all the reasons identified herein. Finally, it is worth noting that Members of Congress are not the only ones being protected by a safe and secure U.S. Capitol Building. High-level Executive Branch Members and other government officials and personnel routinely visit the Capitol. For instance, the Carriage entrance is used for the arrivals and departures of dignitary motorcades. Allowing demonstrators on both the sidewalk and the lower steps of the Eastern Steps could result in that entrance being blocked. By putting the seat of government at heightened security risk through the allowance of demonstrations on the lower steps of the Eastern Steps that may turn violent, there is a substantial risk of disruption of legislative business, and disruption of the government as a whole.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21st day of March 2025.

_____
Sean P. Gallagher